# 13-15742

# United States Court of Appeals
## for the
# Ninth Circuit

DONALD TURNER, on Behalf of the Davis New York Venture Fund,

*Plaintiff-Appellant,*

– v. –

DAVIS SELECTED ADVISORS, LP and DAVIS DISTRIBUTORS, LLC,

*Defendants-Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA,
*No. 4:08-cv-00421-AWT       Honorable A. Wallace Tashima*

## BRIEF FOR PLAINTIFF-APPELLANT

FRANCIS JOSEPH BALINT, JR., ESQ.
BONNETT FAIRBOURN FRIEDMAN
&  BALINT PC
2325 East Camelback Road, Suite 300
Phoenix, Arizona 85016
Tel.:  (602) 274-1100
Fax:  (602) 274-1199

DANIEL W. KRASNER, ESQ.
ROBERT B. WEINTRAUB, ESQ.
WOLF HALDENSTEIN ADLER FREEMAN
&  HERZ LLP
270 Madison Avenue
New York, New York 10016
Tel.:  (212) 545-4600
Fax:  (212) 545-4653

*Attorneys for Plaintiff-Appellant Donald Turner,
on Behalf of the Davis New York Venture Fund*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES .................................................................. vi

REQUEST FOR ORAL ARGUMENT ................................................ - 1 -

JURISDICTIONAL STATEMENT ..................................................... - 1 -

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ......................... - 2 -

STATEMENT OF THE CASE:  THE NATURE OF THE CASE,
    COURSE OF PROCEEDINGS, AND DISPOSITION BELOW ................ - 4 -

STATEMENT OF THE FACTS RELEVANT TO THE ISSUES
    ON REVIEW .............................................................................. - 6 -

  A.  The Parties .......................................................................... - 6 -

  B.  The Allegations of Fact in the AC and SAC Relevant to the
     Motion to Dismiss ................................................................ - 7 -

    **1.**  The Fees at Issue ............................................................ - 7 -

      a)  Advisory Fees ......................................................... - 7 -

      b)  12b-1 Fees .............................................................. - 8 -

    **2.**  The Nature and Quality of the Services Provided By the
      Adviser to the Shareholders ...................................... - 9 -

      a)  Defendants Provided Lesser Services to the Fund
        Because Defendants Operated the Fund Like an
        Index Fund, With Inactive Management ........................... - 10 -

      b)  Defendants Provided Inferior Quality Services as
        Demonstrated By the Fund's Consistent Underperformance ........... - 11 -

**3.** The Fund Was Excessively Profitable to DSA ......................- 13 -

   a) The Advisory Fees Were Excessive and Disproportionate to the Size of the Fund, Especially When Compared to Other Funds......................................................................- 13 -

      (1) Large Blend Funds and Large Funds that Are Actively Managed ................................................- 13 -

      (2) Index Funds.....................................................- 15 -

**4.** The Defendants Received Substantial Fall-Out Benefits .....................- 16 -

**5.** There Were Substantial Economies of Scale Achieved By Defendants, But Such Economies Were Not Passed on to the Fund.....- 16 -

   a) The Savings From the Increased Size of the Fund Were Not Passed on to the Fund ......................................................- 16 -

   b) The Fund Was Managed Like an Index Fund, Which Decreased Costs and Generated Even More Economies of Scale ....................- 17 -

   c) The Fund's Investment Advisory Fee Breakpoints Did Not Confer a Meaningful Benefit Upon Shareholders ...........................- 17 -

   d) The Extraordinary Increase in the Size Of The Fund Through the Use of 12b-1 Distribution Fees Created Diseconomies Which Undermined Defendants Ability to Obtain Even Average Returns ......................................- 19 -

**6.** The Fund's Fee Schedule Is Disproportionate in Comparison With Other Similar Funds.....................................................- 20 -

**7.** The Independence and Conscientiousness of the Mutual Fund's Outside Directors ..............................................................- 21 -

   a) The Fund's Board Members Are Not Truly Independent .................- 22 -

b)  The Fund's Board Continually Approved the Fund's
Advisory Fees and 12b-1 Fees With Virtually No
Negotiation or Time Given to Their Consideration..........................- 22 -

**8.**  Additional Facts Relevant to Only the 12b-1 Fee Claim.......................- 23 -

a)  The Nature and Quality of the Services Provided ............................- 24 -

(1)  The Fund Paid for Many Post-Sale Shareholder
Services Unrelated to the Sale of Fund Shares .....................................- 24 -

(2)  The Fund and Its Shareholders Paid for Services that
Broker-Dealers Were Legally Obligated to Provide Shareholders.......- 24 -

b)  The Transfer Agent Fees and Advisory Fees Each Constitute
Fall-Out Benefits From the Unlawful 12b-1 Fees ............................- 24 -

c)  The Fund's 12b-1 Fee Structure Is Excessive and Disproportionate
Because the Increase in Fund Assets Undermined Performance
and Also in Comparison With Other Similar Funds........................- 25 -

SUMMARY OF THE ARGUMENT .................................................................- 26 -

A.  The Rule 12(b)(6) Motion to Dismiss ...................................................- 26 -

B.  The Rule 59(e)/15 Motion .....................................................................- 26 -

ARGUMENT ....................................................................................................- 28 -

A.  Standard of Review for the Rule 12(b)(6), 59(e)/15 and
Judicial Notice Motions.........................................................................- 28 -

B.  The Legal Standard, as Embodied in the *Jones* and *Gartenberg*
Understanding of Congressional Intent, Applicable to Whether
Both the AC and the SAC Sufficiently Plead ICA §36(b) Claims...........- 29 -

**1.**  Lower Court Decisions Denying Motions to Dismiss ..........................- 33 -

C.  The AC Sufficiently Alleges that Defendants Charged the Fund
Excessive and Disproportionate Advisory Fees and 12b-1 Fees .............- 35 -

iii

1.  The Nature and Quality of the Services Provided By Adviser Were Fewer nd Inferior ........................................................... - 37 -

2.  The Fund Was Excessively Profitable to DSA in Comparison to the Fees Charged Other Funds, Especially Given Its Poor Performance .................................. - 38 -

3.  The Economies of Scale Were Not Passed on to the Fund; Breakpoints Were De Minimis; and Diseconomies in Size Undermined the Fund's Performance .................................... - 39 -

4.  The Fund's Expense Ratio Is Disproportionate in Comparison With Other Similar Funds ....................................................... - 41 -

5.  The Fund's Outside Directors Were Not Independent and Conscientious ........................................................................ - 41 -

6.  Additional Facts Related Only to Demonstrating the Unlawfulness of the 12b-1 Fee ............................................... - 42 -

    a)  The Fund Paid for Post-Sale Shareholder Services Which Were Not "Primarily Intended" to Result in the Sale of Fund Shares and For Which Broker-Dealers Were Legally Obligated; Thus, the Payments Were Excessive and an "Improper Purpose" ... - 42 -

    b)  The Transfer Agent Fees and the Advisory Fees Each Constituted Unlawful Fall-Out Benefits From the 12b-1 Fees ......... - 44 -

    c)  The Fund's 12b-1 Fee Structure Is Excessive Both vis-à-vis Its Advisory Fees and in Comparison With Other Similar Funds, and It Undermined Performance ....................................................... - 44 -

    d)  The Fund's Board Did Not Fulfill Its Fiduciary  Duty When It Failed to Engage in Arms-Length Bargaining .................................. - 45 -

D.  Legal Standard for Consideration of a Rule 59(e)/15 Motion to Alter or Amend the Judgment and Permit the Filing of the SAC ............ - 46 -

E.  The Decision Below Did Not Follow Ninth Circuit Law ........................ - 51 -

iv

F.   The SAC Sufficiently Alleges that Defendants Charged the Fund
     Excessive and Disproportionate Advisory Fees and 12b-1 Fees ............- 52 -

    1.   The Fund Provided Inferior Services and Substantially
         Underperformed ......................................................................- 53 -

    2.   The Fund Was Excessively Profitable to DSA ......................................- 55 -

    3.   The Economies of Scale Were Not Passed on to the Fund and
         Breakpoints Were De Minimis ............................................................- 57 -

    4.   The Fund's Fee Schedule is Disproportionate in Comparison
         With Other Similar Funds........................................................- 58 -

    5.   The Fund's Board Breached Its Fiduciary Duties .................................- 59 -

    6.   Additional Allegations Concerning 12b-1 Fees....................................- 60 -

        a)   The Advisory Fees Constituted Fall-Out Benefits From
             the 12b-1 Fees ......................................................................- 60 -

    G.   The District Court Abused Its Discretion in Granting Defendants'
         Motion to Take Judicial Notice ........................................................- 60 -

    H.   CONCLUSION........................................................................- 61 -

STATEMENT OF RELATED CASES ............................................................- 63 -

CERTIFICATE OF COMPLIANCE................................................................- 63 -

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES**                                                                 **Page(s)**

*Allstate Insurance Co. v. Herron*,
  634 F.3d 1101 (9th Cir. 2011) ...............................................................29, 47, 51

*In re Bear Stearns Companies, Inc. Securities,*
*Derivative and ERISA Litigation*,
  No. 07 Civ. 10453, 2011 U.S. Dist. LEXIS 103061
  (S.D.N.Y. Sept. 13, 2011) ...............................................................49, 50

*Brecher v. Citigroup Inc.*,
  No. 09 Civ. 7359 (SHS), 2011 U.S. Dist. LEXIS 131104
  (S.D.N.Y. Nov. 14, 2011) ...................................................................50

*Burks v. Lasker*,
  441 U.S. 471 (1979) ...............................................................................41

*Chappel v. Laboratory Corp. of America*,
  232 F.3d 719 (9th Cir. 2000) ........................................................46, 47, 48, 49

*Curran v. Principal Management Corp., LLC*,
  No. 09 Civ. 433, 2010 U.S. Dist. LEXIS 83730
  (S. D. Iowa June 8, 2010) ............................................................*passim*

*Dumond v. Massachusetts Financial Services Co.*,
  No. 04-11458-GAO, 2006 U.S. Dist. LEXIS 1933
  (D. Mass. Jan. 19, 2006) .......................................................34, 35, 41

*Eminence Capital, LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) ........................................................29, 47, 48, 49

*Forsythe v. Sun Life Financial, Inc.*,
  417 F. Supp. 2d 100 (D. Mass. 2006) .................................................35

*Gartenberg v. Merrill Lynch Asset Management, Inc.*,
  694 F.2d 923 (2d Cir. 1982), *cert. denied*,
  461 U.S. 906 (1983) ........................................................................*passim*

*Gartenberg v. Merrill Lynch Asset Management, Inc.*,
    573 F. Supp. 1293 (S.D.N.Y. 1983) ....................................................54

*Great Basin Mine Watch v. Hankins*,
    456 F.3d 955 (9th Cir. 2006) .................................................29, 61

*Harris v. Amgen*,
    573 F.3d 728 (9th Cir. 2009) .........................................46, 48, 49, 50

*Howard v. Everex Systems, Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ...........................................48

*Jelinek v. Capital Research & Management Co.*,
    448 F. App'x 716 (9th Cir. 2011) ................................................*passim*

*Jones v. Harris Associates L.P.*,
    559 U.S. 335 (2010) ..............................................................*passim*

*Lee v. City of Los Angeles*,
    250 F.3d 668 (9th Cir. 2001) ...............................................61

*Millenco L.P. v. meVC Advisors, Inc.*,
    No. 02-142-JJF, 2002 U.S. Dist. LEXIS 19512
    (D. Del. Aug. 21, 2002) ...........................................36, 37, 54

*McKesson Corp. v. Health Robotics, S.R.L.*,
    No. C-11-00728,
    2011 U.S. Dist. LEXIS 147476 (9th Cir. 2000) ...........................47, 48

*Peterson v. Miranda,*
    2:11-cv-01919,
    2012 U.S. Dist. LEXIS 149192 (D. Nev. Oct. 17, 2012),
    *motion to amend granted,* 2013 U.S. Dist. LEXIS 79029 .............................47, 48

*Pfeiffer v. Bjurman, Barry & Associates*,
    No. 03 Civ. 9741, 2004 U.S. Dist. LEXIS 16924
    (S.D.N.Y. Aug. 27, 2004) ..............................................35, 43

*Reso v. Artisian Partners Ltd. Partnership*,
  11-cv-873-JPS,
  2011 U.S. Dist. LEXIS 133526 (E.D. Wis. Nov. 18, 2011)................................35

*S.E.C. v. Burns*,
  614 F. Supp. 1360 (S.D. Cal. 1985)................................................................46, 47

*Siemers v. Wells Fargo & Co.*,
  No. 05-04518,
  2006 U.S. Dist. LEXIS 60858 (N.D. Cal. Aug. 14, 2006) ..........................*passim*

*United States v. Ritchie*,
  342 F.3d 903 (9th Cir. 2003) ............................................................................61

*Wicks v. Putnam Investment Management, LLP*,
  No. 04-10988-GAO, 2005 U.S. Dist. LEXIS 4892
  (D. Mass Mar. 28, 2005)...............................................................................*passim*


## <u>STATUTES & RULES</u>

15 U.S.C. § 80a-12(b) ............................................................................................42
15 U.S.C. § 80a-15(a)(2)..........................................................................................7
15 U.S.C. § 80a-15(b)(2) ..........................................................................................7
15 U.S.C. § 80a-35(b) ...............................................................................................1

17 C.F.R. § 270.12b-1 ("Rule 12b-1") ...........................................................*passim*

28 U.S.C. § 1291 ......................................................................................................2
28 U.S.C. § 1331 ......................................................................................................1

Federal Rules of Appellate Procedure
  Rule 34 .................................................................................................................1

Federal Rules of Civil Procedure
  Rule 12(b)(6)..................................................................................................*passim*
  Rule 15(a).......................................................................................................*passim*
  Rule 59(e).......................................................................................................*passim*
  Rule 60(b) ...........................................................................................................46

Investment Company Act of 1940 ("ICA"), 15 U.S.C. §§ 80a-1 *et seq.*...................1
   § 12(b) ..............................................................................2, 3, 26, 43
   § 36(b) ..................................................................................*passim*
   § 44 ...............................................................................................1
   § 48(a) ..........................................................................................60, 62

Securities Act of 1933...........................................................................50

Securities Exchange Act of 1934.............................................................50

## OTHER AUTHORITIES

John C. Bogle, *Common Sense on Mutual Funds* 265
(John Wiley & Sons 2010).................................................................19, 40

John Waggoner, *Some Mutual Funds' Success Has Supersized Them*,
USA Today, Jan. 19, 2007 ....................................................................40

/739037

## REQUEST FOR ORAL ARGUMENT

Plaintiff respectfully requests this Court hear oral argument on this appeal pursuant to Fed. R. App. P. 34.  This case is factually and legally complex, and oral argument would materially assist the Court.

## JURISDICTIONAL STATEMENT

This is an appeal from two Orders and a Final Judgment of the Honorable A. Wallace Tashima, sitting in the District of Arizona, which dismissed D.C. No. 08-CV-00421-TUC-AWT.  The District Court had jurisdiction over the subject matter pursuant to Investment Company Act of 1940 ("ICA") Sections 36(b), 44, 15 U.S.C. §§ 80a-35(b), 43, and 28 U.S.C. §1331 (federal question jurisdiction).

In a Memorandum Order dated June 1, 2011, the District Court dismissed the action with prejudice, holding the Amended Complaint ("AC") failed to state a claim.[1]  Judgment was entered on June 1, 2011.  RE7, 8.  In an Order dated March 19, 2013, RE1, the District Court granted Plaintiff's motion to reconsider/clarify the length of the damages period and denied Plaintiff's motion under Fed. R. Civ. P. Rules 59(e) and 15 to alter or amend the judgment for leave to amend the AC (the Second Amended Complaint ("SAC") was annexed to the motion papers).

---

[1] Record Excerpts are cited "RE."  If both the AC and SAC are cited, the AC is cited first.  Citations to an unreproduced part of the record are to the docket number if the document is on the Docket Sheet in the RE.

The District Court also granted in part Defendants' motion to take judicial notice. On April 16, 2013, a Notice of Appeal was timely filed. RE27.

This Court has jurisdiction over this appeal under 28 U.S.C. §1291, which provides for an appeal from a final order or judgment.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Did the District Court err as a matter of law when it held under Rule 12(b)(6) that the AC failed to sufficiently state a claim under ICA §36(b) that Defendants breached their fiduciary duty by receiving unlawful advisory fees, where, *inter alia*, the: (a) Adviser provided fewer services compared to other actively managed funds; (b) Fund materially underperformed its peer funds and indices; (c) Adviser charged advisory fees that were materially out of proportion to the lesser services and inferior performance it provided, and to fees charged to comparable funds; and (d) despite the Fund's enormous size, Defendants returned immaterial economies of scale to the Fund?

2. Did the District Court err when it held under Rule 12(b)(6) that the AC failed to sufficiently state a claim that Defendants breached their fiduciary duty under ICA §36(b) by receiving unlawful 12b-1 fees, where the: (a) Defendants received hundreds of millions of dollars of 12b-1 fees annually; (b) the Fund's enormous and increasing size and 12b-1 fees were a material cause for its underperformance of comparable peer funds/indices; and (c) the Fund paid 12b-1

- 2 -

fees for post-sale shareholder services that were not "primarily intended" to sell Fund shares?

3.  Under the applicable *de novo* standard of review for a Rule 12(b)(6) motion, did the District Court's grant of the motion to dismiss without leave to amend constitute an abuse of discretion?

4.  Did the District Court's denial of the Rule 59(e)/15 motion constitute "manifest injustice" because, under Ninth Circuit law, the Court's original dismissal should have been without prejudice since only one amended complaint previously had been filed and plaintiff specifically requested, in his opposition to the motion to dismiss, the opportunity to further amend?

5.  Did the District Court abuse its discretion in denying Plaintiff's Rule 59(e)/15 motion to amend the Judgment and file the SAC, under this Circuit's "manifest injustice" standard, where the SAC satisfied all pleading requirements of §36(b)?

6.  Did the District Court err when it held, contrary to *Jelinek v. Capital Research & Mgmt. Co.*, 448 F. App'x 716 (9th Cir. 2011) ("*Jelinek*"), that an allegation a defendant used the 12b-1 fees paid by the Fund for "improper purposes" does not, as a matter of law, state a §36(b) claim?

7.  Did the District Court err when it granted in part Defendants' motion to take judicial notice of opinion pieces not referenced in the AC or SAC?

- 3 -

## STATEMENT OF THE CASE:  THE NATURE OF THE CASE, COURSE OF PROCEEDINGS, AND DISPOSITION BELOW

On July 28, 2008, plaintiff-appellant Donald Turner, on behalf of the Davis New York Venture Fund ("Fund"), filed a complaint in the District of Arizona against Defendants-Appellees ("Defendants") for violations of ICA Sections 36(b), 47 and 48.  The complaint alleged that defendants parent investment management company and its distribution subsidiary violated §36(b) by charging the Fund advisory fees and 12b-1 fees that were excessive and disproportionate.  The case was assigned to Chief Judge John M. Roll.

Defendants filed a motion to dismiss on October 6, 2008.  While that motion was pending, on April 23, 2009, Plaintiff filed an AC.  RE382.  On June 23, 2009, Defendants filed a motion to dismiss the AC.  The parties briefed the motion. Plaintiff, in his answering brief, requested leave to amend if the Court should find the AC inadequate.  On January 28, 2010, Chief Judge Roll requested the parties brief the "standing" issue, RE380, which they did.  In September, 2010, the parties submitted further supplemental briefing on the recent United States Supreme Court decision, *Jones v. Harris Associates L.P.*, 559 U.S. 335 (2010) ("*Jones*").

Chief Judge Roll was assassinated on January 8, 2011.  This case was assigned to Circuit Judge A. Wallace Tashima.  Oral argument on the motion was held on May 17, 2011.

In a Memorandum Order ("MO") dated June 1, 2011, the District Court held that Plaintiff had standing to bring all his claims, but dismissed the action with prejudice for failing to state a claim under Rule 12(b)(6).  Judgment without leave to replead was entered on the same date.  RE7, 8.  Defendants never appealed that portion of the MO holding Plaintiff had standing.

On June 15, 2011, Plaintiff filed a motion for reconsideration and/or clarification of the MO concerning §36(b)'s damages period.  On June 29, 2011, Plaintiff filed a combined Rule 59/15 motion to alter or amend judgment and for leave to amend the AC.  Plaintiff filed a proposed SAC, with a "redline," with the Motion.  RE33-93, 94-208.  On September 9, 2011, Defendants filed a Motion for the Court to Take Judicial Notice.  The District Court decided all three of these pending motions in a six page Order on Reconsideration ("OR") dated March 19, 2013.  RE1.

In the OR, the Court first granted Plaintiff's motion for reconsideration and/or clarification concerning §36(b) damages.  The District Court held that its holding in the MO that "the damages period in this case runs from July 28, 2007, to July 28, 2008" was incorrect.  The Court enlarged the damage period, holding "[a]s a result, the damages period in this case runs from July 28, 2007, through the present and the time of trial, if any."  RE2-3.

The District Court, however, denied Plaintiff's Rule 59(e)/15 motion. The Court refused to alter or amend the Judgment. The Court never addressed the Rule 15 motion and the relationship between Rule 15's requirement that leave to amend be "freely given when justice so requires" and Rule 59(e). RE3-5. Finally, the District Court granted in part Defendants' motion to take judicial notice. RE5-6.

The MO, Judgment and OR constitute the joint basis of this appeal.

## STATEMENT OF THE FACTS RELEVANT TO THE ISSUES ON <u>REVIEW</u>

### A.    The Parties

#### <u>Plaintiff</u>

Plaintiff Donald Turner is an owner of Fund Class A shares. Plaintiff brings this ICA action as a direct action on behalf of the Fund.

#### <u>Defendants</u>

Defendant Davis Selected Advisers, L.P. ("DSA" or "Adviser") is the Fund's investment adviser. It also advises all other funds within the Davis Funds family. Defendant Davis Distributors, LLC ("DD," the Fund's distributor) (collectively "Defendants"), a wholly-owned subsidiary of DSA, is the "principal underwriter" of the Fund and an "affiliated person" of DSA as defined in the ICA.

The Fund is one of the largest mutual funds in the U.S. (approximately 25th largest fund during the relevant period). It is an open-end diversified management investment company, which seeks long-term growth by investing its assets in

equity securities issued by very large companies with market capitalizations of at least $10 billion.  At the beginning of the damages period in mid-2007, Fund net assets totaled about $45 billion.  RE388-89, 434; RE37-40, 78.

**B.      The Allegations of Fact in the AC and SAC Relevant to the Motion to Dismiss**

**1.      The Fees at Issue**

Mutual fund advisory and 12b-1 fees must be reviewed and approved annually by the directors of the Fund.  15 U.S.C. §§80a-15(a)(2), (b)(2); 17 C.F.R. §270.12b-1(e).   Every fee at issue was proposed annually by Defendants to the unaffiliated Directors of the Fund who rubber-stamped Defendants' proposals. RE394; RE41.

**a)      Advisory Fees**

Investment advisory fees, sometimes referred to as management fees, are paid to the investment adviser, here DSA, for investment advisory services and for providing some of the back-office support operations required for the Fund's operations.  Advisory fees are calculated as a percentage of assets under management.  The dollar amount of such fees increases dramatically as the size of the Fund increases.  However, as Congress concluded, the costs for providing such services increase at a lesser rate than the increase in fees.  The advisory fee schedule includes various breakpoints.  But these breakpoints (see chart below taken from the AC and SAC) reduce the fee percentage by only a small amount as

net assets under management exceed the breakpoint threshold(s).  Plaintiff alleged

that the savings under these breakpoints were inadequate.  REAC397, 428-29;

RE43, 71-73.

| Annual Fee as Percent of Net Assets of the Fund | Net Assets of the Fund |
|---|---|
| Not exceeding $250 million[2] | .75% |
| In excess of $250 MM but not exceeding $500 MM | .65% |
| In excess of $500 MM but not exceeding $3 billion | .55% |
| In excess of $3 billion but not exceeding $4 billion | .54% |
| In excess of $4 billion but not exceeding $5 billion | .53% |
| In excess of $5 billion but not exceeding $6 billion | .52% |
| In excess of $6 billion but not exceeding $7 billion | .51% |
| In excess of $7 billion but not exceeding $10 billion | .50% |
| In excess of $10 billion but not exceeding $18 billion | .485% |
| In excess of $18 billion but not exceeding $25 billion | .47% |
| In excess of $25 billion but not exceeding $33 billion | .455% |
| In excess of $33 billion but not exceeding $40 billion | .44% |
| In excess of $40 billion but not exceeding $48 billion | .425% |
| In excess of $48 billion | .41% |

**b)    12b-1 Fees**

Prior to the adoption in 1980 of Rule 12b-1, 17 C.F.R. §270.12b-1, it was

unlawful under ICA §12(b) for a mutual fund to "act as a distributor of securities

of which it [wa]s an issuer."  Rule 12b-1 prohibits mutual funds from directly or

---

[2] Million as part of a dollar amount shall be "MM."  See analysis *infra* concerning elimination of the first two breakpoints after the AC was filed.

indirectly distributing or marketing their own shares unless certain specified conditions are met. The 12b-1 fees that an adviser assesses against a fund and its shareholders, are to be used exclusively to increase the sale of that fund's shares.

12b-1 fees are also calculated as a percentage of assets under management. The dollar amount of 12b-1 fees increases in direct proportion to the increases of the size of the Fund. The 12b-1 fee paid by Fund shareholders consisted of two components, a service fee of 0.25% and a distribution fee of either 0.50% or 0.75%. 12b-1 fees are detailed, *infra*. RE397-401; RE43-46.

To avoid repetition, some of the facts alleged are set forth in greater detail in the Argument.

### 2.  The Nature and Quality of the Services Provided By the Adviser to the Shareholders

The AC and SAC both allege that the advisory fees and 12b-1 fees charged the Fund and received by Defendants each, in 2006, became excessive and disproportionate to the value of the services provided, and not within the parameter of what would have been the result of an arms-length negotiation. RE409-10, 446; RE48.[3] Because of the one year limitations period under §36(b), the damage period began July 28, 2007.

---

[3] Because the Fund's fiscal and calendar years overlap, the exact date the fees became unlawful cannot be determined prior to discovery.

      **a)**      **Defendants Provided Lesser Services to the Fund Because Defendants Operated the Fund Like an Index Fund, With Inactive Management**

Defendants provided lesser services to the Fund because Defendants operated the Fund as if it were an index fund primarily investing in S&P 500 companies. Like an index fund investing in S&P 500 companies, the Fund's universe of potential investments was very limited. The Fund only invested in "companies with market capitalizations of at least $10 billion." (The median market capitalization of a S&P 500 Index company was approximately $8 billion.) Thus, the Fund focused its research and investing on the 200 largest companies in the S&P Index out of roughly 10,000 to 15,000 publicly traded companies. The Fund routinely reported investments of fewer than 95 companies, accounting for 96% of its portfolio, each year.

The Fund's annual report states that its benchmark was the S&P 500 Index. A fund's "R-squared" number is a measure of a fund's movement against its benchmark on a scale ranging from 1 to 100, with 100 being a perfect correlation with its benchmark. An index fund will have an R-squared number very close to 100 because the fund will mirror its index. Whether or not a fund calls itself an index fund, a number above 90 indicates that a fund's performance approaches the index. For the three years prior to the filing of the AC, and the five years prior to the filing of the SAC, the Fund had an R-squared between 97 and 98, measured

- 10 -

against the S&P 500.  Accordingly, Adviser's investment strategy and performance was similar to that of an index fund while charging management fees as if it was actively managing the Fund.  RE389, 416; RE37, 52-54.

> **b)** **Defendants Provided Inferior Quality Services as Demonstrated By the Fund's Consistent Underperformance**

The Fund even underperformed the S&P 500 Index during each of the calendar years 2006-08, 2010, and 2011 Q1.  For the relevant years, the Fund's underperformance was in large part the result of the excessive fees it paid to Defendants.  RE446-47, 450; RE48-49, 52, 76-78.

The Fund was comparable to three peer categories of funds utilized by Morningstar Inc. publications[4] – (a) Large Funds; (b) Large Blend Funds, and (c) S&P 500 Index funds.  RE48.

(a)  The Fund underperformed almost all large, stock funds, whether actively managed or index funds.  Morningstar ranked the Fund, for the five-year period starting May 2006, as "below average" in return and "above average" in risk, giving it a ranking of two "stars" out of five.  The Fund also was tied for last place in the Morningstar rankings of the 31 largest stock funds.  RE55-56.

---

[4] Morningstar is a respected Chicago-based investment research firm that is the bible of the mutual fund industry and a reliable source of independent data for the mutual fund industry.

(b)  The Fund underperformed the actively managed "large blend" and "large" stock funds.  Of the 40 largest mutual funds ranked by Morningstar, 34 of which were stock funds, Morningstar categorized six funds, including the Fund, as "Large Blend" domestic funds.  Morningstar categorized three of these Large Blend funds including the Fund (and the American Fund's Fundamental Investors and Investment Co. of America funds) as actively managed (and the three remaining funds as index funds, discussed below.)  The three Large Blend actively managed funds range in size from approximately $63 billion down to approximately $30 billion.

There were five "Large" actively managed stock funds approximately the size of the Fund:  Vanguard Wellington Fund; Fidelity Growth Fund; Dodge & Cox Stock Fund; Vanguard Windsor Fund and Vanguard Primecap Fund.  As of their 2010 fiscal years, these funds ranged in size from $27.8 billion to $51.3 billion, with the Fund having net assets of $31.1 billion in 2010.  RE56-58.

Each of these eight actively managed "Large Blend" and "Large" funds, including the Fund, is among the 34 largest stock funds.  Of these eight funds, the Fund is tied for last place with its five year Morningstar rating of two stars, and is next to last in average annual return.  Morningstar ranked the Fund's risk/return percentage near the bottom.  RE56-58.

(c)  The Fund also underperformed each of the four Large Blend index funds

- 12 -

that were listed among the 34 largest stock funds:  Fidelity Spartan 500, and three

Vanguard funds -- Total Stock Market, Institutional and Vanguard 500.  Since

Adviser managed the Fund like an index fund, the Fund also was comparable to

these four Large Blend index funds.  The Fund had the lowest Morningstar five

year rating of these five funds, 2 stars.  The four Large Blend index funds each

outperformed the Fund by at least 72% *annually* during this five year period

(1.88% annual return for the Fund versus 3.34% annual return for the four index

funds).  RE58-59.

### 3. The Fund Was Excessively Profitable to DSA

#### a) The Advisory Fees Were Excessive and Disproportionate to the Size of the Fund, Especially When Compared to Other Funds

The Fund was excessively profitable for the Defendants in comparison to

any peer group of funds.

#### (1) Large Blend Funds and Large Funds that Are Actively Managed

The SAC compared the fees charged the Fund to seven other actively

managed domestic Large Blend and Large funds, of roughly similar size where

differences in size could be smoothed.  RE59-65.  The seven other actively

managed funds were from four different fund families -- American Funds (two

funds); Fidelity Funds (one fund); Dodge & Cox (one fund), and Vanguard (three

funds).

- 13 -

The advisory fee charged by every investment adviser reflects in part that adviser's costs and profits, and the cost of advising a similarly situated fund should not be materially different. Here, the advisory services provided by DSA were fewer and thus less costly than the services provided by a true actively managed fund. RE60.

Even assuming *arguendo* the services provided by DSA were similar to services provided to other actively managed funds, which as shown above was not the case, the Fund's advisory fee far exceeded the advisory fee of comparable funds by many multiples, by both percentage and dollars, even before factoring in the Fund's underperformance.

For 2006-10, the Fund's annual advisory fee exceeded the annual advisory fee charged by each of the other Large Blend and Large funds by an amount between approximately $20MM and $95MM annually. The Fund's annual advisory fee was 57.5% more than the average annual advisory fee of the comparable funds, an amount of $66MM more per year per fund ($181MM minus $114.9MM). Cumulatively, over the 2006-10 period, the Fund's advisory fees were excessive, disproportionate and unlawful by the total amount of $330MM when compared to the advisory fee charged other actively managed funds. RE409,

411-15; RE59-65.[5]

### (2)    Index Funds

The Fund was managed by Defendants as if it were an index fund, with a cost structure to Defendants similar to that of an index fund, but Defendants charged advisory fees that were an extraordinary multiple of comparable index funds, roughly between five and twelve times more.

For 2007-10, the Fund's average advisory fee of $181MM exceeded the annual advisory fee charged by the comparable index funds by an amount ranging between approximately $114MM and $201MM.  The Fund's annual advisory fee was 546% more than the average annual advisory fee of comparable index funds, an amount of $153MM more per year per index fund ($181MM minus $28MM). Cumulatively, over the four year period, the Fund's advisory fees were disproportionate by the marginal total amount of $612MM compared to the other

---

[5] The Fund and the comparable funds are different in size, and advisory fees are based upon net asset size.  In order to compare the Fund's advisory fee with the advisory fee of each comparable fund, the net assets of each comparable fund must be adjusted (grossed up or grossed down) in each year to equal the Fund's net assets in that year.  When the net assets of the Fund and the comparison fund have been equalized, the advisory fee (or advisory fee plus management fee where applicable) of that comparable fund is then adjusted up or down by the same percentage used to equalize the net assets of the comparable fund with the Fund, so the advisory fees of the Fund and the comparable fund can be compared.  The Fund's advisory fee is the highest of the eight comparable, large actively managed funds, including the Fund (after taking any gross up/gross down into account). RE65, n.5.

index funds.  RE416-19; RE65-68.

###        4.        The Defendants Received Substantial Fall-Out Benefits

Fall-out benefits are a factor in measuring excessiveness in a §36(b) action.

Fall-out benefits are those benefits (other than the fee in question) that flow to the

adviser and its affiliates as a result of the adviser's relationship with the Fund.  The

AC and SAC each allege that the marginal yearly increase in transfer agent fees

and advisory fees, respectively, constitutes fall-out benefits from the unlawful 12b-

1 fees.  RE397-98, 409, 424, 431; RE39.

###        5.        There Were Substantial Economies of Scale Achieved By Defendants, But Such Economies Were Not Passed on to the Fund

####            a)        The Savings From the Increased Size of the Fund Were Not Passed on to the Fund

As the Fund grew larger, economies of scale occurred for many Fund

activities, particularly advisory services.  Shareholder services generally have

substantially decreased in cost because of significant increases in computerization

in the securities industry, and the concomitant increase in productivity.  Such

services include virtually every operational and compliance issue, from

disseminating prospectuses on the Internet, trading platforms, the preparation of

account statements and trade confirmations, computerized telephone records, and

addressing suitability issues.  These technological advances have dramatically

reduced Defendants costs.

There are additional substantial economies of scale with respect to research services.  Research costs are the same regardless of the size of the investment. RE425-26, 448-49; RE70-71.  Furthermore, the costs to DSA, both research and transaction/execution costs, to invest in a portfolio of fewer than 100 extremely liquid public companies of over $10 billion in market capitalization, were materially less as the Fund's size increased.  RE389; RE53-54, 71.

> **b)**    **The Fund Was Managed Like an Index Fund, Which Decreased Costs and Generated Even More Economies of Scale**

As the Fund grew, it was passively-managed like an index fund.  A fund that is in fact managed like an index fund has a lower cost structure and requires fewer services than a fund which is genuinely actively managed.  Thus, Adviser matched the services of an index fund while charging the much greater fees of an actively managed fund.  However, these economies were not passed on to the Fund, and the fees charged could not possibly be the result of arms-length bargaining.  RE433-34; RE75.

> **c)**    **The Fund's Investment Advisory Fee Breakpoints Did Not Confer a Meaningful Benefit Upon Shareholders**

During the fiscal years 2006-10, the Fund paid advisory fees of between $146MM and $223MM annually, for total advisory fees paid in those five years of $904MM.

The Fund's advisory agreement provides for a very nominal scale-down in

- 17 -

fees as the Fund grows larger.  The chart, *supra*, shows the breakpoints effective through June, 2009.  RE409, 427-28; RE51, 71-72.

In June 2009, just two months after the AC was filed, and without negotiation with the directors, DSA announced it was  "voluntarily reducing the management fee" of the Fund effective July 1, 2009.  The two highest percentage rate categories in the above chart (0.75% and 0.65%) were reduced to the next level (0.55%).  These two categories included only one-half billion dollars in assets, only 1.65% of total Fund assets (assuming $30.2 billion in Fund assets on July 31, 2009).  The 2009 fee reduction was window-dressing as the amount was fixed at $750,000 annually, out of between $150MM and $225MM paid annually in advisory fees under the original breakpoint schedule.  The $750,000 annual "reduction" amounted to a reduction of *only four-tenths of one percent* (0.004%) based on the prior five-year average advisory fee of $181MM.  But, even that reduction was not negotiated by the Fund's supine directors but, rather, was done "voluntarily" by DSA.  RE51, 68.

These nominal breakpoint savings passed along to the Fund were immaterial in comparison to the more than $900MM paid by the Fund in advisory fees.  Even including the breakpoints, the Fund's advisory fee exceeded the annual advisory fee charged by each of the other Large Blend and Large funds by an amount between approximately $20MM and $95MM per year and the Fund's advisory fee

exceeded that charged by the other index funds by an amount ranging between approximately $114MM and $201MM per year.  RE61-67.

> **d)** **The Extraordinary Increase in the Size Of The Fund Through the Use of 12b-1 Distribution Fees Created Diseconomies Which Undermined Defendants Ability to Obtain Even Average Returns**

For a very large fund such as the Fund (whether or not it continues to increase in size) which invests in companies with at least $10 billion in assets, there are diseconomies of scale which undermine Defendants ability to obtain even average returns for the Fund.

A fund's large size undermines its ability to obtain above-average returns because the number of stocks available for a fund's portfolio decreases.  A large fund also has trouble selling or purchasing significant amounts of many of its portfolio securities without causing adverse price impact.  The Fund's returns decrease.  RE432, citing RE338-58 (John C. Bogle); RE433, citing RE360 (Waggoner); RE54-55, 74-75.

Further growth in the Fund did not generate additional, material financial benefits to the Fund from DSA's economies of scale sufficient to offset the cost in 12b-1 fees of more than $140MM annually.  The only beneficiaries of this huge increase in Fund assets were the Defendants.  They reaped a materially larger

- 19 -

advisory fee – marginally, $48MM more annually[6] -- merely based upon the

increase in the size of the Fund, an increase in size which the Fund consistently

paid over $140MM annually to finance but received no benefit therefrom.

REAC430-433; RE73-75.

### 6.   The Fund's Fee Schedule Is Disproportionate in Comparison With Other Similar Funds

During the 2006-11 period, the Fund underperformed the S&P 500 by

approximately 1.07% annually.  The Fund's substantially higher fee schedule

accounted for much of the underperformance.  RE76.

**<u>Actively Managed Funds</u>**

During the 2007-10 period, the Fund's expense ratio[7] was between 39% and

173% more than the expense ratio of all but one of the seven similar sized actively

managed domestic funds.  The Fund's average expense ratio for 2007-10 of 0.875

was 62% higher than the average expense ratio of the seven other actively

managed funds combined (which was 0.54%), accounting for at least 35.8% of the

Fund's underperformance against these funds.  RE76.

---

[6] Advisory fee in 2005 of $133MM.  Advisory fees in 2006-10 of $181MM annually.  REAC409; RE51.

[7] The expense ratio is a measure of the total costs charged by the adviser to operate a mutual fund.  It is calculated by dividing a fund's *operating* expenses by the average dollar value of its assets under management. Operating expenses are taken out of a fund's assets and lower the return to a fund's investors.

In 2008, the Fund's total net asset weighted expense ratio was 15.1% more than that of a benchmark of the 138 largest stock funds.  RE419; RE77.

**Index Funds**

During the 2007-10 period, the Fund's expense ratio was between 430% and 1,650% more than the expense ratio of each of the four similar size domestic index funds.  The Fund's average expense ratio for 2007-10 of 0.875 was 636% higher than the expense ratio of the four index funds (0.11875%).  RE77.

The Fund's disproportionate expenses (the difference between Fund expense ratio of 0.875% and the average index fund expense ratio of 0.11875%) accounted for about 81% of the Fund's underperformance against these index funds.  RE77. In 2007, the Fund's total net asset weighted expense ratio was 13.5 times that of a benchmark of all index funds.  In 2008, the Fund's total net asset weighted expense ratio was 24.4 times that of a benchmark of index funds.  RE419.  RE77-78.

7.    **The Independence and Conscientiousness of the Mutual Fund's Outside Directors**

DSA controls the information which reaches the so-called independent directors of the Fund, thus undermining their statutory duties as "independent watchdogs" and the presumption under the ICA that a director is not a controlled person.  RE439; RE81.

### a)    The Fund's Board Members Are Not Truly Independent

The Fund has a Board of Directors that has not been elected by the shareholders in many years, who rarely meet, whose focus is spread over many different funds in the Davis family of funds, and who receive material compensation for the minimal services they provide.  All but one of the Fund's so-called independent directors received more than $90,000 annually in total compensation from funds in the Davis Funds family, with an average compensation exceeding $100,000 annually.  RE392-96; RE40-43.

### b)    The Fund's Board Continually Approved the Fund's Advisory Fees and 12b-1 Fees With Virtually No Negotiation or Time Given to Their Consideration

Each so-called independent director of the Fund sits on approximately nine boards of directors of mutual funds within the Davis funds family (and each fund has approximately four classes of shares, each of which requires approval of a 12b-1 fee).  The Board of Directors of the Fund meets no more than four times per year and does not address (for purposes of reapproval) the advisory contract or 12b-1 Plans at more than one of the four meetings.  The common board members of the Fund and the other Davis mutual funds meet simultaneously, or *seriatim* on the same day, as the boards of those funds.  Given the number of fund boards which were meeting during one day, the Board of the Fund, during the relevant years, spent an immaterial amount of time considering the Fund's advisory and

- 22 -

distribution contracts.  The Board, at best, assuming normal working hours, spent approximately fifteen minutes on each of the 36 12b-1 fee plans and even less considering the nine advisory contracts, given the SEC's litany of factors that must be considered in renewing 12b-1 contracts.  RE440-44; RE81-83.

### 8.    Additional Facts Relevant to Only the 12b-1 Fee Claim

All of the above fact allegations relate primarily to the advisory fee claim. Additional fact allegations relevant to only the 12b-1 fees follow.

Every class of Fund shares which has a 12b-1 fee assesses the full 0.25% service fee against the Fund.  The 0.25% portion of the 12b-1 fee paid by the Fund shareholders, which is known as the "service fee," is the largest component of the $100MM to $200MM in 12b-1 fees paid annually by Fund shareholders, comprising over 50 percent of the 12b-1 fees paid by Fund shareholders.  The 0.25% service fee assessed by defendants is the maximum 12b-1 service fee permitted by law.  RE403-05; RE44-45.

During 2006-10, Defendants charged and received from the Fund more than $713MM in 12b-1 fees (including 12b-1 distribution fees paid by other Fund classes), the ninth largest amount in the U.S.  More than 50% of these fees were the 0.25% "service fee."  RE407; RE44-45, 51.

a)      **The Nature and Quality of the Services Provided**

(1)      **The Fund Paid for Many Post-Sale Shareholder Services Unrelated to the Sale of Fund Shares**

The majority of the services paid for by the Fund, pursuant to the 0.25% service fee are for post-sale shareholder services that are not "primarily intended" to result in the sale of Fund shares under ICA §12, but are to "compensate the dealer . . . for recordkeeping services" and for "servicing [the Fund's] shareholders and maintaining shareholder accounts." RE404, 407-08; RE84.

(2)      **The Fund and Its Shareholders Paid for Services that Broker-Dealers Were Legally Obligated to Provide Shareholders**

The Fund paid for the post-sale shareholder services identified immediately above, provided by the broker-dealers, even though every broker-dealer is legally obligated to provide customers with these services pursuant to its operations and compliance obligations under applicable statutes, and New York Stock Exchange and NASD/FINRA regulations. RE407-08; RE84.

b)      **The Transfer Agent Fees and Advisory Fees Each Constitute Fall-Out Benefits From the Unlawful 12b-1 Fees**

In dismissing the 12b-1 fee claim, the District Court noted that if the 12b-1 fee allegations had sufficiently stated a claim for excessiveness, then the marginal increase in the transfer agent fees and the advisory fees sufficiently alleged fall-out benefits. RE22.

- 24 -

The AC and SAC each allege that the marginal yearly increase from the 2005 base year in transfer agent fees and advisory fees each constitutes damage flowing from the unlawful 12b-1 fees. Discussed, *infra*.

> **c)** **The Fund's 12b-1 Fee Structure Is Excessive and Disproportionate Because the Increase in Fund Assets Undermined Performance and Also in Comparison With Other Similar Funds**

The 12b-1 fee caused the net assets in the Fund to increase by billions of dollars, and advisory fees concomitantly increased, but the Fund did not lower the maximum 0.25% it charged for the 12b-1 fee, despite the fact that the massive increase in Fund net assets undermined Fund performance. The Fund paid total 12b-1 fees of $713MM in 2006-10. RE409, 434, 446; RE44-45, 48, 51.

In 2007-08, the Fund's total net asset weighted 12b-1 fee (the dollar amount of 12b-1 fees paid to total net assets) was 21.2% more and 33.5% more, respectively, than that of a benchmark of the 138 largest stock funds. The Fund's distribution fee per dollars under management was 18 times more than that of two comparable actively managed Vanguard funds in 2007. RE438-39; RE78-80.

In 2007, the Fund's total net asset weighted 12b-1 fee was 17.57 times that of a benchmark of index funds. In 2008, the Fund's total net asset weighted 12b-1 fee was 35.89 times that of a benchmark of index funds. RE438-39; RE80.

## SUMMARY OF THE ARGUMENT

The principal issue before this Court is whether Plaintiff has sufficiently pled claims under ICA §36(b) by alleging in great detail the Fund's extraordinarily high fees for lesser services and inferior performance. For the reasons analyzed below, the AC and the SAC each sufficiently states a claim under all current pleading standards.

### A.    The Rule 12(b)(6) Motion to Dismiss

The District Court initially erred as a matter of law in granting the 12(b)(6) motion to dismiss. It's dismissal of the AC was based upon a four-page analysis which wholly ignored almost all of the hundreds of specific factual allegations in the AC; misinterpreted some of the AC's fact allegations, and ignored essentially all the many District Court decisions which denied motions to dismiss in cases with comparable pleadings. Indeed, in many of the decisions cited by Plaintiff, the pleadings contained many fewer relevant factual allegations than here.

Moreover, under the applicable *de novo* standard of review for a Rule 12(b)(6) motion, the District Court's grant of the motion to dismiss without leave to amend in fact constituted an abuse of discretion.

### B.    The Rule 59(e)/15 Motion

The District Court abused its discretion by denying Plaintiffs' Rule 59(e)/15 motion to alter/amend the Judgment and for leave to file the SAC. Its one

- 26 -

paragraph merits analysis did not follow the "manifest injustice" standard for 59(e)/15 motions.

First, under the law of this Circuit, a dismissal without prejudice should be granted where a plaintiff had filed only one amended complaint and stated in his opposition papers to the motion to dismiss that he desired to file a second amended complaint.

Plaintiff here had filed only one amended complaint (as of right) and had stated in his papers opposing the motion to dismiss that if the motion was granted, he wished to file a second amended pleading. Nevertheless, the District Court dismissed with prejudice. The District Court's subsequent denial of Plaintiff's Rule 59(e)/15 motion to alter or amend the judgment, in order to correct this error of law, constituted "manifest injustice" and an abuse of discretion.

Second, even if the law of this Circuit does not favor without prejudice dismissals where only one amended pleading has been filed, a District Court has committed an abuse of discretion where it ignores a change in controlling law. This Court decided *Jelinek v. Capital Research & Mgmt. Co.*, 448 F. App'x 716, 718-19 (9th Cir. 2011) after the Rule 12(b)(6) dismissal with prejudice and during the pendency of the 59(e)/15 motion. Plaintiff filed *Jelinek* with the District Court as his first Notice of Supplemental Authority in September, 2011, shortly after the conclusion of the 59(e)/15 briefing and eighteen months before the OR decision.

The *Jelinek* decision, if it had been a published decision, would have constituted a change in controlling law.[8]  Consonant with the Supreme Court's analysis in *Jones, Jelinek* substantially broadened the permissible claims under §36(b), holding that the ICA "encompasses a claim that a fiduciary may breach its duty by *improperly using* fees."  *Id*. at 718 (emph. added).  *Jelinek* was decided after extensive discovery and a non-jury trial.  It was an abuse of discretion for the District Court to ignore *Jelinek* and deny the Rule 59/15 motion.

Third, some Ninth Circuit decisions support the conclusion that manifest injustice exists where it appears at the time of the Rule 59(e)/15 motion that the proposed amended pleading sufficiently states a claim.  If this standard is applicable, the District Court abused its discretion because it did not address the Rule 15 question and the SAC indisputably stated a claim under *Jones* and *Gartenberg*, *infra*.

## **ARGUMENT**

### A.    **Standard of Review for the Rule 12(b)(6), 59(e)/15 and Judicial Notice Motions**

Both the dismissal of a complaint under Rule 12(b)(6) and the District Court's denial of leave to amend are reviewed *de novo.*  In construing the Complaint, this Court must accept all factual allegations in the complaint as true

---

[8] *Jelinek* was unpublished but the Local Circuit Rule permits citation.

and draw all reasonable inferences in the plaintiffs' favor.  A dismissal may be

upheld only if it is clear on *de novo* review that the complaint could not be saved

by amendment.  Rule 15's policy that leave to amend "shall be freely given when

justice so requires [is] "to be applied with extreme liberality."  *E.g.*, *Eminence*

*Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir. 2003).

The denial of a plaintiff's post-judgment Rule 59(e) motion is reviewed

under an abuse of discretion standard.  *E.g.*, *Allstate Ins. Co. v. Herron*, 634 F.3d

1101, 1111 (9th Cir. 2011).

The grant of judicial notice is reviewed for abuse of discretion.  *Great Basin*

*Mine Watch v. Hankins*, 456 F.3d 955, 975-76 (9th Cir. 2006).

**B.    The Legal Standard, as Embodied in the *Jones* and *Gartenberg* Understanding of Congressional Intent, Applicable to Whether Both the AC and the SAC Sufficiently Plead ICA §36(b) Claims**

The Supreme Court decisions in *Jones* and *Gartenberg v. Merrill Lynch*

*Asset Management, Inc.,* 694 F.2d 923 (2d Cir. 1982) ("*Gartenberg*"), *cert. denied,*

461 U.S. 906 (1983), are based upon the underlying fact, found by Congress and

embedded in the ICA statute, that an inherent conflict of interest exists between a

mutual fund on one side and the fund's investment adviser on the other with

respect to fees.

Congress and the SEC recognized that "mutual funds are unique . . . in that

they are 'organized and operated by people whose primary loyalty and pecuniary

interest lie outside the enterprise.'"  Hence, the investment adviser of a mutual

fund has an inherent conflict of interest with funds it advises when it comes to fees.

To address this conflict, Congress enacted ICA §36(b).

> ICA Section 36(b) states in relevant part:

> [T]he investment adviser of a registered investment company shall be
> deemed to have a fiduciary duty with respect to the receipt of
> compensation for services, or of payments of a material nature, paid
> by such registered investment company, or by the security holders
> thereof, to such investment adviser or any affiliated person of such
> investment adviser.  15 U.S.C. § 80a-35(b).

*Gartenberg* identified six factors that a court should weigh in determining

whether an adviser and/or distributor breached its fiduciary duty with respect to

receipt of fees under §36(b).  The "*Gartenberg* factors" are:  (1) the nature and

quality of the services provided by the advisers to the shareholders; (2) the

profitability of the mutual fund to the adviser-manager; (3) "fall-out" benefits; (4)

the economies of scale achieved by the adviser and whether such savings were

passed on to the shareholders; (5) comparative fee structures with other similar

funds; and (6) the independence and conscientiousness of the mutual fund's

outside directors.  694 F.2d at 928-29.

*Gartenberg* was further refined in *Jones*, where the Supreme Court

emphasized other relevant factors beyond the six *Gartenberg* factors.  *Jones* held,

in reversing the Seventh Circuit, that the mutual fund market is not competitive

and, therefore, required that a district court, on a complete record, must consider all

factors in ruling on a §36(b) claim.

In *Jones*, the mutual fund defendants (and the *amicus* mutual fund industry) argued that there was competition in the mutual fund market and, thus, it was unnecessary to give district courts the opportunity to extensively scrutinize mutual fund fees under §36(b). The Seventh Circuit agreed with this analysis, holding that sophisticated investors shop for funds; competitive market pressures exist in the mutual fund market which generally kept fees low; and it was improper to compare the fees charged by a defendant adviser to either its different types of clients or to the fees charged by other investment management companies. 559 U.S. at 341-42.

The Supreme Court rejected these findings, reversed the Seventh Circuit's grant of summary judgment for defendants, and held that competition in the mutual fund market does not exist, stating:

> . . . . The adviser selects the fund's directors, manages the fund's investments, and provides other services. See *id.,* at 481, 99 S. Ct. 1831, 60 L. Ed. 2d 404. Because of the relationship between a mutual fund and its investment adviser, the fund often "'cannot, as a practical matter sever its relationship with the adviser. Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy.'" Ibid. (quoting S. Rep. No. 91-184, p. 5 (1969). . . . 'Congress adopted the (Investment Company Act of 1940) because of its concern with the potential for abuse inherent in the structure of investment companies.' *Daily Income Fund*, 464 U.S., at 536, 104 S. Ct. 831, 78 L. Ed. 2d 645. Recognizing that the relationship between a fund and its investment adviser was 'fraught with potential conflicts of interest,' the Act created protections for mutual fund shareholders.

*Jones*, 559 U.S. at 338-39. *Jones* thus emphasized that mutual fund fees are

- 31 -

properly subject to intensive, fact-based scrutiny under §36(b).

Of major significance here, the *Jones* Court rejected *Gartenberg's* analysis that a comparison of fees charged by a defendant adviser to fees charged by other investment managers essentially was irrelevant. *Gartenberg* had specifically rejected a comparison of fees the adviser charged a money market fund to the fees other advisors charged equity funds, because the differences between such types of funds might make a comparison "inapt." One result of this analysis has been some traditional reluctance by the lower courts, under the "inaptness" analysis, to view a fee disparity, higher fees charged by the defendant, as highly relevant proof in demonstrating unlawfulness.

But, the *Jones* Court rejected *Gartenberg's* "categorical rule," that a comparison of fees between independent advisers essentially was irrelevant, for two reasons. Depending upon the types of funds compared, a comparison could in fact be highly "[]apt;" such comparisons should be given "the weight that they merit." *Id*. at 349-50. More importantly, contrary to *Gartenberg*, since the *Jones* Court found "competition among advisers for the business of managing a fund may be virtually non-existent,'" the fact that funds charge similar fees does not support a legal finding that the fees are lawful because they are similar. *Id*. at 345. In an industry with no competition, and hence a bias toward similar fees, the much higher fees charged by an adviser (of a similar-type fund, with a similar investment

policy and cost structure) *clearly support* a threshold finding of excessiveness at the pleading stage.  These are "apt" comparisons.  This is the case, here.

The AC and SAC each compares the performance, services, fees and fee ratios charged by Adviser to the Fund, a very large equity fund, but which is alleged to operate more akin to an index fund, to the corresponding fees charged to other large "actively managed" equity funds managed by other investment advisers and to large index funds.  The comparison here shows Adviser charged extraordinarily higher fees (despite underperforming with respect to comparable funds).  This underscores that both the AC and the SAC sufficiently allege claims.

The *Jones* decision (reversing grant of summary judgment) and *Gartenberg* (decided after non-jury trial), and their lower court progeny discussed below, illustrate the strong judicial prejudice in favor of using the "all the circumstances" test to permit §36(b) cases to proceed, at least through discovery before weeding out the weak claims on summary judgment before proceeding to trial.  559 U.S. at 350; *id*. at 354 (most lower courts have used *Gartenberg* to "decid[e] which cases may proceed past summary judgment;" Thomas, J., concurring).

### 1.    Lower Court Decisions Denying Motions to Dismiss

Many lower court decisions, based upon lesser facts than those alleged in the AC and SAC, support the conclusion that the AC and SAC sufficiently state claims.  The case law is clear that the short and plain statement of the claim under

Rule 8 does not require that each and every *Gartenberg* factor be addressed, let alone addressed in detail.  694 F.2d at 925, 929-31.

In *Siemers v. Wells Fargo & Co.*, 2006 U.S. Dist. LEXIS 60858 (N.D. Cal. Aug. 14, 2006), the Court denied the motion to dismiss, holding that not all *Gartenberg* factors need be addressed.  *Id*. at *51-*52.  Concerning the nature and quality of the services provided, the court rejected the argument that a fund's below average performance can never, as a matter of law, support a §36(b) claim, holding "only that 'allegations of underperformance alone are insufficient.'" Whether underperformance supported a breach of fiduciary duty was "a question to be resolved on the evidentiary record."  *Id*. at *53-*54.

The *Siemers* court found the complaint sufficient where plaintiff:  only generally alleged the existence of economies of scale, which were allegedly not passed on to the fund; did not allege detailed facts regarding the investment adviser's costs; and cited studies showing that funds in general enjoy lower expenses as assets increase.  The court held that since information regarding the adviser's costs was not public, "[i]t would be unfair to require more before discovery." *Id*. at *54-*56.  *Accord Dumond*.

Concerning a comparison with other funds, *Siemers* found it appropriate for plaintiff to "use higher-than-average expense ratios for certain [of defendants' funds] as a proxy for excessive advisory and distribution fees," holding that even

though expense ratios include all expenses and not just advisory and distribution fees, "increases in expense ratios are nevertheless plausible indicators that advisory and distribution fees were higher than industry averages." *Id.* at *57-*58. RE76-78.

Many other cases similarly denied motions to dismiss, with many holding that not all *Gartenberg* factors need be addressed in the complaint. *Reso v. Artisan Partners Ltd.*, 2011 U.S. Dist. LEXIS 133526 (E.D. Wis. Nov. 18, 2011); *Curran v. Principal Mgmt. Corp., LLC*, 2010 U.S. Dist. LEXIS 83730 at *32-*36, *41-*43 (S.D. Iowa June 8, 2010); *Forsythe v. Sun Life Fin., Inc.,* 417 F. Supp. 2d 100, 113-16 (D. Mass. 2006); *Dumond v. Mass. Fin. Servs. Co.*, 2006 U.S. Dist. LEXIS 1933 at *8, *12 (D. Mass. Jan. 19, 2006); *Wicks v. Putnam Inv. Mgmt., LLP*, 2005 U.S. Dist. LEXIS 4892 at *3, *11-*13 (D. Mass. Mar. 28, 2005); *Pfeiffer v. Bjurman, Barry & Assocs.*, 2004 U.S. Dist. LEXIS 16924 at *10, *15, *18 (S.D.N.Y. Aug. 27, 2004); *Millenco L.P. v. meVC Advisors, Inc.*, 2002 U.S. Dist. LEXIS 19512 at *9-*11 (D. Del. Aug. 21, 2002).

**C.    The AC Sufficiently Alleges that Defendants Charged the Fund Excessive and Disproportionate Advisory Fees and 12b-1 Fees**

The Fund is one of the few very large equity funds.  The AC alleged that the: Fund provided fewer services because either it was an index fund masquerading as an actively managed fund or an actively managed fund with a very small research universe; Adviser charged substantially higher advisory fees and had higher fee

ratios than all other comparable large funds, particularly given the fewer and inferior services provided; and the Fund consistently underperformed its comparable funds and its index.

The AC compared the Fund to other very large funds considered to be its peers by Morningstar:  Dodge & Cox funds,  Vanguard actively managed funds, Vanguard index funds, and to large cohorts of hundreds of actively managed and index funds.  The MO, incorrectly, either ignored or expressly rejected these comparisons, wrongly citing *Jones*.  RE22.

The *Jones* Court expressly held the mutual fund industry *lacked* competition and (in rejecting the Seventh Circuit analysis) held it was permissible to compare a defendants fees to those of other management companies.  559 U.S. at 341-42. Specifically, comparing the Fund to Vanguard Funds is relevant because internally managed funds such as Vanguard "face[] no conflict in negotiating the most favorable terms it can get from the investment adviser.  The prices paid by such funds accordingly provide an extremely probative benchmark of arms-length transactions."  *Brief for John C. Bogle as Amicus Curiae in Support of Petitioners* in *Jones*, at 25 (filed June 15, 2009) (brief available at Am. Bar Ass'n. website, americanbar.org).  Thus, unlike *Gartenberg* where the comparison was between a money market fund and equity funds, the comparisons here were "apt" ones.

It was a fair comparison under *Jones* for the AC to compare the Fund's fees

- 36 -

to those of other very large equity funds of similar size, both actively managed and index funds, which Morningstar categorized as peer funds -- regardless of their fund family.  It was error for the District Court to reject at the pleading stage the comparison of the Fund to similar large funds.

### 1.    The Nature and Quality of the Services Provided By Adviser Were Fewer and Inferior

DSA compared the Fund to the S&P 500 Index.  The Fund invested in only very large companies, with market capitalizations of at least $10 billion.  Adviser essentially used the 200-300 largest companies in the S&P 500 as its research universe, of which it invested in less than 100.  There already is a plethora of publicly-available research about those companies.  Consequently, DSA's research costs were much less than the norm.  Nevertheless, DSA charged fees far in excess of the norm for a very large actively-managed fund.  RE389, 426, 432-33, 446.

Since the Fund's universe was S&P 500 companies, it is not surprising that its R-squared had a near perfect correlation with the S&P 500 Index, 98.  The Fund was being operated essentially like an index fund.  RE389, 416.  Nevertheless, in 2006-08, DSA charged advisory fees approximating $200MM annually as if it were actively managing a portfolio of hundreds of companies.  RE409.  The Fund underperformed the S&P 500 Index for the five years 2004-08, annualized.  RE446.  *Wicks* at *3; *Millenco* at *9-*11; *Siemers* at *53-*54; *Curran* at *32-*33.

- 37 -

### 2.    The Fund Was Excessively Profitable to DSA in Comparison to the Fees Charged Other Funds, Especially Given Its Poor Performance

The District Court did not address, RE21, the AC's allegations that: (a) *larger*, actively-managed stock funds were charging fees substantially less than the Fund and providing better performance. RE411-16. This was error because *Jones* held such comparisons were "apt," and (b) the Fund's expense ratio, a relevant proxy for costs and profits, *Siemers* at *57-*58, was substantially higher than benchmarks of large size actively-managed funds and index funds. RE419.

The four similar actively managed funds used for comparison were Windsor II, Wellington, Dodge & Cox Stock and Dodge & Cox International Stock. The Fund was smaller than each of these four funds, so the Fund's expenses should have been lower. Nevertheless, even before "grossing-up" the advisory fees charged the Fund to account for its smaller size and to create an "apt" comparison, the advisory fees DSA charged were between 13.5% and 111% greater than those charged to each of the four funds, with the median advisory fee of about 50% more. The Fund's total expenses were between 26.4% and 311% greater than those paid by each of the four funds, with the average total expenses charged by DSA about 198% more, again before grossing up. If the gross up were taken into account, the Fund's excessive charges would be a multiple of the percentages above. RE411-15. *Siemers* at *57-*58.

- 38 -

Similarly, the Fund's advisory fees were substantially higher than two comparable index funds, the Vanguard 500 and Vanguard Total Stock Market index funds, even though the Fund was more than 50% smaller than each of them. Using 2007 data, the Fund was 60% and 50% smaller than each of these respective funds. The Fund's advisory fee was 79.7% and 174% more than the advisory fee of these respective funds. RE446-47. See expense ratios, *infra*.

>   **3.     The Economies of Scale Were Not Passed on to the Fund; Breakpoints Were De Minimis; and Diseconomies in Size Undermined the Fund's Performance**

Congress enacted Section 36(b) because it believed that, as mutual funds became ever-larger, economies of scale were not being passed on to shareholders.

As the Fund grew larger, Defendants both received much larger advisory fees and benefited from the economies of scale for many Fund activities. But, Defendants did not pass on to the Fund in a meaningful way these benefits. *Siemers* at *54-*56.

There indisputably were massive technological advances in back office operations, information technologies and front office trading platforms, that materially decreased costs. RE425-26. The fact that the Fund performed as if it was passively managed should have further ***decreased*** costs and generated additional, significant economies of scale. RE433-34.

Additionally, in the past, one of the costs paid by Adviser was to separately

qualify the shares of the Fund with every state.  Federal law negated this

requirement, creating additional economies of scale.  RE449.

Academic studies suggest advisory fee breakpoints do not capture

economies of scale, RE429-30.  For a very large fund such as the Fund (whether or

not it continues to increase in size), there are diseconomies of scale in performance

versus the market which undermine the Fund's ability to obtain above-average or

even average returns.  As the Fund grew in size, its performance became poorer, as

predicted by experts.  RE432, citing RE338-58 (John C. Bogle); RE433, citing

RE360 (Waggoner).

The only beneficiaries in this huge increase in assets under management

were Defendants, who reaped a substantially larger advisory fee – marginally,

$48MM more annually, based upon the increase in Fund size which the Fund paid

more than $140MM annually to finance.  RE431.  *Siemers* at \*54-\*57*; Dumond* at

\*8, \*12.

The District Court improperly rejected the above analysis, first holding

Plaintiff had pointed to no facts showing a particular fee was excessive and then

holding the breakpoints were sufficient as a matter of law without discovery.

RE23.  The Court ignored the facts detailed *supra* and immediately below

concerning fees and ratios.  Moreover, the existence of breakpoints does not

warrant dismissal as a matter of law, without discovery.  *Siemers* at \*54-\*57*;*

*Dumond* at *8, *12.

### 4. The Fund's Expense Ratio Is Disproportionate in Comparison With Other Similar Funds

As stated above, the District Court ignored, RE21-22, that in 2007 and 2008, the Fund's total net asset weighted expense ratio, a relevant proxy for costs and profits under *Siemers* at *54-57, was substantially higher than benchmarks (a large grouping of funds) of 138 large size actively-managed funds, RE419 and RE77, and of index funds. RE419. In 2008, the Fund's expense ratio was 15.1% more than the large fund benchmark and 24.4 times an index fund benchmark. *Id*.

Moreover, the District Court erred when finding that "[a]lleging under-performance in a down economy is particularly unavailing." RE22. This is so because (1) the AC alleges the first three years of unlawful conduct were 2006-08, and the down economy did not start until at the earliest the fall of 2008 and (2) all funds were operating in the same economy, but the Fund underperformed all comparable funds.

### 5. The Fund's Outside Directors Were Not Independent and Conscientious

DSA controlled the information reaching the so-called independent directors, undermining both their statutory duties as "independent watchdogs" and the presumption that a director is not a controlled person. RE439. *Burks v. Lasker*, 441 U.S. 471, 484 (1979).

- 41 -

Each director sat on the boards of approximately nine Davis Funds, each of which had approximately four classes of shares. Thus, directors had to review and vote on 36 Distribution Plans and nine advisory contracts in one day, as the boards of all the Davis Funds met on the same day. The Fund's Board could not possibly have given adequate consideration to these agreements. RE440-44.

Except for a nominal and immaterial voluntary decrease in the advisory fee, which the Fund's Board did not negotiate, the Board neither sought nor obtained materially lower advisory fees when negotiating with DSA, RE450, despite the fact that as the Fund's net assets grew dramatically its performance worsened.

> **6.** **Additional Facts Related Only to Demonstrating the Unlawfulness of the 12b-1 Fee**
>
> > **a)** **The Fund Paid for Post-Sale Shareholder Services Which Were Not "Primarily Intended" to Result in the Sale of Fund Shares and For Which Broker-Dealers Were Legally Obligated; Thus, the Payments Were Excessive and an "Improper Purpose"**

Given the inherent conflict between the fund adviser and the fund, Congress originally enacted ICA §12(b) to prohibit mutual funds from serving as distributors of their own shares, except through underwriters. 15 U.S.C. § 80a-12(b). Rule 12b-1, however, adopted in 1980, permitted mutual funds, under certain limited circumstances, to use shareholder money to "finance[] any activity which is *primarily intended* to result in the sale of shares issued by" that Fund (emph. added). The 0.25% 12b-1 service fee is the largest component of the more than

$100MM in 12b-1 fees paid annually by Fund shareholders.

However, the overwhelming majority of services paid for by the Fund's 12b-1 service fee are post-sale shareholder services for current shareholders. RE404, 407-08, 443-44;   These services include operational and compliance functions concerning the shareholder's brokerage account, such as providing periodic account statements, transaction confirmations, and suitability analyses.

Second, the Fund paid for these post-sale services even though the broker-dealer maintaining the Fund shareholder's account is legally obligated to provide these services under NYSE and NASD/FINRA regulatory regimes. RE407-08.

*Jelinek* (even if not controlling law) and *Jones* demonstrate the unlawfulness of these payments.

The portion of the 12b-1 fee that pays for post-sale shareholder services cannot possibly be "primarily intended" to sell Fund shares under §12. Indeed, the Rule states, for example, that prospectuses can be mailed to "other than **current** shareholders" RE443n.3 (emph. added). Hence, these service fees are excessive and disproportionate because they are for an "improper purpose." *Jelinek*, 448 F. App'x at 718, citing *Forsythe,* 417 F. Supp. 2d at 115-16 and *Siemers*; *Wicks* at *3; *Pfeiffer* at *10-*11, *15. Fund Board approval of payments not primarily intended to result in the sale of Fund shares do not "carr[y] the earmarks of an arm's length bargain." *Jones*, 559 U.S. at 347.

Moreover, where others are legally required to provide such post-sale services, as the broker-dealers are legally required here, the millions of dollars in 12b-1 service fees are excessively large because the payments similarly are for an "improper purpose." *Jelinek*, 448 F. App'x at 718. Charging the Fund to pay for services that others are legally obligated to provide also does not "carr[y] the earmarks of an arm's length bargain." *Jones*, 559 U.S. at 347.

The District Court rejected *Jelinek*, that "us[ing]" the fee for an improper purpose can in itself be excessive and unlawful. RE20-21.

> **b)** **The Transfer Agent Fees and the Advisory Fees Each Constituted Unlawful Fall-Out Benefits From the 12b-1 Fees**

The $14MM marginal average annual increase over year 2005 constituted fall-out benefits, totaling $42MM over three years. The advisory fees in 2006-08 averaged $200.2 million annually, $67MM more than in 2005. The $67MM increase, totaling $201MM was also a fall-out benefit. RE409, 420, 424.

> **c)** **The Fund's 12b-1 Fee Structure Is Excessive Both vis-à-vis Its Advisory Fees and in Comparison With Other Similar Funds, and It Undermined Performance**

The Fund charged 12b-1 fees of $509MM and advisory fees of $600MM during 2006-08. RE409. The Fund's 12b-1 fees were both disproportionately higher in relation to its advisory fees, and at least 18 times greater per million dollars under management, than six comparable actively managed and index funds

– Windsor II, Wellington, and four Vanguard index funds.  RE435-38.

In 2007 and 2008, the Fund's total net asset weighted 12b-1 fee (the dollar amount of 12b-1 fees paid to total net assets) was 21.2% and 33.5% more, respectively, than that of a benchmark of large size funds.  In 2007 and 2008, the Fund's 12b-1 fees exceeded by at least $38MM and $58.4MM, respectively, the average 12b-1 fee of the 138 largest stock funds.  In 2007 and 2008, the Fund's total net asset weighted 12b1- fee was 17.57 times and 35.89 times more, respectively, than a benchmark of index funds.  RE438-39.  *Curran* at *40-*43; *Wicks* at *3.

Comparisons with other management companies should not be rejected at the pleading stage.  *Jones*, 559 U.S. 335.

### d) The Fund's Board Did Not Fulfill Its Fiduciary Duty When It Failed to Engage in Arms-Length Bargaining

*Jones* holds that to be liable under ICA §36(b) an "investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered" and does not "under all the circumstances . . . carr[y] the earmarks of an arm's length bargain."  559 U.S. at 346.

The District Court erred in granting the motion to dismiss because the facts alleged in the AC overwhelmingly stated a cause of action.  Moreover, given Rule 15's liberal amendment policy and that Plaintiff, having filed only one amended

pleading, had expressly requested leave to amend, under a *de novo* standard of review, dismissing the AC with prejudice constituted abuse of discretion. *E.g.*, *Harris v. Amgen*, 573 F.3d 728, 736-37 (9th Cir. 2009); *Eminence,* 316 F.3d at 1052; *Chappel v. Lab. Corp. of Am.*, 232 F.3d 719, 726 (9th Cir. 2000).

### D. Legal Standard for Consideration of a Rule 59(e)/15 Motion to Alter or Amend the Judgment and Permit the Filing of the SAC

A party seeking leave pursuant to Rule 15(a) to amend a complaint that has been dismissed under Rule 12(b)(6) without leave to amend must first have the judgment amended/reopened under either Rule 59(e) or Rule 60(b). *E.g.*, *S.E.C. v. Burns*, 614 F. Supp. 1360, 1367 (S.D. Cal. 1985).

Contrary to the record below, in both its MO and Judgment dismissing the action, the District Court stated that "[b]ecause Plaintiff has not indicated how he could amend his Amended Complaint to state a claim, leave to further amend is denied, and this dismissal is with prejudice." RE7, 26. The District Court essentially reiterated this comment in its Order on Reconsideration, stating "Plaintiff had sufficient opportunity to submit a further amended complaint . . . prior to the Court's dispositive ruling." RE4. The District Court opinion suggests that the Court asked Plaintiff's counsel at oral argument how he would amend the complaint and that counsel did not respond. This is incorrect. Plaintiff was never asked that question by the Court.

Moreover, Plaintiff respectfully submits that he could not know the

deficiencies the Court might find in his pleading until the Court decided the motion to dismiss.  Any proposed amendment before the MO would have been guesswork. Further, the AC was filed before the *Jones* and *Jelinek* decisions.

There "are four basic grounds upon which a Rule 59(e) motion may be granted," the relevant ones here being "if such motion is necessary to prevent manifest injustice" and a change in controlling law.  *E.g.*, *Allstate*, 634 F.3d at 1111; *Burns*, 614 F. Supp. at 1367 (granting 59(e) motion to amend complaint after summary judgment).  Failure to grant the Rule 59(e) motion where the proposed amendment states a cognizable claim would constitute "manifest injustice" and an "abuse of discretion."  *Id.  Accord, e.g., Peterson v. Miranda*, 2012 U.S. Dist. LEXIS 149192  (D. Nev. Oct. 17, 2012), *motion to amend granted*, *Peterson v. Miranda*, 2013 U.S. Dist. LEXIS 79029 (D. Nev. June 4, 2013); *McKesson Corp. v. Health Robotics, S.R.L.*, 2011 U.S. Dist. LEXIS 147476 (N.D. Cal. Dec. 22, 2011); *see, e.g., Eminence,* 316 F.3d 1048; *Chappel*, 232 F.3d at 726.

Under Ninth Circuit law, where a plaintiff has filed only one amended complaint and has stated in its opposition papers to the motion to dismiss that it desires to file a second amended complaint, the dismissal should be without prejudice and a second amendment should be allowed.  In such a circumstance, if the dismissal is granted with prejudice, the subsequent denial of a Rule 59(e)/15 motion to alter or amend the judgment, in order to correct the original dismissal

that had improperly been granted with prejudice and permit the filing of the amended pleading, would constitute "manifest injustice" and an abuse of discretion, even without a holding that the proposed pleading stated a claim. *See, e.g.*, *Peterson*, 2012 U.S. Dist. LEXIS 149192; *McKesson Corp.*, 2011 U.S. Dist. LEXIS 147476; *Harris*, 573 F.3d at 736-37; *Eminence*, 316 F.3d 1048; *Chappel*, 232 F.3d at 726; *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1067-68 (9th Cir. 2000).

Defendants conceded that 'some Ninth Circuit opinions include broad language suggesting that it is often best to order a dismissal without prejudice' and that it is sufficient for plaintiff to merely 'indicate its desire to amend the complaint' or 'giv[e] other indication of a desire to amend,' Dkt. 86, Brief at 6-8 citing, *e.g.*, *Howard.* Defendants also conceded that Plaintiff's main brief opposing the motion to dismiss the AC had "mentioned [the] possibility" of a further amended pleading. *Id*. at 4. Plaintiff's main brief opposing the Rule 12(b)(6) motion had expressly requested "If this Court should grant the dismissal motion, plaintiff requests leave to file a second amended complaint to cure any perceived deficiency." Dkt.52, Brief at 36n.18. *Accord*, *e.g.*, *Peterson*, 2012 U.S. Dist. LEXIS 149192. *See* cases, *supra*.

Second, a District Court abuses its discretion where it ignores a change in controlling law. The *Jelinek* decision, which was decided after the motion to

dismiss was granted here but brought to the District Court's attention before it decided Plaintiff's Rule 59(e) motion, would if published have constituted a change in controlling law. *Jelinek* broadened the permissible claims under §36(b), consonant with *Jones*, holding that use of 12b-1 fees for an "improper purpose" stated a claim.

Third, Ninth Circuit decisions can be read to hold that even if the Rule 12 dismissal should have granted leave to amend, on a 59(e)/15 motion the proposed amended pleading must sufficiently state a claim. If a claim is stated, failure to grant leave constitutes "manifest injustice." *See, e.g., Chappel*, 232 F.3d at 726; *Harris*, 573 F.3d at 736-37; *Eminence,* 316 F.3d at 1052.

The District Court for the Southern District of New York quoted *Harris* with approval when granting a Rule 59(e)/15 motion on facts similar to those here. *In re Bear Stearns Cos., Inc. Secs., Deriv. & ERISA Litig.,* 2011 U.S. Dist. LEXIS 103061 (S.D.N.Y. Sept. 13, 2011) ("*Bear*"). The court granted plaintiffs' Rule 59/15 motion to amend the judgment to permit the filing of a "SACC" (the first complaint after the amendment as of right). 2011 U.S. Dist. LEXIS 103061 at *4.

Though *Harris* did not address a motion under Rule 59(e), the *Bear* Court found its "underlying holding . . . informative to the case at hand." 2011 U.S. Dist. LEXIS 103061 at *9-*12. *Harris* held normally at least one amendment of a complex complaint that has failed to state a claim should be permitted where

plaintiff might be expected to have less than complete information about the defendants' organization, where there is no meaningful evidence of bad faith by plaintiff, and there is no significant prejudice to defendants. *Harris*, 573 F.3d at 737.

The *Bear* District Court held it was not necessary that the SACC be based upon new evidence; "there is no meaningful evidence of bad faith on the part of the plaintiff[];" defendants would not be prejudiced because discovery had not begun; it was "*common practice*" to allow plaintiffs to amend their complaints following dismissal; plaintiff had "less than complete information about the defendants' organization" as defendants are not publicly traded; and it was not "clear" the proposed SACC "suffer[ed] from the same flaws as the [dismissed] ACC." The *Bear* court granted plaintiffs Rule 59/15 motion with leave to amend "in the interests of justice." *Accord*, *Brecher v. Citigroup Inc.*, 2011 U.S. Dist. LEXIS 131104 at *4 (S.D.N.Y. Nov. 14, 2011).

The facts here are on all fours with the above decisions. Moreover, Defendants argued below that an ICA case, as opposed to an ERISA action, is not "complex." ICA actions are akin to complex actions under the 1933 and 1934 Securities Acts, and warrant the same analysis concerning a second amended pleading.

E.    **The Decision Below Did Not Follow Ninth Circuit Law**

The District Court denied Plaintiff's Rule 59(e)/15 motion, holding that "Plaintiff has not set forth sufficient reasons for allowing the extraordinary remedy of reopening the judgment and permitting an amended complaint to be filed." RE5.  The District Court abused its discretion in three ways.

First, the District Court defined the grounds to reopen a judgment as being limited to when the court is presented with newly discovered evidence, committed clear or manifest error, or if there is an intervening change in controlling law. RE3.

The District Court, however, ignored the ground, recognized by this Circuit, "to prevent manifest injustice."  It did not address this Court's rulings that a Rule 59(e)/15 motion should be granted to correct the "manifest injustice" resulting from its own improper grant of the dismissal with prejudice.  *Allstate*, 634 F.3d at 1111.  *See* cases, *supra*.

Second, the District Court denied the Rule 59 motion without discussing *Jelinek* and whether it sufficiently constituted a change in controlling law.

Third, given its denial of the Rule 59(e) part of Plaintiff's motion, the District Court never reached the Rule 15 pleading issue and never analyzed the SAC – which, if the SAC had sufficiently stated a claim under the ICA, as it did, would have mandated that the 59(e)/15 motion be granted.  In this regard, the SAC

- 51 -

included new financial data covering a longer time period, not available at the time of the AC's filing.

Finally, the fact that the SAC so clearly alleges a claim underscores that it was an abuse of discretion for the District Court to deny leave to amend the AC.

### F.    The SAC Sufficiently Alleges that Defendants Charged the Fund Excessive and Disproportionate Advisory Fees and 12b-1 Fees

Assuming *arguendo* that Plaintiff must show that the SAC sufficiently stated a claim in order for this Court to find that the denial of his Rule 59(e) motion constituted an abuse of discretion, the SAC, under *Jones, Jelinek* and *Gartenberg*, sufficiently alleged that defendants charged the Fund hundreds of millions of dollars in excessive fees during 2006-10. The facts alleged in the SAC are overwhelmingly greater in both scale and detail than in the above decisions that denied motions to dismiss.

The principal difference between the AC and SAC is that the SAC alleges, for a five-year period, significant additional facts comparing the Fund to many more funds than did the AC covering a three-year period. The SAC analysis below only addresses new allegations.

The AC compared the Fund to eight funds, four actively-managed and four index, in two fund families. The SAC added six new funds from two new fund families. Four of the six funds added were actively-managed, with three coming from the two new fund families.

The four new actively managed funds were Fidelity Growth; Fundamental Investors and Investment Company of America, both American Funds, and Primecap (Vanguard). The two new index funds were Fidelity Spartan 500 and Vanguard Institutional. Thus, the SAC compared the Fund to eleven funds,[9] seven actively-managed and four index, in four fund families.

Plaintiff did not cherry-pick these funds. Given the Fund's huge size, there were very few comparable funds among fewer than three dozen very large stock funds.

### 1.     The Fund Provided Inferior Services and Substantially Underperformed

The Fund's size would limit the Fund's universe of potential investments to roughly the 200 largest companies out of 10,000 publicly traded companies in the U.S. The Fund routinely held positions in fewer than 95 companies accounting for over 96% of its portfolio. The Fund's R-Squared in comparison to the S&P 500 Index was between 97 and 98 for 2006-10. RE52-54.

The Fund's large size and policy limited its ability to obtain above-average returns; the number of stocks available for the Fund's portfolio decreased dramatically. RE54-55, citing RE338-58.

---

[9] Three international funds in the AC, including two index funds, were not included in the SAC.

The Fund consistently underperformed comparable actively managed and index funds.  For 2006-10, the Fund underperformed its peer fund categories both cumulatively, and in four of the last five individual years from 2006-10 (except 2009) and 2011 Q1.  The Fund also underperformed the S&P 500 Index for at least the seven years from 2004-10, on an annualized basis.  RE48-49, 52, 54-59.

There were only seven other Large ("L") and Large Blend ("LB") actively-managed stock funds of similar size to the Fund during those years.  SAC ¶118 and the Chart following SAC ¶121 identified these funds:  Fidelity Growth (L); Wellington (L); Primecap (L); Fundamental Investors (LB); Investment Company of America (LB); Windsor II (L); Dodge & Cox Stock (L); and the Fund (LB). RE57-58.

For 2006-10, the Fund was tied for last place with a Morningstar rating of two stars and was next to last in average annual return as demonstrated by the SAC's Chart.  RE57.

Given the Fund's consistent underperformance of actively managed peer funds combined with the above allegations about the nature and quality of the services provided by DSA, *Wicks*, *Millenco*, *Siemers*, and the *Gartenberg* district court opinion (573 F. Supp. 1293, 1316 (S.D.N.Y. 1983)) all support the conclusion that the SAC sufficiently states a claim.

Similarly, the Chart at SAC paragraph 126 compares the Fund to four other Large Blend index funds of similar size: Vanguard Total Stock Market; Vanguard Institutional; Fidelity Spartan 500 and Vanguard 500. The Fund's performance was the worst. RE59. Not only is the Fund at the bottom of the return rankings, it is only one of two funds, out of 12 actively managed and index funds, with both an above average risk ranking and a below average return ranking. RE57-59.

### 2.    The Fund Was Excessively Profitable to DSA

The SAC alleges that the advisory fee charged by every investment adviser reflects that adviser's costs, and the cost of advising a similarly situated fund should not be materially different. Since a comparison of fund expense ratios is relevant and can be used as a proxy for excessive advisory fees, *Siemers*, at *57-*58, a comparison of advisory fees of similarly situated funds, after adjusting for size differences, is likewise a relevant proxy for assessing excessive profitability given that each adviser's costs should not be materially different. RE60.

The SAC then compares the Fund's advisory fee to eleven other funds, seven actively managed and four index funds. The seven actively managed funds are: Fidelity Growth, Primecap, Windsor II, Fundamental Investors, Investment Company of America, Wellington, and Dodge & Cox Stock.

Even assuming *arguendo* the advisory services Adviser provided were of

similar nature/quality to the services provided by the advisers of other actively managed funds (and not fewer and less costly, as alleged), the three charts following SAC paragraph 139 graphically illustrate that the Fund's advisory fees exceeded the advisory fees of comparable actively managed funds by material amounts.  RE63-64.

During 2006-10, and even taking the breakpoints into account, the Fund's annual advisory fee exceeded the annual advisory fee charged by the other actively managed Large Blend and Large funds by an amount of between approximately $20MM and $95MM per fund per year, not the $750,000 figure suggested by defendants' voluntary advisory fee reduction after the AC was filed.  The Fund's annual advisory fee was 57.5% more per year than the average annual advisory fee of each comparable fund, an amount of $66MM more per year per fund ($181MM minus $114.9MM).  Cumulatively, during 2006-10, the Fund's total advisory fees were excessive and disproportionate by the marginal, total amount of $330MM when compared to the average total advisory fee of each actively managed fund. RE59-65 & notes.

The Chart immediately after SAC paragraph 148 compares the Fund's advisory fee to the same four domestic index funds analyzed above:  Vanguard Total Stock Market; Vanguard Institutional; Fidelity Spartan 500 and Vanguard 500.

For the period 2007-10 inclusive, the Fund's annual advisory fee exceeded the annual advisory fee charged by the other index funds by an amount ranging between approximately $114MM and $201MM annually. The Fund's annual advisory fee was 546% more per year than the average annual advisory fee of each comparable index fund, an amount of $153MM more per year per index fund ($181MM minus $28MM). Cumulatively, over the four year period, the Fund's total advisory fees were excessive by the marginal total amount of $612MM when compared to the average annual advisory fee of each index fund. RE65-68.

### 3. The Economies of Scale Were Not Passed on to the Fund and Breakpoints Were De Minimis

The costs to DSA, both research and transaction/execution costs, to invest in a portfolio of fewer than 100 liquid public companies of over $10 billion in market capitalization, were materially less as the Fund increased in size. RE53, 71.

The 2009 voluntary advisory fee "reduction" was of no consequence. The reduction effected only the first one-half billion dollars in assets, 1.65% of total Fund assets as of July 31, 2009. The reduction was window-dressing, fixed at an additional $750,000 annually. Even that reduction was not negotiated by the Fund's directors but, rather, was done "voluntarily." RE68.

The *Wicks* and *Siemers* courts each denied motions to dismiss on fewer relevant facts than alleged here: there were general allegations that the funds' assets increased significantly; the nature/quality of the services provided by the

- 57 -

defendants did not substantially change, and generalized studies showed that a fund's manager in general enjoys lower expenses as assets increase. The *Siemers* court denied the dismissal motion where, like here, plaintiff did not allege detailed facts concerning the amount the adviser's costs per unit fell. *Siemers* at *54-*57; *Wicks* at *3.

### 4.    The Fund's Fee Schedule is Disproportionate in Comparison With Other Similar Funds

*Siemers* held that it was relevant to "use higher-than-average expense ratios . . . as a proxy for excessive advisory and distribution fees," because even though expense ratios include all expenses and not just advisory and distribution fees, "increases in expense ratios are nevertheless plausible indicators that advisory and distribution fees were higher than industry averages." *Siemers* at *57-*58. Second, even if fees charged by a fund are equal to the fees charged to other comparable funds, they may nevertheless violate Section 36(b) because of lack of competition in the mutual fund industry. *Jones*, 559 U.S. at 351.

The SAC alleges the Fund's average expense ratio exceeded that of comparable actively managed funds by between 39% and 173% and these very high fees, including advisory and 12b-1 fees, accounted for at least 31% of the Fund's underperformance of the S&P 500. RE76-77.

The Chart at SAC paragraph 190 compared the expense ratios of the same seven other Large Blend and Large Funds analyzed above: Davis, Wellington,

Windsor II, Primecap, Dodge & Cox Stock, Fidelity Growth, Fundamental

Investors and Investment Company of America.

The chart shows that during 2007-10, inclusive, the Fund's expense ratio

was between 39.4% and 173% more than the expense ratio of all but one of the

similar size actively managed domestic funds.  The Fund's average expense ratio

for 2007 through 2010 of 0.875 was 62% higher than the average expense ratio of

the seven other actively managed funds combined (which was 0.54%).  RE76.

The Chart at SAC paragraph 196 concerning expense ratios for index funds,

compared the Fund to the same four index funds:  Vanguard Total Stock Market;

Vanguard Institutional; Fidelity Spartan 500 and Vanguard 500.

The chart shows that during 2007-10, inclusive, the Fund's expense ratio

was between 430% and 1,650% more than the expense ratio of the four index

funds in the chart.  The Fund's average expense ratio for 2007 through 2010 of

0.875 was 636% higher than the expense ratio of the four index funds (0.11875%).

RE77.

### 5.    The Fund's Board Breached Its Fiduciary Duties

The Adviser failed to pass on economies of scale to the Fund.  The Board

approved advisory fee breakpoints which provided at most a negligible benefit to

the Fund; failed to negotiate with Defendants meaningfully lower fees; approved

all the 12b-1 fees and the purposes for which they were used; and failed to

negotiate at arms length with Defendants.

If the Board received the data necessary to determine whether the advisory fees and 12b-1 fees each were excessive and disproportionate, the Board did not utilize the information to engage in arms length bargaining on behalf of the Fund. Alternatively, the Board's utter failure to obtain fee structures that were not excessive strongly supports the conclusion that the Board did not even seek the necessary data.  RE80-85.

### 6.    Additional Allegations Concerning 12b-1 Fees

#### a)    The Advisory Fees Constituted Fall-Out Benefits From the 12b-1 Fees

The SAC alleges that for the 2006-10 period, inclusive, the Fund's advisory fees averaged $181MM annually.  The Fund's advisory fees in 2005 were $133MM.  The $48MM marginal average annual increase from 2005 constituted fall-out benefits, totaling $240MM.  RE51, 69-70, 74.[10]

### G.    The District Court Abused Its Discretion in Granting Defendants' Motion to Take Judicial Notice

While Plaintiff's Rule 59(e)/15 motion was pending, Defendants filed a Motion to Take Judicial Notice of thirteen different articles, by natural person

---

[10] If this Court reverses the District Court on either the AC or the SAC, the §48(a) claim for control person liability should be reinstated.

authors, published in Morningstar.  Defendants argued that the articles they cited were not opinion, but data, noting that the SAC had cited Morningstar data.

The District Court granted Defendants' motion only "for the sake of a complete record [] [holding] that the Court will allow the Morningstar reports to be filed as part of the record as a proffer, to the extent they may be referenced in Plaintiff's Proposed Amended Complaint (Doc. 84, Ex. 1) and Defendants' Opposition to Plaintiff's Rule" 59(e)/15 motion (Doc. 86).  RE5-6.  Since none of the thirteen articles were referenced directly or indirectly in the SAC, or cited by Defendants in their 59(e)/15 opposition, the District Court abused its discretion. *Great Basin*, 456 F.3d at 975-76; *U.S. v. Ritchie*, 342 F.3d 903, 908-09 (9th Cir. 2003); *Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001).[11]

## H.    CONCLUSION

Concerning the §§36(b) and 48(a) claims, both the District Court's grant of the motion to dismiss and its denial of the 59(e)/15 motion should be reversed because both the AC and SAC sufficiently stated claims.  The case should now proceed on the merits.

_____

[11] Defendants moved this Court to dismiss part of one claim upon standing grounds.  The same motion was denied below.  RE13-16.  This Court denied the motion without prejudice to Defendants "renewing the arguments in the answering brief."  Order, App. Dkt. 11.  While any such argument should be denied based upon the District Court's reasoning, if Defendants' answering brief raises this argument, Plaintiff will respond further.

Dated:  January 30, 2014

WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLP

By:  /s/Robert B. Weintraub
Daniel W. Krasner
Robert B. Weintraub
270 Madison Avenue
New York, NY 10016
Telephone (212) 545-4600
Attorneys for Plaintiff-Appellant

## STATEMENT OF RELATED CASES

Pursuant to Rule 28-2.6 of the rules of the Court, Plaintiff-Appellant is not aware of any related cases pending in this Court which arise out of the same case in the district court.

Dated: January 30, 2014
New York, New York

/s/Robert B. Weintraub
Robert B. Weintraub, Esq.

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Fed.R.App.P. 32(a)(7)(C) and Circuit Rule 32-1, that the foregoing brief is proportionately spaced, has a typeface of 14 points, and contains 13,998 words.

Dated this 30th day of January, 2014.
New York, New York

/s/Robert B. Weintraub
Robert B. Weintraub, Esq.

722070v23

- 63 -

| 9th Circuit Case Number(s) | 13-15742 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) Jan 30, 2014 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) /s/Robert B. Weintraub

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date)          .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users.  I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)