**Docket No. 13-15742**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

———————⚬———————

DONALD TURNER,

on Behalf of the Davis New York Venture Fund,

*Plaintiff-Appellant,*

v.

DAVIS SELECTED ADVISERS, LP and DAVIS DISTRIBUTORS, LLC,

*Defendants-Appellees.*

———————————————

*Appeal from a Decision of the United States District Court for the District of Arizona,*
*No. 4:08-cv-00421-AWT · Honorable A. Wallace Tashima*

## BRIEF OF APPELLEES

STEPHEN G. TOPETZES, ESQ.
NICHOLAS G. TERRIS, ESQ.
NICOLE A. BAKER, ESQ.
K&L GATES LLP
1601 K Street. NW
Washington, District of Columbia 20006
(202) 778-9000 Telephone
(202) 778-9100 Facsimile

CHRISTINA N. GOODRICH, ESQ.
K&L GATES LLP
10100 Santa Monica Boulevard
Seventh Floor
Los Angeles, California 90067
(310) 552-5547 Telephone
(310) 552-5001 Facsimile

*Attorneys for Appellees Davis Selected Advisers, L.P. and Davis Distributors, LLC*

 

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

In accordance with Federal Rules of Appellate Procedure 26.1 and 28, the undersigned counsel of record certifies that the following persons, firms, partnerships, or corporations have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

1.    Davis Selected Advisers, L.P. was a defendant in the district court and is an Appellee in this Court;

2.    Davis Selected Advisers, L.P. does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

3.    Davis Distributors, LLC was a defendant in the district court and is an Appellee in this Court ;

4.    Davis Distributors, LLC is a wholly-owned subsidiary of Davis Selected Advisers, L.P. and no publicly held corporation owns 10% or more of its stock; and

5.    Donald Turner was Plaintiff in the district court and is Appellant in this Court.

<u>/s/ Nicholas G. Terris</u>
Nicholas G. Terris
Counsel for Appellees
Davis Distributors, LLC and
Davis Selected Advisers, L.P.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................v

STATEMENT OF JURISDICTION...........................................................1

STATEMENT OF ISSUES PRESENTED...................................................1

STATEMENT REGARDING ADDENDUM.............................................2

STATEMENT OF THE CASE..................................................................2

    *The Parties* ........................................................................................3

    *Relevant Procedural History and Rulings Challenged on Appeal*.................3

    *The Challenged Fees and Plaintiff's Allegations* ...........................................6

        *Advisory Fee*...............................................................................6

        *12b-1 Fees* .................................................................................7

            *12b-1 Service Fees* .................................................................8

            *12b-1 Distribution Fees* .........................................................8

        *Transfer Agency Fees* ......................................................................10

SUMMARY OF ARGUMENT .............................................................11

ARGUMENT ....................................................................................14

    Standard of Review...........................................................................14

I.      SECTION 36(b) PLAINTIFFS FACE A
        DIFFICULT BURDEN ...........................................................15

II.   THE DISTRICT COURT CORRECTLY DISMISSED THE AMENDED COMPLAINT'S § 36(b) ADVISORY FEE CLAIM ................................................................................17

    A.   Nature and Quality of Services Provided .................................18

    B.   Profitability ...............................................................................19

    C.   "Fall-Out Benefits" ...................................................................20

    D.   Economies of Scale...................................................................21

    E.   Fee Structures of Comparable Funds........................................24

    F.   Independence and Conscientiousness of the Directors...............................................................................28

III.  THE § 36(b) 12b-1 FEE CLAIM WAS PROPERLY DISMISSED ...............................................................................30

    A.   Plaintiff Lacks Standing to Challenge 12b-1 Distribution Fees   30

    B.   The District Court Properly Held that Plaintiff Failed to Allege that the 12b-1 Fees Were Disproportionate to the Services Provided....................................................................31

        1.   Plaintiff Must Allege Disproportionality.......................32

        2.   Plaintiff Does Not Allege Disproportionality ...............34

    C.   Plaintiff and the Funds Received a Legally Sufficient Benefit and Plaintiff Fails to Allege an Improper Use of Fees            36

    D.   Plaintiff's Disagreement with the Directors' Decision to Approve the 12b-1 Plans Does Not State a § 36(b) Claim.......38

    E.   Rule 12b-1 Fees Are Exempt from § 36(b) ..............................39

IV.   PLAINTIFF WAIVED HIS §§ 47(b) AND 48(a) ICA CLAIMS ........................................................................42

V.   THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN DENYING PLAINTIFF'S RULE 59(e) MOTION .............................................................................43

   A.   Plaintiff Presented No Newly Discovered Evidence ........................................................................44

   B.   There Was no Intervening Change in Controlling Law ...................................................................44

   C.   The District Court Did Not Err in Dismissing with Prejudice .......................................................46

VI.   THE PROPOSED THIRD COMPLAINT WAS SUBSTANTIVELY INADEQUATE ...................................50

   A.   Plaintiff's New Advisory Fee Allegations Make no Difference ...................................................50

      1.   Nature and Quality of Services Provided ......................51

      2.   Fee Structures of Comparable Funds .............................54

      3.   Independence and Conscientiousness of the Directors ..................................................56

   B.   Plaintiff's 12b-1 Fee Allegations Are Substantially Similar to Those Already Rejected by the Court.................................................56

VII.   THE LAWSUIT CANNOT EXTEND BEYOND TIME PERIODS FOR WHICH PLAINTIFF FILED A VALID AND TIMELY COMPLAINT ...................................................57

CONCLUSION ..................................................................................................61

CERTIFICATE OF COMPLIANCE ......................................................................62

STATEMENT OF RELATED CASES ..................................................................63

ADDENDUM

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

## CASES

*Alexander v. Allianz Dresdner Asset Mgmt. of America Holding, Inc.,*
509 F. Supp. 2d 190 (D. Conn. 2007) ........................................................33

*Amerisourceberrgen Corp v. Dialysist West, Inc.,*
465 F.3d 946 (9th Cir. 2006) ...................................................................50

*Amron v. Morgan Stanley Inv. Advisors, Inc.,*
464 F.3d 338 (2d Cir. 2006) ...........................................................*passim*

*Arpin v. Santa Clara Valley Transp. Agency,*
261 F.3d 912 (9th Cir. 2001) ....................................................................21

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)..............................................................16, 17, 22

*Bay Harbour Management LLC v. Carothers,*
474 F. Supp. 2d 501 (S.D.N.Y. 2007) .......................................................53

*Bellikoff v. Eaton Vance Corp.,*
481 F.3d 110 (2d Cir. 2007) ........................................................32, 43, 47

*Brever v. Federated Equity Mgmt. Co.,*
233 F.R.D. 429 (W.D. Pa. 2005) ...............................................................60

*California ex rel. Dept. of Toxic Substances Control v.*
*Neville Chemical Co.,*
358 F.3d 661 (9th Cir. 2004) ....................................................................54

*Cervantes v. Countrywide Home Loans, Inc.,*
656 F.3d 1034 (9th Cir. 2011) .............................................................48, 49

*Conley v. Gibson,*
355 U.S. 41 (1957)...................................................................................17

*Dixon v. Wallowa County,*
336 F.3d 1013 (9th Cir. 2003) ..................................................................44

*Doe v. United States,*
    58 F.3d 494 (9th Cir. 1995) ........................................................46

*Dumond v. Massachusetts Fin. Servs. Co.,*
    CIV.A. 04-11458-GAO, 2006 WL 149038
    (D. Mass. Jan. 19, 2006) ...................................................17, 22

*Exxon Shipping Co. v. Baker,*
    554 U.S. 471 (2008) ..................................................................45

*Flintkote Co. v. Lysfjord,*
    246 F.2d 368 (9th Cir. 1957) ......................................................58

*Foman v. Davis,*
    371 U.S. 178 (1962)...................................................................46

*Francisco Jose Rivero v. City and County of San Francisco,*
    316 F.3d 857 (9th Cir. 2002) ......................................................15

*Gallus v. Ameriprise Financial, Inc.,*
    675 F.3d 1173 (8th Cir. 2012) ..............................................28, 32

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,*
    694 F.2d 923 (2d Cir. 1982) .............................15, 23, 32, 45, 51

*Gilley Enterprises v. Atlantic Richfield Co.,*
    588 F.3d 659 (9th Cir. 2009) ..............................................46, 47

*Glanton v. Advance PCS, Inc.,*
    465 F.3d 1123 (9th Cir. 2006) ....................................................31

*Gollust v. Mendell,*
    501 U.S. 115 (1991)...................................................................31

*Great Basin Mine Watch v. Hankins,*
    456 F.3d 955 (9th Cir. 2006) ......................................................14

*Green v. Nuveen Advisory Corp.,*
    186 F.R.D. 486 (N.D. Ill. 1999) .................................................40

*Green v. Nuveen Advisory Corp.,*
   295 F.3d 738 (7th Cir. 2002) ........................................................39

*Hoffman v. UBS-AG,*
   591 F. Supp. 2d 522 (S.D.N.Y. 2008) ...........................................20

*In re AllianceBernstein Mut. Fund Excessive Fee Litigation,*
   No. 04-Civ. 4885 (SWK), 2006 WL 1520222
   (S.D.N.Y. May 31, 2006) ...............................................................17

*In re Goldman Sachs Mut. Funds Fee Litig.,*
   No. 04 Civ. 2567(NRB), 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006) .........23

*In re Franklin Mut. Funds Fee Litigation,*
   478 F. Supp. 2d 677 (D.N.J. 2007)............................................17, 18, 23, 59

*In re Salomon Smith Barney Mut. Fund Fees Litig.,*
   528 F. Supp. 2d 332 (S.D.N.Y. 2007), affirmed in relevant part,
   vacated on other grounds, 425 F. App'x 25 (2d Cir. June 9, 2011).............22

*In re Scudder Mut. Funds Fee Litig.,*
   No. 04 Civ. 1921 (DAB), 2007 WL 2325862
   (S.D.N.Y. Aug. 14, 2007).........................................................20, 25

*In re Western States Wholesale Natural Gas Antitrust Litig.,*
   715 F.3d 716 (9th Cir. 2013) ..................................................45, 46

*ING Principal Prot. Funds Derivative Litig.,*
   369 F. Supp. 2d 163 (D. Mass. 2005).........................................33, 35, 36

*Jelinek v. Capital Research and Management Co.,*
   448 F. App'x. 716 (9th Cir. Aug. 24, 2011)...............................33, 39, 44, 45

*Jones v. Harris,*
   559 U.S. 335 (2010).................................................................*passim*

*Kalish v. Franklin Advisers, Inc.,*
   742 F. Supp. 1222 (S.D.N.Y. 1990) .............................................24

*Kasilag v. Hartford Financial Servs., LLC,*
    11-1083 (RMB/KMW), 2012 WL 6568409 (D.N.J. Dec. 17, 2012) ............31

*Krantz v. Fidelity Mgmt. & Research Co.,*
    98 F. Supp. 2d 150 (D. Mass. 2000) ..............................................................29

*Krantz v. Prudential Invs. Fund Mgmt. LLC,*
    305 F.3d 140 (3d Cir. 2002) .......................................................16, 17, 29, 47

*Krinsk v. Fund Asset Mgmt., Inc,*
    1986 WL 205 (S.D.N.Y. May 9, 1986) ........................................................59

*Krinsk v. Fund Asset Mgmt., Inc.,*
    875 F.2d 404 (2d Cir. 1989) .........................................................................23

*Laborers' Local 265 Pension Fund v. iShares Trust,*
    No. 3:13-cv-00046, 2013 WL 4604183 (M.D. Tenn. Aug. 28, 2013) ..........42

*Leadsinger, Inc. v. BMG Music Publishing,*
    512 F.3d 522 (9th Cir. 2008) ........................................................................46

*Lekas v. Briley,*
    405 F.3d 602 (7th Cir. 2005) ........................................................................27

*Lessler v. Little,*
    857 F.2d 866 (1st Cir. 1988) .........................................................................42

*Levine v. Vilsack,*
    587 F.3d 986 (9th Cir. 2009) ........................................................................14

*Lopez v. Smith,*
    203 F.3d 1122 (9th Cir. 2000) ......................................................................46

*McHenry v. Renne,*
    84 F.3d 1172 (9th Cir. 1996) ..................................................................49, 54

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.,*
    540 F.3d 1049 (9th Cir. 2008) ................................................................16, 47

*Meyer v. Oppenheimer Mgmt. Corp.,*
     895 F.2d 861 (2d Cir. 1990) ...................................................................17, 20

*Migdal v. Rowe Price-Fleming Int'l, Inc.,*
     248 F.3d 321 (4th Cir. 2001) ...............................................................*passim*

*Miguel v. Country Funding Corp.,*
     309 F.3d 1161 (9th Cir. 2002) ......................................................................59

*Morongo Band of Mission Indians v. Rose,*
     893 F.2d 1074 (9th Cir. 1990) ......................................................................54

*Moss v. U.S. Secret Service,*
     572 F.3d 962 (9th Cir. 2009) ........................................................................17

*Northstar Financial Advisors, Inc. v. Schwab Investments,*
     615 F.3d 1106 (9th Cir. 2010) ......................................................................43

*Oja v. U.S. Army Corps of Eng'rs,*
     440 F.3d 1122 (9th Cir. 2006) ......................................................................60

*Perrian v. O'Grady,*
     958 F.2d 192 (7th Cir.1992) .........................................................................50

*Pfeiffer v. Bjurman, Barry & Assoc.,*
     03 CIV.9741(DLC), 2006 WL 497776 (S.D.N.Y. Mar. 2, 2006)
     aff'd, 215 F. App'x 30 (2d Cir. 2007) .............................................15, 21, 36

*Police and Fire Ret. Sys. Of the City of Detroit, v. IndyMac MBS,*
     721 F.3d 95 (2d Cir. 2013), cert. granted,
     134 S.Ct. 1515 (Mar 10, 2014) ....................................................................59

*Premo v. Martin,*
     119 F.3d 764 (9th Cir. 1997) ........................................................................49

*Proctor v. Vishay Intertechnology, Inc.,*
     584 F.3d 1208 (9th Cir. 2009) ......................................................................14

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.,*
     442 F.3d 741 (9th Cir. 2006) ..................................................................49, 58

*Rohrbaugh v. Inv. Co. Inst.,*
    No. Civ. A. 00-2137, 2002 WL 31100821 (D.D.C. July 2, 2002) ...............42

*Royal Ins. Co. of Am. v. Southwest Marine,*
    194 F.3d 1009 (9th Cir. 1999) ........................................................................50

*Ruotolo v. City of New York,*
    514 F.3d 184 (2d Cir. 2008) ..........................................................................45

*Sec. & Exch. Comm'n v. Ralston Purina Co.,*
    346 U.S. 119 (1953) ......................................................................................27

*Siemers v. Wells Fargo & Co.,*
    No. C 05-04518 WHA, 2006 WL 2355411 (N.D. Cal. Aug. 14, 2006) .......22

*Swartz v. KPMG LLP,*
    476 F.3d 756 (9th Cir. 2007) .........................................................................53

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ......................................................................................16

*Turner v. Burlington Northern Santa Fe R. Co.,*
    338 F.3d 1058 (9th Cir. 2003) .......................................................................53

*U.S. v. Daychild,*
    357 F.3d 1082 (9th Cir. 2004) .......................................................................33

*United States ex rel. Totten v. Bombardier Corp. and Envirovac, Inc.,*
    286 F.3d 542 (D.C. Cir. 2002) ......................................................................41

*Weeks v. Bayer,*
    246 F.3d 1231 (9th Cir. 2001) ....................................................14, 43, 44, 50

*Westlands Water Dist. v. Firebaugh Canal,*
    10 F.3d 667 (9th Cir. 1993) ...........................................................................49

*William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,*
    668 F.2d 1014 (9th Cir. 1981) ..................................................................58, 60

*Yameen v. Eaton Vance Distributors, Inc.*,
     394 F. Supp. 2d 350 (D. Mass. 2005)......................................................*passim*

*Young-Henderson v. Spartanburg Area Mental Health Ctr.*,
     945 F.2d 770 (4th Cir. 1991) .........................................................................58

## STATUTES, RULES AND REGULATIONS

15 U.S.C. § 77b(a)(15)(i) ...................................................................................27

15 U.S.C. §§ 80a-1 et seq ....................................................................................2

15 U.S.C. § 80a-15(a) .........................................................................................60

15 U.S.C. § 80a-15(c) ....................................................................................28, 29

15 U.S.C. § 80a-16(a) .........................................................................................29

15 U.S.C. § 80a-17............................................................................................41, 42

15 U.S.C. § 80a-17(d) ....................................................................................13, 42

15 U.S.C. § 80a-22(b) ....................................................................................13, 40

15 U.S.C. § 80a-35(b) .........................................................................................15

15 U.S.C. § 80a-35(b)(3) ....................................................................................59

15 U.S.C. § 80a-35(b)(4) ..............................................................1, 9, 13, 40, 41

15 U.S.C. § 80a-47(b) .................................................................................4, 5, 42

15 U.S.C. § 80a-48(a) .................................................................................4, 5, 43

Circuit Rule 36-3................................................................................................33

District of Arizona Local Rule 15.1...........................................................5, 48, 49

Fed. R. App. P 10(c) ..........................................................................................49

Fed. R. Civ. P. 12(b)(6)..................................................................16, 53

Fed. R. Civ. P. 15 ...........................................................2, 5, 6, 14, 53

Fed. R. Civ. P. 15(c)......................................................................14, 59

Fed. R. Civ. P. 15(c)(1)(B) ............................................................58, 59

Fed. R. Civ. P. 15(c)(2)........................................................................60

Fed. R. Civ. P. 15(d) .....................................................................14, 58

Fed. R. Civ. P. 59(e)......................................................................*passim*

Ninth Circuit Rule 28-2.7 .......................................................................2

17 C.F.R. § 230.501(a)(6) ....................................................................27

17 C.F.R. § 270.12b-1(b)(2) ......................................................28, 38, 60

17 C.F.R. § 270.12b-1(b)(3)(i).......................................................38, 60

17 C.F.R. § 270.12b-1(e) ......................................................................38

17 C.F.R. § 270.18f-3(a)(1)(i) ..........................................................30, 31

45 Fed. Reg. 73,898 (November 7, 1980) ........................................7, 42

45 Fed. Reg. 73,901 (November 7, 1980) .............................................42

57 Fed. Reg. 30,985 (July 13, 1992)......................................................41

57 Fed. Reg. 30,988 (July 13, 1992)......................................................41

57 Fed. Reg. 30,989 (July 13, 1992)......................................................41

63 Fed. Reg. 40,231-01 (July 28, 1998) ................................................29

63 Fed. Reg. 40,235 (July 28, 1998)......................................................29

75 Fed. Reg. 47,064 (proposed Aug. 4, 2010)........................................34

75 Fed. Reg. 47,065 (proposed Aug. 4, 2010)........................................37

75 Fed. Reg. 47,070 (proposed Aug. 4, 2010)........................................38

75 Fed. Reg. 47,071 (proposed Aug. 4, 2010)....................................37, 38

75 Fed. Reg. 47,072 (proposed Aug. 4, 2010)........................................37

75 Fed. Reg. 47,074 (proposed Aug. 4, 2010)........................................41

75 Fed. Reg. 47,076 (proposed Aug. 4, 2010)........................................41

75 Fed. Reg. 47,079 (proposed Aug. 4, 2010)........................................41

75 Fed. Reg. 47,082 (proposed Aug. 4, 2010)........................................37

75 Fed. Reg. 47,095 (proposed Aug. 4, 2010)........................................42

75 Fed. Reg. 47,096 (proposed Aug. 4, 2010)........................................42

75 Fed. Reg. 47,098 (proposed Aug. 4, 2010)....................................34, 38

75 Fed. Reg. 47,111 (proposed Aug. 4, 2010)........................................37

## OTHER AUTHORITIES

1970 ICA Amendments, Pub. L. No. 91-547, 84 Stat. 1413 ..................................40

NASD Rule 2830 .......................................................................41

NASD Rule 2830(b)(8)(A) ...............................................................9

NASD Rule 2830(b)(9).................................................................8

NASD Rule 2830(d)(2)(E)................................................................9

INVESTMENT COMPANY INSTITUTE, 2009 INVESTMENT
    COMPANY FACT BOOK 65 (49th ed.).................................................34

INVESTMENT COMPANY INSTITUTE, 2013 INVESTMENT
    COMPANY FACT BOOK 82 (53d ed.) ................................................................34

Investment Company Institute, SEC No-Action Letter,
    1998 WL 1543541 (Oct. 30, 1998) ...............................................................38

U.S. Constitutions, Article III, § 2 ...............................................................1, 14, 31

U.S. SEC. AND EXCH. COMM'N, DIVISION OF INVESTMENT MANAGEMENT:
    REPORT ON MUTUAL FUND FEES AND EXPENSES (Dec. 2000),
    available at http://www.sec.gov/news/studies/feestudy.htm....................9, 24

## STATEMENT OF JURISDICTION

As demonstrated below, Plaintiff lacks Article III standing and this Court lacks subject matter jurisdiction over Plaintiff's 12b-1 distribution fee claim. Otherwise, Defendants agree with Plaintiff's jurisdictional statement.

## STATEMENT OF ISSUES PRESENTED

1.    Whether Plaintiff lacks Article III standing to assert 12b-1 distribution fee claims since he only owns shares of the subject mutual fund that **did not** pay the fee?

2.    Whether the district court properly dismissed Plaintiff's Amended Complaint under Jones v. Harris for failure to adequately allege facts showing that the fees Defendants received were "so disproportionately large that [they bore] no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining"?

3.    Whether the judgment should be affirmed on the alternative ground that Plaintiff failed to plead that 12b-1 fees were used improperly or did not benefit shareholders?

4.    Whether the judgment should be affirmed on the alternative ground that, while 12b-1 fees are regulated by detailed rules approved by the Securities and Exchange Commission, they are expressly exempt from liability here by 15 U.S.C. § 80a-35(b)(4)?

1

5. Whether the district court acted within its broad discretion in denying Plaintiff's Rule 59(e)/Rule 15 post-judgment motion to file a third complaint after almost three years of extensive proceedings where Plaintiff made no effort to amend for nearly two years even after the district court warned it might issue an order disposing of the case?

6. Whether the judgment should be affirmed on the alternative ground that Plaintiff's proposed third complaint is meritless and fails to meet the standards under Fed. R. Civ. P. 15 and 59(e)?

7. Whether the judgment should be partially affirmed on the alternative ground that the lawsuit must be limited to time periods for which Plaintiff filed a timely, valid pleading?

## STATEMENT REGARDING ADDENDUM

All relevant authority, under Ninth Circuit Rule 28-2.7, is cited verbatim in the addendum.

## STATEMENT OF THE CASE

This is an appeal from the dismissal of a mutual fund shareholder's lawsuit alleging excessive fees under § 36(b) of the Investment Company Act of 1940, 15 U.S.C. §§ 80a-1 et seq., ("ICA").

### *The Parties*

Plaintiff-Appellant Donald Turner ("Plaintiff") is Class A shareholder of the Davis New York Venture Fund ("Fund"), a mutual fund registered under the ICA. ER-382-83.

Defendants-Appellees are Davis Selected Advisers, L.P. ("Davis") and Davis Distributors, LLC ("Distributors") (collectively, "Defendants"). ER-390.

Davis is the Fund's investment advisor. Id. As is typical in the fund industry, Jones v. Harris, 559 U.S. 335, 338 (2010), Davis serves pursuant to an investment advisory contract. ER-391. It provides management and investment advice, performs managerial duties, and "furnishes statistical, executive and clerical personnel, bookkeeping, office space and equipment." Id.

Distributors is the Fund's principal underwriter and distributes the Fund's shares. Id.

### *Relevant Procedural History and Rulings Challenged on Appeal*

As the district court noted, the dismissal in this case followed protracted proceedings. ER-4.

In July 2008, Plaintiff commenced this action with a 51-page complaint. ER-4, 463; SER-848-903. Defendants moved to dismiss with prejudice. ER-4, 465; SER-828-847.

3

After the motion was fully briefed, Plaintiff filed a 79-page Amended Complaint on April 23, 2009 (sometimes hereinafter the "AC"). ER-382, 465-67; see SER-764-847. Like Plaintiff's initial pleading, the Amended Complaint primarily alleged an ICA § 36(b) claim, along with §§ 47(b) and 48(a) claims. ER-451-58. Defendants again moved to dismiss on June 22, 2009. ER-467; SER-736-763. Defendants expressly requested dismissal with prejudice, SER-762, a request they repeated in multiple filings. SER-277, 304, 316, 333, 847.

Plaintiff opposed Defendants' second motion to dismiss on September 25, 2009. ER-469; SER-352-439. Defendants replied on November 3, 2009. ER-469; SER- 318-351. Plaintiff then obtained leave to file another supplemental memorandum. ER-469-70; SER-257-308. Thereafter, the district court ordered three supplemental briefs on standing. ER-470.

On March 30, 2010, the Supreme Court issued Jones, which affirmed the standard for § 36(b) liability relied on in Defendants' motions. Jones, 559 U.S. 335. Plaintiff did not seek leave to replead. ER-470-71. Rather, he stood on the Amended Complaint and requested permission to file additional briefs defending its sufficiency under Jones. Id. The district court obliged, and Plaintiff and Defendants each submitted two further briefs. ER-471; SER-309-317.

Apart from one footnote, see Appellant's Br. 48 and SER-395, none of Plaintiff's many briefs mentioned another amendment, let alone provided a

4

proposed amended pleading as required by D. Ariz Local Rule 15.1. See, e.g., SER-257-271, 279-293, 306-308.

Even after the district court on March 4, 2011 set Defendants' motion to dismiss for hearing and then three weeks later re-set the hearing for May 11, 2011, Plaintiff did not move to file another amended complaint. He instead filed additional materials opposing Defendants' motion to dismiss. ER-471-72.

At the May 11, 2011 hearing, the district court stated that the motion could result in a dispositive order. ER-4. At the hearing and for the next two weeks, Plaintiff still did not seek leave to amend. Id., ER-472.

On June 1, 2011, the district court entered an opinion and order dismissing Plaintiff's amended complaint with prejudice. ER-8-26. The district court concluded that Plaintiff had standing, ER-13-16, but (after careful review of his allegations) held the Amended Complaint failed to state plausible § 36(b) claims. ER-19-24. Additionally, the court dismissed the § 47(b) claim for failure to satisfy the requirements for a derivative action and the § 48(a) claim for lack of a private right of action under the statute. ER-24-26. Because Plaintiff had not indicated how he could amend his complaint to state a claim, the dismissal was with prejudice. ER-26. Judgment was entered the same day. ER-7.

Plaintiff then filed multiple post-judgment motions and notices, including a motion pursuant to Rules 59(e) and 15 to reopen the judgment and file a second

amended complaint (the "Proposed Third Complaint" or "PTC").  ER-472-475.  In light of the PTC's repeated references to Morningstar data, Defendants filed a motion requesting that the district court take notice of complete copies of certain Morningstar reports.  ER-475; SER-18-72.

After substantive briefing, SER-1-256, on March 19, 2013, the district court denied Plaintiff's Rule 59(e)/ Rule 15 motion and granted in part Defendants' motion for judicial notice (for the sake of a complete record).  ER-1-6.  This appeal followed.  Plaintiff challenges the dismissal of the Amended Complaint, the denial of the Rule 59(e)/ Rule 15 motion, and the district court's taking judicial notice.

### *The Challenged Fees and Plaintiff's Allegations*

Although they differ in certain respects, Plaintiff's various complaints purportedly challenge three separate and distinct fees paid by the Fund, which were calculated as a percentage of assets under management.

#### *Advisory Fee*

Plaintiff challenges the investment advisory fee paid to Davis for managing the Fund's portfolio of securities and other services.  See, e.g., AC ¶¶ 68, 345-384, ER-397, 445-51.  The advisory fee includes a number of "breakpoints"—asset levels above which marginal fee rates are reduced.  See AC ¶ 249, ER-428-29.  As a result, the marginal investment advisory fee rate drops approximately 45%: from 0.75% of net assets to 0.41%.  Id.

Plaintiff nonetheless alleges that the Fund's advisory fees were excessive primarily because (1) the Fund's performance "resemble[d]" or was worse than that of an index fund or certain other funds in the years prior to the commencement of the lawsuit, AC ¶¶ 173, 275-79, 296-300, ER-35, 433-34, 437, (2) the Fund and the advisory fee were large in absolute terms, AC ¶¶ 227-233, 269, 282, ER-425-26, 432, 434, 444, and (3) the advisory fees supposedly were higher than those of certain purportedly "comparable" mutual funds.  AC ¶¶ 139, 148, 160, 168, 173-196, ER-411, 412, 414-15.  Plaintiff also offers conclusory allegations suggesting that the Fund's board of directors lacked independence.  AC ¶¶ 52, 61-66, 321-25, ER-392-94, 440-41.

### *12b-1 Fees*

12b-1 fees are named after the 1980 SEC rule authorizing them.  See Bearing of Distribution Expenses by Mutual Funds (hereinafter "12b-1 Adopting Release"), 45 Fed. Reg. 73,898 (November 7, 1980).  The amount and permissible purposes for 12b-1 fees are subject to detailed SEC-approved rules promulgated by the National Association of Securities Dealers, Inc. ("NASD") (now the Financial Industry Regulatory Authority, or "FINRA").  See Yameen v. Eaton Vance Distributors, Inc., 394 F. Supp. 2d 350, 354-55 (D. Mass. 2005).

The principal use of the 12b-1 fees in this case was compensating shareholders' broker-dealers or other financial intermediaries for performing

certain services.  AC ¶¶ 78-79, ER-398.  There are two types of relevant 12b-1 fees: 12b-1 service fees and 12b-1 distribution fees.  Id.

### *12b-1 Service Fees*

12b-1 **service** fees, which may not exceed 0.25 of 1% of average net assets per year, Yameen, 394 F. Supp. 2d at 355, are "'payments by an investment company for personal service and/or the maintenance of shareholder accounts.'" Id. n.4 (quoting NASD Rule 2830(b)(9)).  12b-1 service fees are the **only** type of 12b-1 fee assessed on Plaintiff's Class A shares.  AC ¶ 77, ER-398; see ER-15.

Plaintiff acknowledges that the 12b-1 service fee was mainly used to pay unaffiliated broker-dealers for providing shareholder services.  AC ¶¶ 79, 105 ER-398, 404.

Plaintiff nevertheless seeks to attack the 12b-1 service fees.  See, e.g., Appellant's Br. 24, 44.  He alleges these payments are impermissible because (in his view) broker-dealers need not and should not be compensated for providing post-sale shareholder services.  Id.

### *12b-1 Distribution Fees*

Plaintiff also purports to challenge the Fund's 12b-1 distribution fee even though (as a Class A shareholder) he does not directly or indirectly pay it.  AC ¶ 25, ER-388.

The separate 12b-1 **distribution** fee is "a sales charge that is deducted from the net assets of an investment company and does not include a service fee." NASD Rule 2830(b)(8)(A).  The 12b-1 distribution fee may not exceed 0.75% per year of the average annual net assets of the investment company plus interest.  See Yameen, 394 F. Supp. 2d at 354-55, citing NASD Rule 2830(d)(2)(E).

Consistent with common industry practice,[1] the Fund has multiple classes of shares and 12b-1 plans.  AC ¶¶ 41, 77-80, ER-390, 398.  This enables investors "to choose between paying distribution and service charges up front and spreading them out over a period of several years."  Yameen, 394 F. Supp. 2d at 354.  Plaintiff acknowledges that the 12b-1 distribution fees were used to pay for commissions to unaffiliated brokers.  AC ¶ 79, ER-398.

As a Class A shareholder, Plaintiff elected to pay an "up-front" sales load, AC ¶¶ 41, 77, ER-390, 398, which is not at issue and is exempt from § 36(b).  15 U.S.C. § 80a-35(b)(4).  By contrast, in lieu of front-end sales load, a 12b-1 distribution fee of up to 0.75% is assessed against Class B shares of the Fund, which Plaintiff does not own.  See, e.g., AC ¶¶ 41, 79.

---

[1]    See U.S. SEC. AND EXCH. COMM'N, DIVISION OF INVESTMENT MANAGEMENT: REPORT ON MUTUAL FUND FEES AND EXPENSES (Dec. 2000) ("Fee Study"), available at http://www.sec.gov/news/studies/feestudy.htm.  SER-508-543 at 517.

The themes of Plaintiff's lengthy, repetitive 12b-1 fee allegations are that (1) the fees are large—large in absolute dollar terms, AC ¶ 130, ER-410, large compared to the 12b-1 fees charged certain other funds, AC ¶¶ 310-11, ER-438-39, and large compared to the Fund's advisory fees and the advisory fees charged by other funds, AC ¶¶ 288-95, ER-435-36, (2) shareholders allegedly received an immaterial benefit from the 12b-1 fees because the fees exceeded the Fund's savings from the advisory fee breakpoints discussed above, AC ¶¶ 244-55, ER-427-28; and (3) it was impermissible, or at least bad business judgment, for the Fund's directors to approve the Fund's 12b-1 plans (and the Fund should have been closed to new investors) because larger funds often do not perform as well as smaller funds, AC ¶¶ 262-74, ER-431-33, and the Fund had no problem with net redemptions.  AC ¶ 339, ER-445.

### *Transfer Agency Fees*

Plaintiff also mentions—but does not assert claims concerning—transfer agency fees.  ER-10 n.3.

Transfer agency fees pay for services including the maintenance of shareholder account records, and the "processing of the sale and redemption of Fund shares."  AC ¶ 72, ER-397.  Almost all of the Fund's transfer agency fees were paid to compensate an unaffiliated third party.  AC ¶¶ 72-76, ER-397-398.

## SUMMARY OF ARGUMENT

The district court correctly dismissed the § 36(b) claims in the Amended Complaint for failure to adequately allege that fees Defendants received were "so disproportionately large that [they bore] no reasonable relationship to the services rendered **and** could not have been the product of arm's-length bargaining." <u>Jones</u>, 599 U.S. at 344 (emphasis added).

Regarding advisory fees, the Amended Complaint alleged that the Fund had recently underperformed its peers. But underperformance does not show excessive fees. Moreover, the Fund's long-term track record was excellent. Plaintiff also asserted that the Fund and its advisory fees were large in absolute terms, suggesting this means Defendants failed to pass along economies of scale. Such boilerplate allegations are insufficient. And the breakpoints in the Fund's advisory fee schedule, and the fact that sophisticated institutional investors pay Defendants the same advisory fee, demonstrate that Defendants shared economies of scale.

Plaintiff's related suggestion that the Fund's fees were higher than those of a few supposedly "comparable" funds also backfires. Given the numerous funds in the marketplace, such paltry allegations would be meaningless even if the funds actually were comparable. But the index funds Plaintiff mentions unquestionably are **not** comparable; two other funds Plaintiff cites are recognized as having unusually low costs, and the Fund's advisory fee is **lower** than those of the

11

remaining proffered benchmark funds. Plaintiff's allegations that a fully informed board of directors approved the fees further supports dismissal.

Plaintiff (a Class A shareholder) lacks a financial interest in, and hence Article III standing to challenge, the 12b-1 distribution fee.

Plaintiff's 12b-1 claims also fail on the merits.

A § 36(b) plaintiff attacking 12b-1 fees must state a claim that the distribution fee received by a defendant subject to § 36(b) is disproportionate to the distribution services rendered. The Amended Complaint not only fails to do this, it affirmatively alleges that substantially all of the Fund's 12b-1 fees were used to pay unaffiliated third parties for distribution or shareholder services.

Even if (contrary to law) Plaintiff could allege a § 36(b) claim on the theory that 12b-1 fees were used for a purpose that was either impermissible or did not benefit shareholders, this is not such a case. The 12b-1 fees at issue manifestly benefited shareholders by enabling them to obtain the services of broker-dealers (including via fund supermarkets) without paying for such services through a front-end sales load or otherwise. The SEC recognizes that such uses of 12b-1 fees are permissible and beneficial.

Plaintiff's allegations challenging the wisdom of the Fund board's decisions regarding the Fund's 12b-1 plans simply are not cognizable under § 36(b).

Although the Court need not reach the issue, there is an independent basis to dismiss Plaintiff's 12b-1 fee claim. 12b-1 fees are subject to ICA §§ 22(b) and 17(d) and the comprehensive regulation of mutual fund sales charges thereunder, but are expressly exempt from § 36(b)'s ambit. See 15 U.S.C. § 80a-35(b)(4) (exempting from 36(b) payments subject to § 17).

The district court acted well within its discretion in denying Plaintiff's extraordinary Rule 59(e) post-judgment request to file the Proposed Third Complaint. Plaintiff received every reasonable opportunity to plead his case. He had more than two years before judgment, the benefit of two motions to dismiss, and Jones to enable him to cure the defects in the Amended Complaint. The few additional alleged facts in the PTC were available to Plaintiff well before judgment. Plaintiff unduly delayed and acted in bad faith by awaiting the district court's decision before attempting to amend; and Defendants and the courts plainly would be prejudiced by having to endure still more effort and expense in addressing yet another iteration of Plaintiff's meritless claims.

Even a cursory review of the PTC confirms that the case should remain closed. The PTC rehashes allegations that the district court rejected. Its principal additional allegations are not only insufficient but further undermine his case. The PTC alleges excessive fees based on selected Morningstar data. The data Plaintiff cites does not render his § 36(b) claim plausible. Plaintiff also conveniently omits

Morningstar's conclusion that the Fund *"is among the cheapest front-load, large cap offerings,"* earning it Morningstar's best possible grade for fees.

Alternatively, the lawsuit must be limited to periods for which Plaintiff filed a valid and timely complaint given the strictures of Rules 15(c), 15(d), and § 36(b)(3). Plaintiff's initial complaint did not put at issue all fees Defendants received during the pendency of the lawsuit. And Plaintiff did not seek to file a supplemental pleading nor do his amended pleadings relate back.

## ARGUMENT

### Standard of Review

Defendants agree with Plaintiff that a complaint's dismissal for failure to state a claim is reviewed *de novo*.

The district court's other rulings on appeal are reviewed for abuse of discretion. Great Basin Mine Watch v. Hankins, 456 F.3d 955, 975-76 (9th Cir. 2006) (judicial notice); Weeks v. Bayer, 246 F.3d 1231, 1234 (9th Cir. 2001) (Rule 59(e)/15 motion).

This Court may affirm the district court's judgment on any grounds supported by the record without a cross-appeal. Levine v. Vilsack, 587 F.3d 986, 991 (9th Cir. 2009) (Article III standing); Proctor v. Vishay Intertechnology, Inc., 584 F.3d 1208, 1226 (9th Cir. 2009) (grounds rejected or not considered);

Francisco Jose Rivero v. City and County of San Francisco, 316 F.3d 857, 862 (9th Cir. 2002).

## I.    SECTION 36(b) PLAINTIFFS FACE A DIFFICULT BURDEN

Section 36(b) provides a limited remedy for a plaintiff suing on behalf of a mutual fund.  Such a plaintiff faces the difficult burden of showing that a fund has been "charge[d] a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered **and** could not have been the product of arm's-length bargaining."  Jones, 559 U.S. at 344 (emphasis added) (adopting standard from Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923, 928 (2d Cir. 1982)).

Because § 36(b) encompasses only "receipt of compensation for services" by an investment adviser and certain affiliated persons, 15 U.S.C. § 80a-35(b), fees paid to unaffiliated third parties are outside its ambit.  See Pfeiffer v. Bjurman, Barry & Assoc., 03 CIV.9741(DLC), 2006 WL 497776, at *5 (S.D.N.Y. Mar. 2, 2006) aff'd, 215 F. App'x 30 (2d Cir. 2007).

As the district court correctly recognized, ER-12-13, determining whether a plaintiff has surmounted the high hurdle § 36(b) "requires consideration of all relevant factors," Jones, 559 U.S. at 349, including six non-exclusive "Gartenberg factors" discussed below.

To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "[C]onclusory statements" are "not entitled to the assumption of truth." Id. at 678, 679. And the pleaded facts must be more than "merely consistent with a defendant's liability"; they must "allow[] the court to draw the reasonable inference that the defendant is liable." Id. at 678. Courts assessing 12(b)(6) motions properly consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).[2]

Section 36(b) plaintiffs have an incentive to bring "a largely groundless" claim based on its "in terrorem" effect. Amron v. Morgan Stanley Inv. Advisors, Inc., 464 F.3d 338, 346 (2d Cir. 2006). Accordingly, notwithstanding Plaintiff's erroneous assertion that courts have a "prejudice in favor" of allowing "cases to proceed[] at least through discovery," Appellant's Br. 33, courts have vigilantly applied the Iqbal/Twombly pleading standard and frequently granted motions to dismiss § 36(b) claims—including the following cases cited approvingly in Jones: Amron, 464 F.3d 338; Krantz v. Prudential Invs. Fund Mgmt. LLC, 305 F.3d 140

---

[2]    See also Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (judicially noticing issuer's "reported stock price history and other publicly available financial documents," including SEC filings). The AC and Plaintiff's brief expressly reference the Fund's SEC filings. AC ¶ 385, ER-451; Appellant's Br. 10.

(3d Cir. 2002); <u>Migdal v. Rowe Price-Fleming Int'l, Inc.</u>, 248 F.3d 321 (4th Cir. 2001); <u>In re Franklin Mut. Funds Fee Litigation</u>, 478 F. Supp. 2d 677 (D.N.J. 2007); <u>In re AllianceBernstein Mut. Fund Excessive Fee Litigation</u>, No. 04-Civ. 4885 (SWK), 2006 WL 1520222 (S.D.N.Y. May 31, 2006); <u>Yameen</u>, 394 F. Supp. 2d 350.

Plaintiff's relies heavily on pre-<u>Iqbal/Twombly</u> decisions denying motions to dismiss. <u>See</u> Appellant's Br. 33-35.[3] As this Court has recognized, however, <u>Iqbal</u>'s overhaul of the pleading standard "is a significant change, with broad-reaching implications." <u>Moss v. U.S. Secret Service</u>, 572 F.3d 962, 972 (9th Cir. 2009).

## II.     THE DISTRICT COURT CORRECTLY DISMISSED THE AMENDED COMPLAINT'S § 36(b) ADVISORY FEE CLAIM

Because advisory fees and 12b-1 fees are separate fees for separate and distinct services, the district court properly rejected Plaintiff's "attempt to aggregate 12b-1 and advisory fees to further a § 36(b) claim." ER-21, <u>citing</u> <u>Meyer v. Oppenheimer Mgmt. Corp.</u>, 895 F.2d 861, 866 (2d Cir. 1990). Plaintiff

---

[3]    For example, Plaintiff repeatedly cites <u>Dumond v. Massachusetts Fin. Servs. Co.</u>, CIV.A. 04-11458-GAO, 2006 WL 149038 (D. Mass. Jan. 19, 2006). <u>Dumond</u> relied on the now-superseded pleading standard of <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957), <u>Dumond</u>, 2006 WL 149038, at *2, and disagreed with the Second, Third, and Fourth Circuits' approach to assessing motions to dismiss § 36(b) claims. <u>Id.</u> at *3.

has not challenged that ruling. Defendants, therefore, discuss separately Plaintiff's advisory fee and 12b-1 fee claims.

## A.    Nature and Quality of Services Provided

Although not disputing that the Fund was actively managed (which Plaintiff cannot do in good faith[4]), the Amended Complaint asserted that, for three years prior to its filing, "the Fund's **_performance_** resemble[d] that of an index fund."[5] This is unavailing. That a fund's investment return "resembles" that of an index fund does not suggest that the adviser is not spending the time and money researching stocks and general market forces that is the hallmark of active management. See In re Franklin, 478 F. Supp. 2d at 687 (rejecting allegations that a fund "grew so large that it began to function more like an index fund," stating: "the allegations pertaining to these Funds' resemblance to index funds do[] not address the actual services rendered to those Funds").

The Amended Complaint additionally contains assertions that the Fund had underperformed the S&P 500 Index each calendar year since 2006, and for the trailing five-year period. AC ¶¶ 349, 350, ER-446. However, as the Fourth Circuit

---

[4]    Plaintiff affirmatively argues that Davis selected "less than 100" of the companies in the S&P 500 for investment. Appellant's Br. 37; id. at 10.

[5]    AC ¶ 173, ER-35 (emphasis added). Plaintiff elaborates that the Fund allegedly was 98% correlated with the Standard & Poor's Total Return Index. AC ¶¶ 351-52, ER-446; see also AC ¶¶ 275-79, 296-300, ER-433-34, 437; Appellant's Br. 10, 35-37.

recognized in an opinion cited approvingly in <u>Jones</u> and followed by the district court, "allegations of underperformance alone are insufficient to prove that an investment adviser's fees are excessive." <u>Migdal</u>, 248 F.3d at 327; ER-22. Underperformance figures for relatively short time horizons are of especially limited utility given that "[a]n underachieving fund one year may be an overachieving fund the next." <u>Id.</u> at 327-28.

Looking back over a longer, more meaningful horizon, the Fund had significantly outperformed its benchmarks.[6]  If anything, that track record suggested that the quality of the adviser's services was excellent.

**B.     Profitability**

One short section of the Amended Complaint asserts that the advisory fees were "[e]xcessively [p]rofitable" to Davis.  ER-446.  But none of the allegations in this section actually addresses profitability.  <u>See</u> <u>Amron</u>, 464 F.3d at 341, 344 (finding that complaint "allege[d] nothing" regarding profitability where it merely asserted that "the 'sheer enormity' of the fees suggests the fund advisors received significant profits.").  The Amended Complaint instead purports to demonstrate the excessiveness of the advisory fees by reference to allegedly comparable funds, AC ¶¶ 354-58, ER-446-46, which are discussed below.

---

[6]     <u>See, e.g.,</u> SER-445-469 at 449 (Fund had outperformed S&P 500 Index for every rolling 10-year period since inception); SER-470-507 at 474, 504 (similar).

### C.    "Fall-Out Benefits"

Fall-out benefits are "benefits other than the advisory fees that flow to the adviser or its affiliates as a result of the adviser's relationship with the fund." Hoffman v. UBS-AG, 591 F. Supp. 2d 522, 538 n.30 (S.D.N.Y. 2008); Jones, 559 U.S. at 344 n.5.  According to Plaintiff, the Fund's 12b-1 and transfer agency fees were fall-out benefits.  AC ¶¶ 360-66, ER-447-448.

That an investment adviser or its affiliates perform non-advisory services for a fund (and receive a separate fee therefor) does not establish fall-out benefits for purposes of § 36(b).  To do so, a plaintiff must sufficiently allege that the fees received for other services are themselves legally excessive.  See Meyer, 895 F.2d at 866 ("If the fee for each service viewed separately is not excessive in relation to the service rendered, then the sum of the two is also permissible.").

Section III below demonstrates the insufficiency of Plaintiff's 12b-1 fee allegations.

Regarding transfer agency fees, the Amended Complaint merely offers a handful of boilerplate allegations that fail to suggest that the fees were excessive or unearned in any respect.[7]

---

[7]    See, e.g., AC ¶¶ 73, 364-65, 367, ER-397-98, 448.  Compare In re Scudder Mut. Funds Fee Litig., No. 04 Civ. 1921 (DAB), 2007 WL 2325862, at *16 (S.D.N.Y. Aug. 14, 2007) (rejecting similar allegations).

Worse, the transfer agency fee allegations are misleading. Buried in the Amended Complaint is an admission that "the overwhelming majority of payments for transfer agent services" are received not by Defendants but by a company that is not a party to this action and is unaffiliated with the Fund or with Davis. ER-397, ¶ 72.

As the district court recognized, such payments to non-affiliates are manifestly outside the scope of § 36(b). See ER-10 n.1 (as the transfer agent "is a non-affiliated company, § 36(b)'s fiduciary duty requirement does not apply"); Pfeiffer, 2006 WL 497776, at *5. Plaintiff offers no challenge to the district court's reasoning on transfer fees. And "issues which are not specifically and distinctly argued and raised in a party's opening brief are waived." Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir. 2001).

### D.    Economies of Scale

The Amended Complaint offers an assortment of allegations that could be made regarding most large mutual funds: (a) "all managers of mutual funds" enjoy economies of scale, AC ¶ 231, ER-426, see also AC ¶¶ 227-30, 232-33; ER-425-26; Appellant's Br. 39-40 (asserting that mutual funds generally enjoy economies of scale due to technological advances and changes in the regulatory regime) (b) the Fund was large, AC ¶¶ 269, 334 (the Fund was nation's 25th largest), ER-432,

21

444; and AC ¶ 282, ER-434, (c) the fee was large in absolute terms and (because it is based on net asset value) has increased with the Fund's size.[8]

As the district court correctly held, "[m]ere allegations that the fund was 'large' and that there were economies of scale to be realized are insufficient." ER-23. Notwithstanding Plaintiff's reliance on two unpublished, pre-Ipbal decisions analyzing different allegations, Appellant's Br. 39-40[9], the clear weight of authority recognizes that generic "large fund" allegations such as Plaintiff's do not support a reasonable inference that a particular adviser achieved any economies of scale, let alone that it achieved them to such a degree that excessive fees can be inferred.  See, e.g., In re Salomon Smith Barney Mut. Fund Fees Litig., 528 F. Supp. 2d 332, 339 (S.D.N.Y. 2007), affirmed in relevant part, vacated on other

---

[8]    AC ¶ 129, ER-408-09 (advisory fee increased from $87.9 million in fiscal year ended July 31, 2003 to $223.5 million in fiscal year ended July 31, 2008); AC ¶¶ 234, 237, ER-426-27.

[9]    The § 36(b) discussion in the pre-Iqbal decision Siemers v. Wells Fargo & Co., No. C 05-04518 WHA, 2006 WL 2355411, at *19 (N.D. Cal. Aug. 14, 2006), was dictum (the claims were dismissed for lack of standing). Id. at * 20-21. Further, at least some of the funds involved did not offer any breakpoints and others apparently offered breakpoints during only part of the relevant period. Id. at *16. And the plaintiffs made a number of more-specific factual allegations, including that an analyst had criticized the adviser for its high fees and that the adviser benefitted from economies of scale by receiving breakpoints from the subadviser that it did not pass along to the fund. Id. at *16. Plaintiffs additionally offered comparisons regarding "industry averages for same-sized funds," id. at 20, not (as here) inapt comparisons to a small number of funds that actually underscore the lack of a plausible claim. See also n. 3 (discussing Dumond).

grounds, 425 F. App'x 25 (2d Cir. June 9, 2011) ("Plaintiffs cannot meet their burden simply by pointing to the size of the funds and their rates of growth. There must be 'allegations regarding the costs of performing fund transactions or the relationship between such costs and the number of transactions performed.'") (citation omitted); In re Franklin, 478 F. Supp. 2d at 687 (dismissing complaint alleging that fund "ranked 18[th] out of 50 in terms of total fees charged to the Funds, taking in over $251.3 million in fees" and stating that "[i]f plaintiffs were allowed to state a § 36(b) claim based upon such paltry allegations, then any fund that grew over time while not simultaneously lowering its fees would be subject to suit under the ICA.  This cannot be allowed."); In re Goldman Sachs Mut. Funds Fee Litig., No. 04 Civ. 2567(NRB), 2006 WL 126772, at *9 (S.D.N.Y. Jan. 17, 2006) ("Mere assertions that fees increased with the size of the [f]unds are not enough. . . "); Amron, 464 F.3d at 345.  See also Gartenberg, 694 F.2d at 928 ("cost-plus" contract **not** required);  Krinsk v. Fund Asset Mgmt., Inc., 875 F.2d 404, 411 (2d Cir. 1989) (affirming finding that per-unit costs for most money market funds do not decrease with fund growth).

Even assuming *arguendo* that Plaintiff had adequately alleged economies of scale, it is indisputable that the Fund's advisory fee is structured so that the Fund shares such economies.  As Plaintiff acknowledges, the Fund's advisory fee schedule includes breakpoints that reduce the marginal advisory fee rate from

0.75% of net assets to 0.41%.  <u>See</u> AC ¶ 249, ER-428-29; SER-504.[10]  The

existence of such breakpoints, which are not legally required, distinguishes the

Fund from many other large mutual funds, which (as the SEC has recognized)

either have significant assets above the last breakpoint or do not have breakpoints

in their advisory fee schedules at all.[11]  Accordingly, as the district court properly

concluded, the Amended Complaint did "not provide any facts to show that [the

Fund's] breakpoints are [an] inadequate means of giving the shareholders benefits

of economies of scale."  ER-23.  <u>Compare</u> <u>Kalish v. Franklin Advisers, Inc.</u>, 742 F.

Supp. 1222, 1239 (S.D.N.Y. 1990) (advisers may share economies of scale with a

fund by methods including "appropriately fixed 'break-points'") (internal citation

omitted).

### E.    Fee Structures of Comparable Funds

Plaintiff asserts that the district court "did not address" his allegations

regarding "comparable" funds.  Appellant's Br. 38.  To the contrary, the court

---

[10]     In another effort to muddy the water, Plaintiff alleges that the percentage
increase in the advisory fee for a particular period was greater than the percentage
increase in net assets as of particular dates.  <u>See</u> AC ¶¶ 130, 132, 234-43, ER-410,
426-27.  Because net assets rise or fall with investment returns and with sales and
redemptions of fund shares, such arbitrary comparisons are meaningless.

[11]     Fee Study, at 6, 32, 57 n.107; SER-508-543.  For example, 19% of the 100
largest mutual funds had "[s]ingle fee contracts [that] do not employ breakpoints"
**at all**.  <u>Id.</u> at 32 (emphasis added).

properly *rejected* Plaintiff's allegations as having "little probative value" ER-22 because they are based on "other funds that are not comparable to this Fund." ER-21.

The Complaint expatiates about how the Fund's fees compare to those of Vanguard index funds and to a benchmark of index funds. AC ¶¶ 173-96, ER-416-19; Appellant's Br. 15-16, 17. As already noted, however, the Fund is actively managed. These allegations therefore are patently meritless "inapt comparisons," Jones, 559 U.S. at 350, as the district court recognized. ER-22.

The Amended Complaint also compares the Fund to four actively managed funds. Given the myriad funds in the marketplace, even allegations that the Fund's advisory fees exceeded those of four genuinely comparable funds would be entitled to almost no weight. See Amron, 464 F.3d at 345 (insufficient to allege that fund expenses were higher than the industry mean "conveniently omitting where the [fund] falls on the distribution of fees"); Scudder, 2007 WL 2325862, at *17 (comparison to four funds insufficient).

But the Amended Complaint does not even manage that. Two of the four "comparable funds"—the Windsor II and Wellington Funds, AC ¶¶ 139, 148, ER-411, 412—are Vanguard funds.[12] "That a mutual fund has an expense ratio higher

---

[12]    See SER-544-581 at 558, 582-623 at 599.

than Vanguard, a firm known for its emphasis on keeping costs low, raises little suspicion." <u>Amron</u>, 464 F.3d at 345.

Significantly, the Fund's effective advisory fee is **<u>lower</u>** than those charged by the other two funds mentioned in the Amended Complaint—the Dodge & Cox Stock Fund and Dodge & Cox International Stock Fund, AC ¶¶ 157, 165, ER-413, 415. This is true even though the Dodge & Cox funds are alleged to be larger, AC ¶¶ 160, 168, ER-414-15 and thus (at least according to Plaintiff) should be enjoying greater economies of scale.

Plaintiff attempts to paper over this inconvenient fact by alleging that the Dodge & Cox funds' advisory fees were lower than the Fund's advisory fees and Rule 12b-1 fees **<u>combined</u>**. AC ¶¶ 163, 171, ER-414-15. As already noted, however, 12b-1 fees and advisory fees are "for entirely different services," and thus are not properly "aggregated . . . to determine the merits of a Section 36(b) claim." <u>Meyer</u>, 895 F.2d at 866; ER-21.[13]

Plaintiff's affirmative allegations that the Dodge & Cox funds are appropriate benchmarks exclude the possibility that the Fund's advisory fee was

---

[13]    The AC misleadingly states that the Dodge & Cox funds' lack of a 12b-1 fee means that marketing expenses incurred by the funds "would come out of its management fee." AC ¶ 162, ER-414. But the Dodge & Cox funds are no-load funds, <u>see</u> SER-624-662 at 627. And Plaintiff does not allege and cannot allege that they incur the same expenses associated with compensating brokers to advise shareholders. <u>See</u> n.17 below.

"so disproportionately large" that it "could not have been the product of arm's length bargaining." Jones, 559 U.S. at 346. This in itself supports dismissal with prejudice. See Lekas v. Briley, 405 F.3d 602, 613 (7th Cir. 2005) ("A plaintiff can plead himself out of court by alleging facts which show that he has no claim . . . .") (citation and internal quotation marks omitted).

Consideration of comparative fees yields another independent reason for dismissal. As the Amended Complaint obliquely acknowledges, AC ¶¶ 212-13, ER-422, exactly the same advisory fee is assessed on retail class shares as on Class Y shares that are offered only to limited classes of investors consisting largely of those who qualify as "accredited investors" under Rule 501(a)(6) of Regulation D under the Securities Act of 1933.[14] 17 C.F.R. § 230.501(a)(6). The willingness of such sophisticated investors to pay the Fund's advisory fee further underscores the inadequacy of Plaintiff's contention that the fee was legally excessive. Cf. Jones, 559 U.S. at 350 n.8 (there must be a "large disparity in fees" charged to institutional and retail clients before a court finds a § 36(b) violation).

---

[14]    See SER-663-691 at 685 (class Y shares only available to limited classes of presumably large or otherwise sophisticated investors, including institutions and government entities investing at least $5 million and 401(k) and similar plans investing at least $500,000). Accredited investors are presumed sophisticated enough to fend for themselves without certain regulatory safeguards. See, e.g., Sec. & Exch. Comm'n v. Ralston Purina Co., 346 U.S. 119, 125 (1953); see generally 15 U.S.C. § 77b(a)(15)(i).

### F.    Independence and Conscientiousness of the Directors

Because Plaintiff failed to plausibly allege excessive fees, it is unnecessary to consider his allegations regarding the directors, which merely affect the degree of deference accorded the board's decision.  See Jones, 559 U.S. at 352 ("Section 36(b) is sharply focused on the question of whether the fees themselves were excessive") (internal citations omitted); Gallus v. Ameriprise Financial, Inc., 675 F.3d 1173, 1180 n.4 (8th Cir. 2012); Migdal, 248 F.3d at 328.

In any event, Plaintiff's claims are further undermined by the fact that the Fund's disinterested directors approved the fees.  See Jones, 559 U.S. at 339-40, 348-49.[15]  The ICA presumes that non-affiliated directors "are disinterested" and "a plaintiff's burden to overcome this presumption is a heavy one."  Amron, 464 F.3d at 344 (citation and internal quotation marks omitted).

Plaintiff's boilerplate allegations fail.  Plaintiff alleges that the directors serve on the boards of multiple funds with the same adviser and receive significant compensation for their service (a prevailing and, in the view of many, beneficial, industry practice, see Migdal, 248 F.3d at 330-331), AC ¶¶ 52, 61-66, ER-392-94 and therefore must devote insufficient time to each fund. AC ¶¶ 321-22, 324-25,

---

[15]    See also 15 U.S.C. § 80a-15(c) (non-interested directors must approve advisory agreement); 17 C.F.R. § 270.12b-1(b)(2) (similar).  Non-interested directors constituted a super-majority of the Fund's board.  See AC ¶ 60, ER-393; SER-663-691 at 666-670.

ER-440-41. Plaintiff also criticizes the board for relying on information furnished by the investment adviser, AC ¶¶ 314-15, ER-439, ignoring that "[t]he ICA itself approves this very practice." Migdal, 248 F.3d at 331 (citing 15 U.S.C. § 80a-15(c)); Jones, 559 U.S. at 348. Courts have repeatedly held that such allegations do not suggest that the directors were "interested." Migdal, 248 F.3d at 330-31; Krantz, 305 F.3d at 143-44; Amron, 464 F.3d at 345. The district court properly did the same. ER-23-24.

Further, Plaintiff alleges that the directors do "not stand for election annually as do most directors of public companies," and instead "serve until their resignation, removal, retirement or death." AC ¶¶ 57, 59 ER-392-93. Plaintiff adds that, in certain circumstances, the board fills director vacancies. AC ¶ 58, ER-392-93. These allegations merely restate in a pejorative manner permissible prevailing industry practices.[16] See e.g., Krantz v. Fidelity Mgmt. & Research Co., 98 F. Supp. 2d 150, 157 (D. Mass. 2000) (rejecting challenge to director

---

[16]    See Temporary Exemption for Certain Investment Advisers, 63 Fed. Reg. 40,231-01, 40,235 n.38 (July 28, 1998) ("The [ICA] does not require that shareholders annually elect directors. Most open-end funds are organized in states that do not require annual shareholder meetings.") (internal citations omitted); 15 U.S.C. § 80a-16(a). If anything, allegations that the directors enjoy what amounts to lifetime tenure underscore their independence.

independence based on allegation that "the investment adviser appointed the directors").

Significantly, Plaintiff alleges that the board acted in an informed manner in approving the challenged fees.  See AC ¶ 330, ER-443 ("the board had available to it the data necessary to determine" whether the Fund's 12b-1 plans should be continued); ¶¶ 381-82 ER-450 (similar).

Because § 36(b) "does not call for judicial second-guessing of informed board decisions," Jones, 559 U.S. at 352, Plaintiff's affirmative allegations that the board acted with complete information further supports dismissal.

## III.    THE § 36(b) 12b-1 FEE CLAIM WAS PROPERLY DISMISSED

The district court correctly concluded that Plaintiff failed to plead a plausible claim for excessive 12b-1 fees.  See ER-20-24.

### A.    Plaintiff Lacks Standing to Challenge 12b-1 Distribution Fees

Plaintiff lacks Article III standing to pursue 12b-1 distribution fee claims. Defendants previously raised this issue of subject matter jurisdiction at length by motion, dckt. nos. ("DE") 8, 10, which this Court's motions panel denied without prejudice to its renewal here.  DE 11.

As discussed in the Statement of the Case, Plaintiff owns only Class A Fund shares that do not pay 12b-1 distribution fees.  He thus lacks a financial interest in litigation relating to the 12b-1 distribution fees.  Regulations under the ICA require a strict separation of distribution-related expenses among share classes. See 17

30

C.F.R. § 270.18f-3(a)(1)(i).  Thus, assuming *arguendo* that the 0.75% 12b-1

distribution fee assessed on Class B shares were found to violate § 36(b), the result

would be a return of the amount deemed excessive, which would accrue only to the

benefit of Class B shareholders, not to Plaintiff.  Defendants respectfully submit

that the district court overlooked Rule 18f-3 in ruling that Plaintiff had standing.

ER-8.

Plaintiff's lack of a financial interest in litigation regarding the 12b-1 fees

precludes a finding of Article III standing.  See <u>Gollust v. Mendell</u>, 501 U.S. 115,

125-26 (1991); <u>Kasilag v. Hartford Financial Servs., LLC</u>, 11-1083 (RMB/KMW),

2012 WL 6568409, at *9 (D.N.J. Dec. 17, 2012).  And his theory that a reduction

of the 12b-1 fee might improve investment performance is impermissibly

speculative and fails on redressability grounds.  See <u>Glanton v. Advance PCS, Inc.</u>,

465 F.3d 1123, 1125 (9th Cir. 2006).

**B.    The District Court Properly Held that Plaintiff Failed to Allege
        that the 12b-1 Fees Were Disproportionate to the Services
        Provided**

As the district court explained, Plaintiff's 12b-1 fee claim fails because

while Plaintiff challenges "the ***use*** of the [12b-1 fee]—he thinks that the service

was unnecessary" he does ***not*** properly allege "that the fee level exceeded what

was reasonable for the service provided."  ER-21 (emphasis added).

### 1.    Plaintiff Must Allege Disproportionality

Jones did not consider a claim for excessive 12b-1 fees.  Assuming,

however, that § 36(b) can be used to attack 12b-1 fees (but see Section III.E.

below), a plaintiff must state a claim that the distribution fee received by a fund

distributor is "so disproportionately large that it bears no reasonable relationship to

the [distribution or shareholder] services rendered and could not have been the

product of arm's length bargaining."  Jones, 559 U.S. at 346.  See, e.g., Gallus, 675

F.3d at 1181-82 (12b-1 fee claim must meet Gartenberg standard); Yameen, 394 F.

Supp. 2d at 358 (dismissing complaint that failed to allege "that the distribution

fees are disproportionate and unrelated to the sales-related services actually

provided") (citation and internal quotation marks omitted).

Conversely, courts have repeatedly held that § 36(b) does not encompass a

claim that a 12b-1 plan is of insufficient or no benefit to the fund due to supposed

failures to achieve economies of scale or otherwise.  See, e.g., Bellikoff v. Eaton

Vance Corp., 481 F.3d 110, 114, 118 (2d Cir. 2007) (rejecting same allegation that

"the benefits of certain 'economies of scale' were not passed along to

shareholders" because "one must allege excessive fees, rather than fees that might

simply be described as 'improper'" and "the complaint must specifically allege that

the fees were so disproportionately large that they bore no relationship to the

services rendered"); Gallus, 675 F.3d at 1181-82 (rejecting § 36(b) fee claim based

32

on theory that shareholders did not sufficiently benefit from the fees); <u>Yameen</u>, 394 F. Supp. 2d at 357-58 (dismissing § 36(b) action alleging that fund closed to new investors could not achieve further economies of scale). <u>See also</u> <u>Alexander v. Allianz Dresdner Asset Mgmt. of America Holding, Inc.</u>, 509 F. Supp. 2d 190, 194-96 (D. Conn. 2007); <u>ING Principal Prot. Funds Derivative Litig.</u>, 369 F. Supp. 2d 163, 167-69 (D. Mass. 2005); <u>Amron</u>, 464 F.3d at 344-45.

Plaintiff's contrary argument relies on this Court's unpublished opinion in <u>Jelinek v. Capital Research and Management Co.</u>, 448 F. App'x. 716 (9th Cir. Aug. 24, 2011). Appellant's Br. 28, 43, 44. <u>Jelinek</u> lacks precedential weight. Circuit Rule 36-3; <u>U.S. v. Daychild</u>, 357 F.3d 1082, 1095 n.21 (9th Cir. 2004) ("[T]he district court should not have relied on an unpublished decision"). And the language on which Plaintiff relies (Section 36(b) is "broad enough to permit a plaintiff to sue on a theory that fees were used for improper purposes," 448 F. App'x. at 718), is dictum. Further, as noted below, <u>Jelinek</u> does not help Plaintiff in any event because it rejects the principal theory on which he relies, and Plaintiff fails to allege that fees were used for any improper purpose. Fundamentally, any suggestion that § 36(b) provides a broad mechanism for individual shareholders to challenge the uses to which a fee is put is foreclosed by <u>Jones</u>'s teaching that "Section 36(b) is sharply focused on the question of whether the fees themselves were excessive." 559 U.S. at 352 (citation and internal quotation marks omitted).

### 2.    Plaintiff Does Not Allege Disproportionality

As the district court recognized, Plaintiff's allegations—such as those regarding the absolute size of the fees, Appellant's Br. 44, inapposite comparisons with the 12b-1 fees charged by "no-load" funds[17], Id. at 44-45, or the "ratio between 12b-1 and advisory fees," ER-21—fail to even suggest disproportionality. Id. They are therefore "irrelevant to a § 36(b) claim." Id.[18]

Moreover, Plaintiff does not aver that the Fund's 12b-1 fees were not used to distribute the Fund or to provide services to the Fund's shareholders. To the contrary, with respect to service fees, Plaintiff expressly alleges that the Fund pays

---

[17]    Vanguard-managed funds Plaintiff cites are "no load." See, e.g., SER-544-581 at 548, 582-623 at 587, 599; see also Amron, 464 F.3d at 345 (recognizing Vanguard funds are low-cost funds). "No-load funds are sold directly to investors or are sold to investors through financial advisers who charge investors separately for investment advice. Thus, no-load funds tend to have lower expense ratios than other funds with similar investment objectives." INVESTMENT COMPANY INSTITUTE, 2009 INVESTMENT COMPANY FACT BOOK 65 (49th ed.); INVESTMENT COMPANY INSTITUTE, 2013 INVESTMENT COMPANY FACT BOOK 82 (53d ed.) (similar). Further, "[i]nvestors who do not want to pay 12b-1 fees have available to them a range of funds that do not charge these fees, although investors in these funds may have to pay distribution costs through other means." Mutual Fund Distribution Fees; Confirmations, 75 Fed. Reg. 47,064, 47,098 (proposed Aug. 4, 2010) (hereinafter, the "12b-1 Amendment Release").

[18]    Some allegations border on the nonsensical. Plaintiff imagines a shareholder who owns shares of multiple Davis Funds and consequently is charged "three times" for the same service. AC ¶ 216, ER-422-23. This is baffling. If someone invests $1 each in three funds with identical 12b-1 fees, the same amount of 12b-1 fees is assessed on his shares as if he invested $3 in one of the funds. Regardless, as the district court correctly held, Plaintiff lacks standing to pursue this meritless argument as he held shares in only one fund. See ER-15-16.

the .25% of net assets to "[Distributors], which pays most of the service fee to

broker-dealers for service related expenses." AC ¶ 78, ER-398; see also AC ¶ 16,

ER-385-86 (12b-1 fees "financed shareholder services provided by broker-

dealers"); AC ¶¶ 101-04, 123-24, ER-404, 407.[19]

> Accordingly, in this case as in Yameen:

> Plaintiff does not dispute that the Fund charged a 0.25% service fee to
> provide ongoing personal services, such as shareholder assistance, in
> accordance with NASD Rule 2830 . . .   It follows that the portion of
> [his] claim relating to the 0.25% service fee must be dismissed.

394 F. Supp. 2d at 355 n.5.  See also ING, 369 F. Supp. 2d at 169 (similar);

Amron, 464 F.3d at 344-45 (approving treatment of 12b-1 fees as a "'wash,' offset

by the cost of payments to personnel") (internal citation omitted).

> Similarly, regarding the 0.75% fee assessed on Class B and Class C shares,

Plaintiff acknowledges that the fees were assessed to reimburse Distributors for

commissions paid to unaffiliated third-party broker-dealers who sold Fund shares.

See, e.g., AC ¶ 79, ER-398 ("the distribution fee[] is mainly used to finance

---

[19]     These allegations generally comport with the Fund's disclosure documents.
See, e.g., SER-663-691 at 682, 692-735 at 733.  The Fund disclosed that that
"[p]ayments under the Class A Distribution Plan also may be used to **reimburse**
the Distributor for other distribution costs (**excluding overhead**) not covered in any
year by any portion of the sales charges the Distributor retains." Id. (emphasis
added).  Presumably based on this disclosure, the Amended Complaint alleges that
"[Distributors] retains for its own account a portion of the service fees from all
classes of the Fund's shares." AC ¶ 80, ER-398.  Plaintiff offers no argument that
any such portion of the service fee is disproportionate to the service rendered in
return for the fee.

payments to dealers primarily as commissions to compensate the individual stockbrokers for their sales activities."); AC ¶ 105, ER-404.[20]  Thus, such payments are again properly considered "a 'wash,' offset by the cost of payments." Amron, 464 F.3d at 344-45.

Plaintiff's supermarket allegations, AC ¶¶ 108-17, ER-405-06, fail for the same reason.  Defendants are not alleged to have received payments for maintenance of the supermarket websites, which were made to unaffiliated broker-dealers.  See ER-10 n.3; Pfeiffer, 2006 WL 497776, at *5 (even "serving as a pass-through entity for Rule 12b-1 payments does not constitute 'receipt'").

### C.    Plaintiff and the Funds Received a Legally Sufficient Benefit and Plaintiff Fails to Allege an Improper Use of Fees

Courts have soundly rejected Plaintiff's "no benefit" and "improper purpose" theories, which are nothing more than broad attacks on SEC-approved industry practices.

The Fund's 12b-1 plans (like many others) facilitate investor choice.  They enable investors to fully or partially pay for the advice and assistance of a broker or

---

[20]    Plaintiff hypothesizes that, *in the future*, Distributors may profit from the 12b-1 fees.  AC ¶ 205, ER-421.  Such speculation is irrelevant.  In any event, as plaintiff acknowledges, the funds Distributors may one day retain would simply compensate Distributors for its payments of dealer's commissions, which to date have substantially exceeded amounts collected from the Fund's 12b-1 plans, plus interest.  See AC ¶¶ 248, 398, ER-428, 453-54; SER-682-683.  Courts have validated such arrangements.  ING, 369 F. Supp. 2d at 169; Yameen, 394 F. Supp. 2d at 357.

other financial adviser indirectly and over time through a charge levied against an investor's fund shares.  See, e.g., Yameen, 394 F. Supp. 2d at 354 (Rule 12b-1 effectively allows investors in mutual funds "to choose between paying distribution and service charges up front and spreading them out over a period of several years").  See also 12b-1 Amendment Release, 75 Fed. Reg. at 47,082 (these choices "benefit shareholders").

As discussed below, payments for both pre- and post-sale services are consistent with Rule 12b-1 and expressly authorized by SEC-approved NASD rules.  These rules establish the system through which broker-dealers are compensated by mutual funds in a manner and amount that the SEC has determined to be fair and reasonable.  See Yameen 394 F. Supp. 2d at 354-55 & nn. 4-5; 12b-1 Amendment Release, 75 Fed. Reg. at 47,071 & n.100, 47,111 (payments for shareholder services are a common and legitimate use of 12b-1 fees and "may act as an inducement to intermediaries' sales personnel to sell fund shares").  See also id. at 47,065, 47,071 & nn.97-98, 47,072 & n.111.

It is absurd for Plaintiff to assert that that "broker-dealers [are] legally obligated to provide [services] to Fund shareholders without payment." AC ¶ 16, ER-385; see also AC ¶¶ 123-27, ER-407-408, Appellant's Br. 24, 44.  To the contrary, financial intermediaries are not required to work for free and the elimination of 12b-1 fees "would not eliminate the need to compensate fund

intermediaries for fund distribution and for the other services they provide." 12b-1 Amendment Release, 75 Fed. Reg. at 47,098.

In another slight variation on the theme, Plaintiff criticizes the use of 12b-1 fees to compensate unaffiliated broker-dealers for maintaining mutual fund "supermarkets" on their websites. AC ¶¶ 108-17, ER-405-06. However, the SEC has spoken approvingly of this standard industry practice. See 12b-1 Amendment Release, 75 Fed. Reg. at 47,070, 47,071 & nn. 94, 96, 103 (payments to supermarkets are "a common use of 12b-1 fees" that offer various benefits to investors); Investment Company Institute, SEC No-Action Letter, 1998 WL 1543541, at *5-*6 (Oct. 30, 1998)).

Plaintiff thus has not alleged that the 12b-1 fees did not benefit Fund shareholders or that they were used for any improper purpose.

### D. Plaintiff's Disagreement with the Directors' Decision to Approve the 12b-1 Plans Does Not State a § 36(b) Claim

A 12b-1 plan must be renewed annually by a vote of the independent directors. See 17 C.F.R. § 270.12b-1(b)(2), (b)(3)(i). It may be continued if the directors reach the business judgment that the plan likely will benefit the fund and its shareholders. 17 C.F.R. § 270.12b-1(e).

Plaintiff disagrees with the board's judgment. He opines that the 12b-1 plans were unnecessary to deal with net redemptions and speculates that the Fund would have performed better had it been smaller. AC ¶¶ 262-74, ¶ 339, ER-431-

33, 445.  Plaintiff also would have closed the Fund to new investors.  AC ¶ 261, ER-431.

Such assaults on the independent directors' business judgment are not cognizable under § 36(b), which is "sharply focused on the question whether the fees themselves were excessive."  <u>Jones</u>, 559 U.S. at 352 (citation and internal quotation marks omitted).  To the extent they may be brought at all, Plaintiff must seek redress for his supposed grievances through an ordinary shareholder derivative action—not a § 36(b) claim.  <u>See</u> <u>Green v. Nuveen Advisory Corp.</u>, 295 F.3d 738, 744 n.9 (7th Cir. 2002) ("fund mismanagement issues" outside purview of 36(b)); <u>Migdal</u>, 248 F.3d at 329.  <u>Cf.</u> <u>Jelinek</u>, 448 F. App'x. at 719 (***rejecting*** 36(b) claim based on "theory that fees were used to promote growth that was adversely affecting the mutual funds").

### E.    Rule 12b-1 Fees Are Exempt from § 36(b)

Although the Court need not reach this issue to dispose of Plaintiff's appeal, Defendants respectfully contend that there is an alternative ground for affirming dismissal of the 12b-1 fee claim, which the district court rejected, albeit with little analysis, ER-19-20:

Section 22(b) and the regulations thereunder—not § 36(b)—govern the permissible amount of 12b-1 fees, which are expressly and categorically exempted by § 36(b)(4).[21]

Congress enacted § 36(b) in 1970 to impose a judicially enforced outer-limit on advisory fees. See 1970 ICA Amendments, Pub. L. No. 91-547, 84 Stat. 1413. Section 22(b), enacted contemporaneously, contemplates that excessive mutual fund sales charges would be defined and prohibited by the NASD (now FINRA), subject to SEC supervision. See 15 U.S.C. § 80a-22(b) (authorizing NASD to strike a balance between prohibiting "excessive" sales charges and "allow[ing] for reasonable compensation for sales personnel, broker-dealers, and underwriters").

The only mutual fund sales charges in 1970 were sales loads paid directly by investors, which were and are expressly excluded from § 36(b). See 15 U.S.C. § 80a-35(b)(4). But in 1992, exercising its authority pursuant to § 22(b) and recognizing that 12b-1 fees had come to "serve as the functional equivalent of

---

[21]    Without addressing § 36(b)(4), some authority similarly holds that 36(b) may **not** be used to challenge compensation other than for advisory services fees. E.g., Green v. Nuveen Advisory Corp., 186 F.R.D. 486, 492 (N.D. Ill. 1999). The district court erroneously stated that Yameen rejected Defendants' position, ER-20, but the court actually reserved the issue. 394 F. Supp. 2d at 358 n.9.

traditional front-end sales charges," Order Approving Proposed Rule Change

Relating to the Limitation of Asset-Based Sales Charges as Imposed by Investment

Companies (hereinafter "Order Approving NASD Rule 2830"), 57 Fed. Reg.

30,985, 30,988 (July 13, 1992), the SEC approved NASD Rule 2830, which limits

the amount and permissible purposes of 12b-1 fees.  See Yameen, 394 F. Supp. 2d

at 353-55.  The SEC found that sales charges consistent with Rule 2830 are

"reasonable" and that the Rule appropriately carries out the "congressional

mandate to prevent excessive sales charges."  Order Approving NASD Rule 2830,

57 Fed. Reg. 30,985, 30,989.  See also 12b-1 Amendment Release 75 Fed. Reg. at

47,074 & n.141, 47,076 & n.161, 47,079.

    Plaintiff concedes that the Fund's 12b-1 fees complied with Rule 2830.  AC

¶¶ 285-86, ER-434.  Accordingly, the Fund's 12b-1 fees cannot be legally

excessive under § 36(b).

    Indeed, § 36(b)(4) *expressly exempts* from § 36(b) "sales loads" and

"payments made in connection with transactions subject to[22] [ICA § 17] or [the]

rule . . . thereunder."  15 U.S.C. § 80a-35(b)(4).  12b-1 fees clearly so qualify

because payments under contracts with fund distributors are specifically addressed

---

[22]    In this context, "subject to" is synonymous with "governed by."  United
States ex rel. Totten v. Bombardier Corp. and Envirovac, Inc., 286 F.3d 542, 547
(D.C. Cir. 2002).

and regulated by Rule 17d-3, which incorporates the constraints of Rule 12b-1. See 12b-1 Adopting Release, 45 Fed. Reg. at 73,898; id. at 73,901 n.48 ("The [SEC] is exercising its authority under section 17(d) to permit arrangements for use of fund assets for distribution which involve covered joint transactions only if such arrangements comply with Rule 12b-1."); 12b-1 Amendment Release, 75 Fed. Reg. at 47,095-96 & n.345.

Thus, § 36(b) claims based on purportedly excessive 12b-1 fees must be dismissed. See Laborers' Local 265 Pension Fund v. iShares Trust, No. 3:13-cv-00046, 2013 WL 4604183, at *5-9 (M.D. Tenn. Aug. 28, 2013) (dismissing § 36(b) action alleging excessiveness of § 17 transactions); Rohrbaugh v. Inv. Co. Inst., No. Civ. A. 00-2137, 2002 WL 31100821, at *2 n.8 (D.D.C. July 2, 2002) (Section 36(b)(4) "prohibits claims for any conduct covered by Section 17"); Lessler v. Little, 857 F.2d 866, 874 (1st Cir. 1988) (applying § 36(b)(4) to exclude payments subject to § 17 from § 36(b)).

## IV.    PLAINTIFF WAIVED HIS §§ 47(b) AND 48(a) ICA CLAIMS

Plaintiff failed to contest, and thus waived, any challenge to the dismissal of his § 47(b) claim.  ER-25-26.

And, irrespective of the disposition of the 36(b) claims, there is no private right of action under § 48(a).  ER-26; <u>Northstar Financial Advisors, Inc. v. Schwab Investments</u>, 615 F.3d 1106, 1116 (9th Cir. 2010); <u>Bellikoff</u>, 481 F.3d at 116-17. Plaintiff has not argued otherwise.

## V.    THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN DENYING PLAINTIFF'S RULE 59(e) MOTION

The district court acted well within its broad discretion in denying Plaintiff's post-judgment motion for leave to file a third complaint after nearly three years of exhaustive litigation.  <u>See</u> ER-3-5.

As Plaintiff concedes, Appellant's Br. 46, when a plaintiff delays until after judgment, "[i]t is clear in the first instance that the judgment would have to be reopened, under Federal Rule of Civil Procedure 59(e), before the district court could entertain [plaintiff's] motion to amend." <u>Weeks</u>, 246 F.3d at 1236 (citation omitted).  <u>See also</u> ER-3.

Rule 59(e) "is a high hurdle for [plaintiff] to meet.  Judgment is not properly reopened absent highly unusual circumstances, unless [1] the district court is presented with newly discovered evidence, [2] committed clear error, or [3] if there is an intervening change in the controlling law." <u>Weeks</u>, 246 F.3d at 1236 (citation and internal quotation marks omitted).

Thus, Plaintiff's assertion that the Proposed Third Complaint "clearly alleges a claim," Appellant's Br. 52, is not merely incorrect.  It misstates the law.

43

"The question is whether the court, when it dismissed the case, committed some clear error that required it to reopen the judgment." Id. at 1326.[23]

Plaintiff failed to demonstrate any basis for Rule for 59(e) relief.

## A.    Plaintiff Presented No Newly Discovered Evidence

To be "newly discovered" for purposes of Rule 59(e), evidence must "be discovered after the judgment" and "could not be discovered earlier through due diligence" and must be "of such a magnitude that had the court known of it earlier, the outcome would like have been different." Dixon v. Wallowa County, 336 F.3d 1013, 1022 (9th Cir. 2003).  Plaintiff satisfies none of these criteria.  To the contrary, as the district court found, the inconsequential additional alleged facts in Plaintiff's Proposed Third Complaint were "based on evidence readily available" to Plaintiff well before the district court dismissed the action.  ER-4.

## B.    There Was no Intervening Change in Controlling Law

Plaintiff asserts that, "if published," Jelinek, 448 F. App'x. 716 "would… have constituted a change in controlling law."  Appellant's Br. 49.  But Jelinek was

---

[23]    Citing inapposite Ninth Circuit cases involving pre-judgment motions to amend that did not apply Rule 59(e), Plaintiff suggests that there is "manifest injustice" whenever a proposed post-judgment amendment states a claim. Appellant's Br. 49, 51.  This is contrary to Weeks, inconsistent with the extraordinary nature Rule 59(e) relief, and would all but eliminate the incentive to timely seek amendment before judgment.

*unpublished*; it carries no precedential force.  <u>See</u> Section II.B.1.  Further, as noted in Sections II.B and D, <u>Jelinek</u> is unhelpful to Plaintiff.

Plaintiff notes that he filed the Amended Complaint before <u>Jones</u>. Appellant's Br. 47.  However, Plaintiff does not state that <u>Jones</u> was either a change or intervening.

And with good reason: As discussed above, <u>Jones</u> confirmed the <u>Gartenberg</u> standard on which both of Defendants' motions to dismiss were predicated, SER-318-351, 736-762, 786-798, 828-847, thus precluding any claim of unfair surprise. More importantly, as discussed in the Statement of the Case, Plaintiff made no attempt to amend his complaint in the ***13 months*** between the <u>Jones</u> decision and entry of judgment.  Plaintiff instead elected to stand on his second complaint and request permission to file more briefs defending the sufficiency of the amended complaint under <u>Jones</u>.  <u>See</u> DE 68, ER-470.  <u>Jones</u> is no basis to allow Plaintiff another post-judgment bite at the apple.  <u>See, e.g.,</u> <u>In re Western States Wholesale Natural Gas Antitrust Litig.</u>, 715 F.3d 716, 738 (9th Cir. 2013) (affirming denial of leave where plaintiff delayed seeking amendment for several months after significant new judicial opinion); <u>Ruotolo v. City of New York</u>, 514 F.3d 184, 191-92 (2d Cir. 2008) (affirming denial of amendment based on intervening case when plaintiff did not move promptly following decision).  <u>See generally</u> <u>Exxon Shipping Co. v. Baker</u>, 554 U.S. 471, 485 n.5 (2008) (59(e) "may not be used to…

45

raise arguments or present evidence that could have been raised prior to the entry of judgment.") (citation and internal quotation marks omitted).

## C.    The District Court Did Not Err in Dismissing with Prejudice

Plaintiff also fails to demonstrate that the district court committed any error (let alone the requisite clear error) in dismissing with prejudice.

Plaintiff asserts that it is "common practice" to allow leave to amend following dismissal.  Appellant's Br. 50.[24]  However, "[a]lthough Federal Rule of Civil Procedure 15(a) provides that leave to amend 'shall be granted when justice so requires,' it is **not** to be granted automatically."  In re Western States Wholesale Natural Gas Antitrust Litig., 715 F.3d at 738 (citation and internal quotation marks omitted, emphasis added).  Instead, whether to grant leave to amend "remains within the discretion of the district court."  Leadsinger, Inc. v. BMG Music Publishing, 512 F.3d 522, 532 (9th Cir. 2008).  And courts may deny leave to amend for futility *or* in light of such other factors as "undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, [or] undue prejudice to the opposing party . . . ."  Id., quoting Foman v. Davis, 371 U.S. 178, 182 (1962).  See also  Gilley

---

[24]    Cases in which this Court required further amendments are distinguishable. For example, some involve a first complaint that could be amended as a matter of right.  E.g., Doe v. United States, 58 F.3d 494, 497 (9th Cir. 1995).  Others address actions filed by a pro se litigant who "is far more prone to making errors in pleading."  E.g., Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000).

Enterprises v. Atlantic Richfield Co., 588 F.3d 659, 669 n.8 (9th Cir. 2009)

(concluding denial of leave to replead appropriate even assuming plaintiff "could,

in the abstract, amend his complaint to state a claim").

Plaintiff contends that "he could not know the deficiencies the Court might

find in his pleading until the Court decided the motion to dismiss."  Appellant's Br.

47.  But this Court and others have recognized that plaintiffs are **not** "entitled to an

advisory opinion from the Court informing them of the deficiencies in the

complaint and then an opportunity to cure those deficiencies."  Bellikoff, 481 F.3d

at 118 (citations and internal quotation marks omitted).  See Metzler, 540 F.3d at

1072 (affirming denial of leave to amend notwithstanding that "the prior

dismissals… did **not** provide [plaintiff] with guidance as to the basis of

dismissals") (emphasis added); Krantz, 305 F.3d at 144-45 (available case law

provided notice).

Here, Plaintiff received ample guidance.  Defendants' motion to dismiss the

initial Complaint, SER-828-847, had already given Plaintiff a roadmap of the

deficiencies in his claims.  He failed to cure those deficiencies in his Amended

Complaint.  In fact, Plaintiff chose to stand on his Amended Complaint even after

receiving a second roadmap of its deficiencies in Defendants' motion to dismiss

the Amended Complaint, SER-736-762, the Jones decision, several opportunities

for supplemental briefing and other materials, ER-4, 469-72, *nearly two years*

47

between the filing of the motion to dismiss and its disposition, ER-468, 472, and an explicit warning from the district court that its decision on the motion to dismiss may be dispositive.  ER-4.

Plaintiff notes that one of his numerous briefs included a cursory footnote reference to the possibility of a further amendment, albeit without specifying what it might add.  Appellant's Br. 48.  This perfunctory boilerplate allusion was completely inadequate, and Plaintiff's failure to make a meaningful effort to amend prior to judgment independently supports affirmance.

In Cervantes v. Countrywide Home Loans, Inc., 656 F.3d 1034, 1043 (9th Cir. 2011), this Court recognized that District of Arizona Local Rule 15.1 requires "plaintiffs to submit a copy of the proposed amended pleadings along with a motion to amend."  Id. at 1043.  Cervantes reiterated that a district court does "not abuse its discretion by denying leave to amend where the [plaintiff] failed to attach a proposed amended complaint in violation of local rules and failed to articulate a factual and legal basis for amendment."  Id. (citation omitted).  Such a request is "procedurally improper and substantively unsupported."  Id.  It was insufficient that Plaintiffs mentioned their desire for leave to amend and stated a "general theory" of the proposed amendment.  Id.

Here, similarly, despite being on notice of the Amended Complaint's deficiencies for almost two years, prior to judgment, Plaintiff never sought to

comply with L.R. 15.1.  Nor did he so much as "indicate[] how he could amend his Amended Complaint to state a claim," ER-7, 26.  Plaintiff even failed to forecast an amendment at the motion to dismiss hearing or in the two weeks between the hearing and entry of judgment although the district court "noted it was possible that the hearing could result in a dispositive order."  ER-4.[25]  The district court cannot be said to have acted improperly by denying Plaintiff's essentially non-existent request to amend.  See Cervantes, 656 F.3d at 1043; Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 749 (9th Cir. 2006).

The extensive proceedings and corresponding burdens on Defendants and the judiciary—coupled with the availability long before Plaintiff sought to amend of the inconsequential additional facts cited in the Proposed Third Complaint, ER-4 - underscore that the district court's dismissal with prejudice was well within its discretion, which is "particularly broad where the plaintiff has bypassed other opportunities to amend."  Westlands Water Dist. v. Firebaugh Canal, 10 F.3d 667, 677 (9th Cir. 1993).  See Premo v. Martin, 119 F.3d 764, 772 (9th Cir. 1997) (after judgment, "the conclusion that amendment will cause undue delay is particularly justified" and such delay "is a legitimate rationale for denying leave to amend"); McHenry v. Renne, 84 F.3d 1172, 1179 (9th Cir. 1996) (affirming denial of leave

---

[25]    Plaintiff seemingly disagrees with the district court's findings regarding the hearing.  See Appellant's Br. 46.  This is meritless.  Regardless, Plaintiff did not properly preserve the matter for review.  See FED. R. APP. P. 10(c).

to amend where defendants "had to spend a large amount of time and money defending against" prior prolix complaints) (citations and internal quotations omitted); <u>Royal Ins. Co. of Am. v. Southwest Marine</u>, 194 F.3d 1009, 1016-17 (9th Cir. 1999) (affirming denial of leave to reassert an old theory based on additional facts that plaintiff knew earlier); <u>Amerisourceberrgen Corp v. Dialysist West, Inc.</u>, 465 F.3d 946, 952-54 (9th Cir. 2006) (similar); <u>Perrian v. O'Grady</u>, 958 F.2d 192, 195 (7th Cir.1992) (citing burden on judiciary).

In sum, "[f]aced with a complaint that did not state a cause of action, the district court properly granted judgment." <u>Weeks</u>, 246 F.3d at 1236. It was hardly obliged to permit Plaintiff's post-judgment third complaint "particularly in light of the fact that he did not seek to amend during the seven months [or, in this case, almost two years] that the motion for judgment on the pleadings was pending." <u>Id.</u>

## VI.   THE PROPOSED THIRD COMPLAINT WAS SUBSTANTIVELY INADEQUATE

The Court may affirm on the alternative ground that the substance of the Proposed Third Complaint falls far short of the standard for a motion to amend or a motion to re-open the judgment.

### A.   Plaintiff's New Advisory Fee Allegations Make no Difference

The PTC's advisory fee claim fails for substantially the same reasons as the claim set forth in the Amended Complaint. The few new allegations that Plaintiff

offers, which are discussed below, relate to three <u>Gartenberg</u> factors and are plainly insufficient.

### 1.    Nature and Quality of Services Provided

The PTC repeatedly refers to data and rankings from Morningstar.com. Plaintiff implies that Morningstar's views support a claim of substandard services and excessive fees.  PTC ¶¶ 109-127, ER-55-59.  Plaintiff emphasizes that Morningstar awarded the Fund only two "stars" out of five based on its risk-adjusted performance over a five-year period, fewer stars than earned by other funds deemed comparable by Morningstar.  PTC ¶¶ 109, 120, ER-55, 57; Appellant's Br. 11.

Even focusing only on the portions of the Morningstar analysis that Plaintiff has cherry-picked, the PTC does not state a plausible claim.  As already discussed above, assertions that a fund has underperformed (particularly over a fairly short period) do not suggest excessive fees especially where, as here, the Fund's longer term track record was excellent.  <u>See</u> Section II.A.; ER-22; <u>Migdal</u>, 248 F.3d at 327-28.  It is immaterial that this same alleged underperformance resulted in the Fund earning fewer Morningstar stars.

Consideration of the entirety of the contemporaneous Morningstar reports underscores why there is no reason to revive this lawsuit.[26] While Morningstar observed that the Fund "has had a crummy five years" (resulting in the two star ranking), it proceeded to explain:

> [D]espite its recent stumbles, this fund remains attractive. It has low expenses, experienced comanagers, a stable analyst team, and a consistent approach that entails buying and holding stocks that look cheap relative to their historical and projected earnings adjusted for [various] factors…. The fund also beat its index and most peers in every rolling 10-year period on these managers' watch.

SER-77-91, 24-42 (same). Morningstar also awarded the Fund a grade of "A" (the best possible) for fees, and explains that "***this fund is among the cheapest front-load, large cap offerings, earning it full credit for cost***." SER-77-91 (emphasis added). Accordingly, the Fund was an "Analyst Pick," and Morningstar awarded the Fund an overall grade of "A." Id. Other Morningstar reports similarly conclude that the Fund's fees were low and that the advisory services were of high quality.[27]

---

[26]    The Morningstar reports were part of the record and filed with Defendants' opposition to Plaintiff's Rule 59(e) motion or with a motion for judicial notice in further support of that opposition. See SER-18-67. The district court properly granted the motion for judicial notice for the sake of a complete record. ER-5-6.

[27]    See SER-24-42, p.3 (Fund "is among the cheapest front-load, large-cap offerings," earning best possible grade for fees); SER-46-47, p.1 (noting the Fund's "stellar overall record," which was aided "by the [F]und's low costs"); SER-56-57, p.1 (noting Fund's "reasonable expenses").

Plaintiff suggests that the Court ignore the full Morningstar reports because the PTC did not reference them.  Appellant's Br. 61.  However, where, as here, the reports' authenticity is unquestioned, courts should "prevent plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting documents upon which their claims are based."  <u>Swartz v. KPMG LLP</u>, 476 F.3d 756, 763 (9th Cir. 2007) (citation and internal quotation and other marks omitted).

Moreover, Plaintiff affirmatively argues that Morningstar's information is authoritative.  According to Plaintiff, "Morningstar is a respected Chicago-based investment research firm that is the bible of the mutual fund industry and a reliable source of independent data for the mutual fund industry."  Appellant's Br. 11 n.4.  And Plaintiff here must do more than plead a plausible claim—he must show that denying him leave to amend would work a manifest injustice.  <u>See</u> <u>Turner v. Burlington Northern Santa Fe R. Co.</u>, 338 F.3d 1058, 1063 (9th Cir. 2003) (59(e) relief available only in narrow circumstances such as to correct manifest injustice).  <u>See also</u> FED. R. CIV. P. 15 (authorizing leave to amend "when justice so requires").

It is thus entirely appropriate for the Court to consider that Morningstar information clearly ***refuted*** Plaintiff's claims.  <u>See, e.g.</u>, <u>Bay Harbour Management LLC v. Carothers</u>, 474 F. Supp. 2d 501, 504 (S.D.N.Y. 2007) (in determining that an amended pleading would not further the interests of justice, court considered

53

that proposed new claims were undermined by evidentiary materials from

purported source of allegations).  Cf. Morongo Band of Mission Indians v. Rose,

893 F.2d 1074, 1079 (9th Cir. 1990) (affirming denial of leave to amend where,

among other things, the proposed amended claim was tenuous); California ex rel.

Dept. of Toxic Substances Control v. Neville Chemical Co., 358 F.3d 661, 673

(9th Cir. 2004) ("Futility includes the inevitability of a claim's defeat on summary

judgment."); McHenry, 84 F.3d at 1179 (the lower the likelihood of plaintiff's

success, the more appropriate is dismissal with prejudice).

### 2.    Fee Structures of Comparable Funds

Plaintiff admits that his additional "comparable funds" allegations are the

most significant change in the PTC.  Appellant's Br. 52.  But they are transparently

meritless.

The PTC again compares the Fund's fee structure to those of index funds

and to three other Vanguard funds.  PTC ¶¶ 190, 196-202, ER-76-78.  These inapt

comparisons must be rejected for the reasons discussed above in Section II.E.

The PTC also compares the Fund's fees to four other funds.  PTC ¶¶ 190-95,

ER-76-77.  As discussed above, even an unfavorable comparison with four of the

many funds in the marketplace would be meaningless.  And Plaintiff still cannot

even muster that.

The Fund's effective advisory fee rate is ***lower*** than those of two of the four allegedly comparable funds—the larger Dodge & Cox Stock Fund, AC ¶¶ 157, 160, 168, ER-413-15, and the Fidelity Growth Company Fund.  PTC ¶¶ 118-121, 139, 190, ER-57, 76; SER-92-195;  see also SER-624-662.  Plaintiff unsuccessfully attempts to obscure these straightforward, indisputable facts with largely irrelevant charts and graphs, some of which impermissibly aggregate different fees paid by the allegedly comparable funds.  See, e.g., PTC ¶¶ 139, 148, 190, 196, ER-61, 66, 76, 77.  Plaintiff also repeats the misleading and immaterial allegation that the Dodge & Cox funds' advisory fees were lower than the Fund's advisory fees and Rule 12b-1 fees combined.  PTC ¶ 140 n.5, ER-65.[28]

Further, Plaintiff's only pleaded basis for selectively comparing the Fund to these four funds is that Morningstar's analysis supports the comparison.  See, e.g., PTC ¶¶ 115-121, ER-56-57.  But Plaintiff cannot attempt to predicate a claim on Morningstar's fund categories while running from Morningstar's express conclusion that the Fund "***is among the cheapest front-load, large cap offerings,***

---

[28]    One of the remaining two allegedly comparable funds from the American Funds family is significantly larger than the Fund, PTC p. 31, ¶ 139, p. 47, ¶ 209, ER-63, 79, and thus (at least according to Plaintiff), should be enjoying greater economies of scale and charging lower effective advisory fees than the Fund.  See, e.g., PTC ¶¶ 167, 170, ER-71.

*earning it full credit for cost*" and thus receives Morningstar's best possible grade for fees.  SER-24-41, 77-91 (emphasis added).

### 3.    Independence and Conscientiousness of the Directors

The PTC adds that, at the June 2009 meeting of the Fund's board of directors, the adviser announced that "it was voluntarily reducing the management fee" of the Fund by an amount that Plaintiff characterizes as "immaterial."  PTC ¶¶ 7-8, ER-36.

That the adviser voluntarily lowered fees by an allegedly immaterial amount hardly suggests that prior fees were legally excessive or that the board process was somehow deficient.  If anything, the change confirms that Davis appropriately shares economies of scale with investors.

### B.    Plaintiff's 12b-1 Fee Allegations Are Substantially Similar to Those Already Rejected by the Court

Plaintiff's recycled claim regarding the Fund's 12b-1 fees deserves little discussion.

The PTC reiterates Plaintiff's view that the distribution and other services provided in exchange for the 12b-1 fees were not useful or necessary or should not have been authorized, PTC ¶¶ 72, 179-80, ER-46, 73-74; and that the 12b-1 fees were large in absolute terms or as compared with the advisory fees, or that the fees grew with the size of the Fund.  PTC ¶¶ 86-87, 154, 177, 180-86, 203-207, ER-50-51, 68, 73-75, 78.  The PTC also includes a number of incoherent allegations

purporting to compare 12b-1 fees among various funds. PTC ¶¶ 209-217, ER-79-80. But most of the supposed benchmarks are no-load Vanguard funds that are **not** sold with the advice and other services provided by brokers. See PTC ¶ 209, ER-79; SER-544-623 (identifying SEC filings stating that funds are no load). Plaintiff makes no attempt to compare the services provided to the shareholders of these manifestly dissimilar funds. Thus, Plaintiff again has plainly failed to allege disproportionality.

Plaintiff also again affirmatively alleges that nearly all of the 12b-1 fees are to enable payments to unaffiliated third party entities for distribution related expenses and shareholder services. PTC ¶ 65, ER-45 (Distributors pay "most of the service fee to broker-dealers for service-related expenses"); PTC ¶ 67, ER-45 (the 12b-1 distribution fee "is mainly used to finance payments to dealers, primarily commissions, to compensate the individual stockbrokers for their sales activities."). Such payments should be treated as a "'wash,' offset by the cost of payments to the personnel," Amron, 464 F.3d at 344-45 (internal citation omitted).

For these reasons and the additional reasons in Section II, the PTC also fails to state a claim, and no injustice resulted from the denial of leave to amend.

## VII. THE LAWSUIT CANNOT EXTEND BEYOND TIME PERIODS FOR WHICH PLAINTIFF FILED A VALID AND TIMELY COMPLAINT

As demonstrated above, there are abundant reasons for this Court to affirm the judgment of dismissal with prejudice. An alternative and additional ground for

partial affirmance is that the lawsuit must be limited to time periods for which Plaintiff filed a valid and timely complaint.

The district court concluded that "the damages period in this case runs from July 28, 2007, through the present and the time of trial, if any." ER-3.

This contravenes the principle that "a plaintiff is not entitled to recover damages for injuries resulting from wrongful acts committed subsequent to the filing of the action." Flintkote Co. v. Lysfjord, 246 F.2d 368, 394 (9th Cir. 1957); Reyn's Pasta Balla, 442 F.3d at 749 (even when continuing conspiracy alleged).

There is an exception: a plaintiff may sue regarding events arising after filing the complaint if (1) he supplements his pleading pursuant to Rule 15(d), and (2) the supplemental pleading is timely on its own or with the benefit of the relation back rule of Rule 15(c)(1)(B). See William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc. 668 F.2d 1014, 1056-1057 (9th Cir. 1981).

The exception is inapplicable.

Plaintiff never sought leave to file a supplemental pleading. Plaintiff filed the Amended Complaint on April 23, 2009, ER-382, without the mandatory request for leave to file a supplemental pleading, ER-466-67. See Young-Henderson v. Spartanburg Area Mental Health Ctr., 945 F.2d 770, 775 (4th Cir. 1991) ("facts accruing after the suit is brought may not be inserted by way of amendment but must be added by supplemental pleading . . . supplemental

pleadings require leave of court."). Plaintiff also deems his proposed third complaint filed June 29, 2011 an *amended* (not *supplemental*) pleading. ER-33.

Even if the Court treated Plaintiff's Amended Complaint and PTC as supplemental pleadings, these complaints cannot relate back for two reasons.

First, relation back is categorically unavailable in § 36(b) cases. Section 36(b)(3) provides that "[n]o award of damages shall be recoverable [under § 36(b) for any time period prior to one year before the action was instituted." 15 U.S.C. § 80a-35(b)(3). This is not an ordinary statute of limitations, but a substantive limit on liability similar to a statute of repose to which relation back does not apply. See In re Franklin, 478 F. Supp. 2d at 685; Krinsk v. Fund Asset Mgmt., Inc, 1986 WL 205, at *3-4 (S.D.N.Y. May 9, 1986). See also Miguel v. Country Funding Corp., 309 F.3d 1161, 1164-65 (9th Cir. 2002) (Rule 15(c) did not allow plaintiff to relate back claim where the applicable time bar was a statute of repose); Police and Fire Ret. Sys. Of the City of Detroit, v. IndyMac MBS, 721 F.3d 95, 105-06 (2d Cir. 2013), cert. granted, 134 S.Ct. 1515 (Mar 10, 2014).

Second, merely filing an initial § 36(b) complaint challenging some fees does not *ipso facto* put into issue *every* component of compensation Defendants receive from the fund while the case is pending. Instead, each annual investment advisory agreement and each annual 12b-1 distribution plan is a separate "transaction or occurrence" within the meaning of Rule 15(c)(1)(B).

The ICA requires funds to have written advisory contracts and 12b-1 plans that must be reviewed and approved by the fund's directors at least annually. 15 U.S.C. § 80a-15(a); 17 C.F.R. 270.12b-1(b)(2), (3)(i). Accordingly, a complaint challenging one advisory fee contract or 12b-1 distribution plan does not relate back to a complaint challenging another. See Brever v. Federated Equity Mgmt. Co., 233 F.R.D. 429, 432 (W.D. Pa. 2005) (proposed amendment that would have expanded § 36(b) claim to include advisory fees for a different time period "necessarily cover[s] fee arrangements and services that are distinct from those initially brought under review by [the original plaintiff's] claims" and, as a result, fails to satisfy the requirements of Rule 15(c)(2)). Cf. Oja v. U.S. Army Corps of Eng'rs, 440 F.3d 1122, 1134-35 (9th Cir. 2006) (claim challenging statement as Privacy Act violation does not relate back to claim challenging almost identical earlier statement on different website).

These principles have the following implications:

1.    Plaintiff's later complaints do not relate back to the original.

2.    Because Plaintiff never supplemented his original pleading, he may not seek damages postdating the commencement of the action.

3.    Even if Plaintiff's purported amended pleadings were treated as supplemental pleadings (which they should not be), they can expand the lawsuit by no more than one year prior to their filing. William Inglis, 668 F.2d at 1056

(noting potential for gaps in damage periods when plaintiff fails to timely supplement).

## **CONCLUSION**

The district court's judgment should be affirmed.

Dated:  April 18, 2014                    Respectfully submitted,

s/   Nicholas G. Terris
Stephen G. Topetzes
Nicholas G. Terris
Nicole A. Baker
K&L GATES LLP
1601 K Street, NW
Washington, DC   20006
Tel:  (202) 778-9000
Fax: (202) 778-9100
stephen.topetzes@klgates.com
nicholas.terris@klgates.com
nichole.baker@klgates.com


Christina N. Goodrich
K&L Gates LLP
10100 Santa Monica Blvd., 7th Floor
Los Angeles, CA  90067
Tel:  (310) 552-5000
Fax:  (310) 552-5001
christina.goodrich@klgates.com


*Counsel for Davis Selected Advisers, L.P. and Davis Distributors, LLC*

## CERTIFICATE OF COMPLIANCE

I, Nicholas G. Terris, certify that this proportionally-spaced brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). Excluding the parts exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), this brief contains 13,903 words as determined by the word processing program used to prepare this brief, Microsoft Word 2010.

I further certify that (1) all privacy redactions have been made pursuant to Federal Rule of Appellate Procedure 25(a)(5); (2) that the electronic submission of this brief is an exact copy of the paper document submitted to the Court; and (3) that this document has been scanned for viruses with the most recent version of Symantec Endpoint, a commercial virus scanning program, and is free of viruses.

                                       */s/ Nicholas G. Terris*
                                       Nicholas G. Terris
                                       Counsel for Appellees
                                       Davis Distributors, LLC and
                                       Davis Selected Advisers, L.P.

## <u>STATEMENT OF RELATED CASE</u>

Pursuant to Ninth Circuit Rule 28-2.6, defendants are not aware of any

related cases pending in this Court.

 */s/ Nicholas G. Terris*
Nicholas G. Terris
Counsel for Appellees
Davis Distributors, LLC and
Davis Selected Advisers, L.P.

# ADDENDUM

# ADDENDUM

## Constitutional Provisions

Article III, Sect. 2 ...................................................................................4

## Statutes

15 U.S.C. § 77b(a)(15)(i) .........................................................................4

15 U.S.C. § 80a-15(a) ...............................................................................4

15 U.S.C. § 80a-15(c) ...............................................................................5

15 U.S.C. § 80a-16(a) ...............................................................................6

15 U.S.C. § 80a-17(d) ...............................................................................6

15 U.S.C. § 80a-22(b) ...............................................................................7

15 U.S.C. § 80a-35(b) ...............................................................................8

15 U.S.C. § 80a-46(b) ...............................................................................9

15 U.S.C. § 80a-47(a) .............................................................................10

Pub. L. No. 91-547, 84 Stat. 1413 .........................................................10

## Regulations

17 C.F.R. § 230.501(a)(6) .......................................................................10

17 C.F.R. § 270.12b-1(b)(2) ...................................................................11

17 C.F.R. § 270.12b-1(b)(3)(i).................................................................11

17 C.F.R. § 270.12b-1(e) ........................................................................11

17 C.F.R. § 270.18f-3(a)(1)(i) .................................................................12

**Other**

45 Fed. Reg. 73,898 ........................................................................12

45 Fed. Reg. 73,901 n.48 ................................................................14

57 Fed. Reg. 30,985 ...................................................................... 14

57 Fed. Reg. 30,988 ........................................................................15

57 Fed. Reg. 30,989 ...................................................................... 17

63 Fed. Reg. 40231-01 .................................................................. 20

63 Fed. Reg. 40235 n. 38 ................................................................21

75 Fed. Reg. 47,064 ...................................................................... 21

75 Fed. Reg. 47,065 ........................................................................22

75 Fed. Reg. 47,070 ........................................................................24

75 Fed. Reg. 47,071 & nn.94, 96-98, 100, 103........................................26

75 Fed. Reg. 47,072 & n.111 ............................................................28

75 Fed. Reg. 47,074 & n.141 ............................................................30

75 Fed. Reg. 47,076 & n.161 ............................................................33

75 Fed. Reg. 47,079 ........................................................................35

75 Fed. Reg. 47,082 ........................................................................37

75 Fed. Reg. 47,095 ........................................................................38

75 Fed. Reg. 47,096 & n.345 ............................................................40

75 Fed. Reg. 47,098 ........................................................................43

75 Fed. Reg. 47,111 ........................................................................45

NASD Rule 2830(b)(8)(A) ..............................................................46

NASD Rule 2830(b)(9) ....................................................................46

NASD Rule 2830(d)(2)(E) ...............................................................46

Federal Rule of Civil Procedure 12(b)(6) .......................................47

Federal Rule of Civil Procedure 15 ................................................47

Federal Rule of Civil Procedure 59(e) ............................................49

Federal Rule of Appellate Procedure 10(c) .....................................49

District of Arizona Local Rule 15.1.................................................49

## Article III, Sect. 2

The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority;--to all cases affecting ambassadors, other public ministers and consuls;--to all cases of admiralty and maritime jurisdiction;--to controversies to which the United States shall be a party;--to controversies between two or more states;--between a state and citizens of another state;--between citizens of different states;--between citizens of the same state claiming lands under grants of different states, and between a state, or the citizens thereof, and foreign states, citizens or subjects.

## 15 U.S.C. § 77b(a)(15)(i)

(a) Definitions
When used in this subchapter, unless the context otherwise requires--

(15) The term "accredited investor" shall mean--

(i) a bank as defined in section 77c(a)(2) of this title whether acting in its individual or fiduciary capacity; an insurance company as defined in paragraph (13) of this subsection; an investment company registered under the Investment Company Act of 1940 [15 U.S.C.A. § 80a-1 et seq.] or a business development company as defined in section 2(a)(48) of that Act [15 U.S.C.A. 80a-2(a)(48)]; a Small Business Investment Company licensed by the Small Business Administration; or an employee benefit plan, including an individual retirement account, which is subject to the provisions of the Employee Retirement Income Security Act of 1974 [29 U.S.C.A. § 1001 et seq.], if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such Act [29 U.S.C.A. § 1002(21)], which is either a bank, insurance company, or registered investment adviser;

## 15 U.S.C. § 80a-15(a)

(a) Written contract to serve or act as investment adviser; contents

It shall be unlawful for any person to serve or act as investment adviser of a registered investment company, except pursuant to a written contract, which

4

contract, whether with such registered company or with an investment adviser of such registered company, has been approved by the vote of a majority of the outstanding voting securities of such registered company, and--

(1) precisely describes all compensation to be paid thereunder;

(2) shall continue in effect for a period more than two years from the date of its execution, only so long as such continuance is specifically approved at least annually by the board of directors or by vote of a majority of the outstanding voting securities of such company;

(3) provides, in substance, that it may be terminated at any time, without the payment of any penalty, by the board of directors of such registered company or by vote of a majority of the outstanding voting securities of such company on not more than sixty days' written notice to the investment adviser; and

(4) provides, in substance, for its automatic termination in the event of its assignment.


### 15 U.S.C. § 80a-15(c)

(c) Approval of contract to undertake service as investment adviser or principal underwriter by majority of noninterested directors

In addition to the requirements of subsections (a) and (b) of this section, it shall be unlawful for any registered investment company having a board of directors to enter into, renew, or perform any contract or agreement, written or oral, whereby a person undertakes regularly to serve or act as investment adviser of or principal underwriter for such company, unless the terms of such contract or agreement and any renewal thereof have been approved by the vote of a majority of directors, who are not parties to such contract or agreement or interested persons of any such party, cast in person at a meeting called for the purpose of voting on such approval. It shall be the duty of the directors of a registered investment company to request and evaluate, and the duty of an investment adviser to such company to furnish, such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such company. It shall be unlawful for the directors of a registered investment company, in connection with their evaluation of the terms of any contract whereby a person undertakes regularly to serve or act as investment

adviser of such company, to take into account the purchase price or other consideration any person may have paid in connection with a transaction of the type referred to in paragraph (1), (3), or (4) of subsection (f) of this section.

## 15 U.S.C. § 80a-16(a)

(a) Election of directors

No person shall serve as a director of a registered investment company unless elected to that office by the holders of the outstanding voting securities of such company, at an annual or a special meeting duly called for that purpose; except that vacancies occurring between such meetings may be filled in any otherwise legal manner if immediately after filling any such vacancy at least two-thirds of the directors then holding office shall have been elected to such office by the holders of the outstanding voting securities of the company at such an annual or special meeting. In the event that at any time less than a majority of the directors of such company holding office at that time were so elected by the holders of the outstanding voting securities, the board of directors or proper officer of such company shall forthwith cause to be held as promptly as possible and in any event within sixty days a meeting of such holders for the purpose of electing directors to fill any existing vacancies in the board of directors unless the Commission shall by order extend such period. The foregoing provisions of this subsection shall not apply to members of an advisory board.

Nothing herein shall, however, preclude a registered investment company from dividing its directors into classes if its charter, certificate of incorporation, articles of association, by-laws, trust indenture, or other instrument or the law under which it is organized, so provides and prescribes the tenure of office of the several classes: Provided, That no class shall be elected for a shorter period than one year or for a longer period than five years and the term of office of at least one class shall expire each year.

## 15 U.S.C. § 80a-17(d)

(d) Joint or joint and several participation with company in transactions

It shall be unlawful for any affiliated person of or principal underwriter for a registered investment company (other than a company of the character described in

section 80a-12(d)(3)(A) and (B) of this title), or any affiliated person of such a person or principal underwriter, acting as principal to effect any transaction in which such registered company, or a company controlled by such registered company, is a joint or a joint and several participant with such person, principal underwriter, or affiliated person, in contravention of such rules and regulations as the Commission may prescribe for the purpose of limiting or preventing participation by such registered or controlled company on a basis different from or less advantageous than that of such other participant. Nothing contained in this subsection shall be deemed to preclude any affiliated person from acting as manager of any underwriting syndicate or other group in which such registered or controlled company is a participant and receiving compensation therefor.

## 15 U.S.C. § 80a-22(b)

(b) Rules relating to purchase of securities by members from issuer investment company

(1) Such a securities association may also, by rules adopted and in effect in accordance with section 78o-3 of this title, and notwithstanding the provisions of subsection (b)(6) thereof but subject to all other provisions of said section applicable to the rules of such an association, prohibit its members from purchasing, in connection with a primary distribution of redeemable securities of which any registered investment company is the issuer, any such security from the issuer or from any principal underwriter except at a price equal to the price at which such security is then offered to the public less a commission, discount, or spread which is computed in conformity with a method or methods, and within such limitations as to the relation thereof to said public offering price, as such rules may prescribe in order that the price at which such security is offered or sold to the public shall not include an excessive sales load but shall allow for reasonable compensation for sales personnel, broker-dealers, and underwriters, and for reasonable sales loads to investors. The Commission shall on application or otherwise, if it appears that smaller companies are subject to relatively higher operating costs, make due allowance therefor by granting any such company or class of companies appropriate qualified exemptions from the provisions of this section.

(2) At any time after the expiration of eighteen months from December 14, 1970 (or, if earlier, after a securities association has adopted for purposes of paragraph (1) any rule respecting excessive sales loads), the Commission may alter or

supplement the rules of any securities association as may be necessary to effectuate the purposes of this subsection in the manner provided by section 78s(c) of this title.

(3) If any provision of this subsection is in conflict with any provision of any law of the United States in effect on December 14, 1970, the provisions of this subsection shall prevail.

## 15 U.S.C. § 80a-35(b)

(b) Compensation or payments as basis of fiduciary duty; civil actions by Commission or security holder; burden of proof; judicial consideration of director or shareholder approval; persons liable; extent of liability; exempted transactions; jurisdiction; finding restriction

For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person. With respect to any such action the following provisions shall apply:

(1) It shall not be necessary to allege or prove that any defendant engaged in personal misconduct, and the plaintiff shall have the burden of proving a breach of fiduciary duty.

(2) In any such action approval by the board of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company, shall be given such consideration by the court as is deemed appropriate under all

8

the circumstances.

(3) No such action shall be brought or maintained against any person other than the recipient of such compensation or payments, and no damages or other relief shall be granted against any person other than the recipient of such compensation or payments. No award of damages shall be recoverable for any period prior to one year before the action was instituted. Any award of damages against such recipient shall be limited to the actual damages resulting from the breach of fiduciary duty and shall in no event exceed the amount of compensation or payments received from such investment company, or the security holders thereof, by such recipient.

(4) This subsection shall not apply to compensation or payments made in connection with transactions subject to section 80a-17 of this title, or rules, regulations, or orders thereunder, or to sales loads for the acquisition of any security issued by a registered investment company.

(5) Any action pursuant to this subsection may be brought only in an appropriate district court of the United States.

(6) No finding by a court with respect to a breach of fiduciary duty under this subsection shall be made a basis (A) for a finding of a violation of this subchapter for the purposes of sections 80a-9 and 80a-48 of this title, section 78o of this title, or section 80b-3 of this title, or (B) for an injunction to prohibit any person from serving in any of the capacities enumerated in subsection (a) of this section.


## 15 U.S.C. § 80a-46(b)

(b) Equitable results; rescission; severance

(1) A contract that is made, or whose performance involves, a violation of this subchapter, or of any rule, regulation, or order thereunder, is unenforceable by either party (or by a nonparty to the contract who acquired a right under the contract with knowledge of the facts by reason of which the making or performance violated or would violate any provision of this subchapter or of any rule, regulation, or order thereunder) unless a court finds that under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of this subchapter.

(2) To the extent that a contract described in paragraph (1) has been performed, a court may not deny rescission at the instance of any party unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its grant and would not be inconsistent with the purposes of this subchapter.

(3) This subsection shall not apply (A) to the lawful portion of a contract to the extent that it may be severed from the unlawful portion of the contract, or (B) to preclude recovery against any person for unjust enrichment.

## 15 U.S.C. § 80a-47(a)

(a) Procurement

It shall be unlawful for any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person which it would be unlawful for such person to do under the provisions of this subchapter or any rule, regulation, or order thereunder.

## Pub. L. No, 91-547, 84 Stat. 1413

To amend the Investment Company Act of 1940 and the Investment Advisers Act of 1940 to define the equitable standards governing relationships between investment companies and their investment advisers and principal underwriters, and for other purposes.

## 17 C.F.R. § 230.501(a)(6)

(a) Accredited investor. Accredited investor shall mean any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

**17 C.F.R. § 270.12b-1(b)(2)**

(b) A registered, open-end management investment company ("Company") may act as a distributor of securities of which it is the issuer: Provided, That any payments made by such company in connection with such distribution are made pursuant to a written plan describing all material aspects of the proposed financing of distribution and that all agreements with any person relating to implementation of the plan are in writing: And further provided, That:

(2) Such plan, together with any related agreements, has been approved by a vote of the board of directors of such company, and of the directors who are not interested persons of the company and have no direct or indirect financial interest in the operation of the plan or in any agreements related to the plan, cast in person at a meeting called for the purpose of voting on such plan or agreements;

**17 C.F.R. § 270.12b-1(b)(3)(i)**

(b) A registered, open-end management investment company ("Company") may act as a distributor of securities of which it is the issuer: Provided, That any payments made by such company in connection with such distribution are made pursuant to a written plan describing all material aspects of the proposed financing of distribution and that all agreements with any person relating to implementation of the plan are in writing: And further provided, That:

(3) Such plan or agreement provides, in substance:

(i) That it shall continue in effect for a period of more than one year from the date of its execution or adoption only so long as such continuance is specifically approved at least annually in the manner described in paragraph (b)(2) of this section;

**17 C.F.R. § 270.12b-1(e)**

(e) A registered open-end management investment company may implement or continue a plan pursuant to paragraph (b) of this section only if the directors who vote to approve such implementation or continuation conclude, in the exercise of reasonable business judgment and in light of their fiduciary duties under state law and under sections 36(a) and (b)(15 U.S.C. 80a–35 (a) and (b)) of the Act, that

11

there is a reasonable likelihood that the plan will benefit the company and its shareholders;

## 17 C.F.R. § 270.18f-3(a)(1)(i)

Notwithstanding sections 18(f)(1) and 18(i) of the Act (15 U.S.C. 80a–18(f)(1) and (i), respectively), a registered open-end management investment company or series or class thereof established in accordance with section 18(f)(2) of the Act (15 U.S.C. 80a–18(f)(2)) whose shares are registered on Form N–1A [§§ 239.15A and 274.11A of this chapter] ("company") may issue more than one class of voting stock, provided that:

(a) Each class:

(1)(i) Shall have a different arrangement for shareholder services or the distribution of securities or both, and shall pay all of the expenses of that arrangement;

## 45 Fed. Reg. 73,898

Summary: The Commission is adopting a rule to permit open-end management investment companies to bear expenses associated with the distribution of their shares, if such companies comply with certain conditions and procedures. The rule requires that any decision by an open-end management investment company to use its assets to finance distribution be approved by its shareholders and directors, including its disinterested directors. The rule also contains provisions intended to ensure that the disinterested directors are not dominated or nor unduly influenced by management and that the directors are fully informed and exercise reasonable business judgment. The procedures in the rule by which shareholders and directors would approve a plan to use assets for distribution are generally similar to those prescribed by statute for approval of investment advisory contracts. The procedural requirements are somewhat less stringent that they were in the rule as proposed.

The Commission also is adopting a rule to exempt from the requirement of prior Commission approval, to the extent necessary, certain agreements between open-end management investment companies and their affiliated persons whereby investment company assets are used for distribution, if such agreements are entered into in compliance with the rule permitting such companies to bear their

distribution expenses.

The Commission is adopting certain disclosure and reporting requirements relating to the use of assets for distribution, including a revision of the registration and reporting form for open-end management investment companies.

The Commission is taking these actions because it believes that directors and shareholders of open-end management investment companies should be able to make business judgments to use fund assets for distribution in appropriate cases but that, in view of the investment adviser's conflict of interest with respect to any recommendation to bear distribution expenses and because of uncertainties about whether such companies are likely to benefit from such expenditures, any such exercise of business judgment should be subject to conditions designed to ensure that it is made by persons who are free of undue management influence and have carefully considered all relevant factors.

. . .

Supplementary Information:  The Commission today is adopting rule 12b-1 (17 CFR 270.12b-1) under the Investment Company Act of 1940 (15 U.S.C. 80a-1 et seq.) ("Act") to permit open-end management investment companies ("mutual funds" or "funds") to bear expenses associated with the distribution of their shares. Among the significant provisions of the rule are the following:

--Selection and nomination of directors who are not interested persons of the fund must be committed to the discretion of such disinterested directors;

--A fund which decides to bear distribution expenses must formulate a written plan describing all material aspects of the proposed financing of distribution, and all agreements relating to implementation of the plan must be in writing; such plan and agreements must contain certain provisions similar to those required by the Act for investment advisory contracts;

-- The plan must be approved initially: (1) By a vote of at least a majority of the fund's outstanding voting securities; (2) by its board of directors as a whole; and (3) separately by its directors who are not interested persons of the fund and have no direct or indirect financial interest in the operation of the plan or any agreement related to the plan;

--In considering a plan to finance distribution, the directors must give appropriate weight to all pertinent factors; and

--The directors must decide, in the exercise of their reasonable business judgment and in light of their fiduciary duties under state law and under the Act, that there is a reasonable likelihood that a plan will benefit the fund and its shareholders.

The Commission also is adopting rule 17d-3 (17 CFR 270.17d-3) under the Act to provide an exemption from section 17(d) (15 U.S.C. 80a-17(d)) of the Act and rule

17d-1 (17 CFR 270.17d-1) thereunder, to the extent necessary, for agreements between a mutual fund and its affiliated persons whereby payments are made by the fund with respect to distribution, if such agreements are entered into in compliance with rule 12b-1. The Commission also is adopting certain disclosure and reporting requirements relating to use of assets for distribution, so that funds which bear distribution expenses in accordance with rule 12b-1 will disclose that fact to shareholders and prospective investors, as well as report it in registration statements filed with the Commission.

## 45 Fed. Reg. 73,901 n.48

It must be noted that the Commission is also relying on other sources of authority as well. Section 38(a) of the Act (15 U.S.C. 80a-37(a)) gives the Commission general authority to adopt rules "necessary or appropriate to the exercise of the powers conferred" elsewhere in the Act and specifically authorizes the Commission to define "accounting, technical, and trade terms" used in the Act. The latter phrase is significant because the term "distributor" is section 12(b) is not defined. In addition, section 17(d) of the Act authorizes the Commission to adopt rules regulation certain joint transactions involving investment companies and their affiliated persons and principal underwriters. The Commission is exercising its authority under section 17(d) to permit arrangements for use of fund assets for distribution which involve covered joint transactions only if such arrangements comply with rule 12b-1.

## 57 Fed. Reg. 30,985

I. Introduction and Background

The National Association of Securities Dealers, Inc. ("NASD") submitted on December 28, 1990, a proposed rule change pursuant to section 19(b)(1) [FN1] of the Securities Exchange Act of 1934 ("Act") and rule 19b-4 [FN2] thereunder to amend article III, section 26 of the Rules of Fair Practice to subject asset-based sales charges imposed in connection with mutual fund shares to a maximum sales charge. Notice of the proposed rule change appeared in the Federal Register on April 19, 1991.[FN3] The Commission received 24 comment letters.[FN4] This order approves SR-NASD-90-69 as proposed, effective one year from the date of this order.

In 1970, Congress amended section 22(b) of the investment Company Act of 1940 ("1940 Act") to expand the NASD's authority to prohibit NASD members from offering or selling to the public mutual fund shares that include an excessive sales load.[FN5] To that end, in 1975 the NASD proposed and, with Commission approval, adopted amendments to article III, section 26 of the Rules of Fair Practice to impose a limitation on the sales charge permitted as a front-end sales load on shares offered and sold by its members.[FN6]

Under the "maximum sales charge rule" in the existing Rules of Fair Practice, no member may offer or sell shares of any open-end investment company or any "single payment" investment plan issued by a unit investment trust registered under the 1940 Act if the public offering price includes a sales charge which is excessive. Under existing rules, the maximum front-end sales charge may not exceed 8.5 percent of the offering price of mutual fund shares. The maximum amount is scaled down in steps to 6.25 percent if investors are not offered one of three additional services or benefits: dividend reinvestment at net asset value, quantity discounts, or rights of accumulation.

**57 Fed. Reg. 30,988**

One commenter raised issues not otherwise raised by those in favor of the proposal, those opposing the proposal, or those commenting on the de minimis exception. Specifically, this commenter questioned (1) the NASD's authority to regulate "Pure No-Load Funds" pursuant to article III, section 26 of the Rules of Fair Practice and (2) the NASD's jurisdiction to regulate service fees.[FN20] As this commenter has noted, funds that do not charge asset-based fees but do however charge service fees will be subject to NASD regulation under the proposed rule. In responding to this commenter, the NASD asserted its jurisdictional authority to regulate fees received by its members pursuant to section 22(b) of the 1940 Act [FN21] and section 15A(b)(6) of the Act.[FN22]

The Commission received eight comment letters that were generally in favor of the proposed rule change.[FN23] These commenters believed the NASD should regulate asset-based sales charges; they believed the proposal appropriately recognized that rule 12b-1 fees, alone or in combination with contingent deferred sales charges, generally serve as the functional equivalent of traditional front-end sales charges and should therefore be subject to NASD regulation. Moreover, those in favor of the proposal believed it constituted a step forward in this area, providing significant protections for investors while allowing flexibility in fund

distribution systems. Some commenters who supported the proposal requested modifications of various sections as discussed below.

One commenter who was otherwise in favor of the proposed rule change suggested that the small one-time asset-based sales charges on very large purchases should not trigger a change in the fund's classification resulting in a substantial decrease in the maximum sales charge permitted.[FN24] The NASD believes it is difficult to exclude the "one-time charges" from the parameters of the rule as the fund's own disclosure documents describe these fees as asset-based sales charges. Both the Commission and the NASD have taken the position that providing such relief would not be compatible with the proposed rule.

Another commenter generally in favor of the proposed rule change suggested allowing an asset-based distribution charge with an annual maximum of .75%-1.0% which is not limited with a cap.[FN25] Here again, the NASD and the Commission are of the opinion that such a modification would undermine the intent of the rule, inasmuch as an overall cap, which is equivalent regardless of the type of sales charge assessed, is the essence of the proposed rule change.

The Commission received comment letters from seven commenters who expressed complete opposition to all aspects of the proposed rule change. [FN26] Most of these commenters who expressed opposition to the proposed rule change maintained that the proposed rule should not be approved because they believe fees are already adequately disclosed in the prospectus and that potential shareholders need only examine the mutual fund fee table, required in every fund prospectus, to determine if the costs of the fund are fair and reasonable.[FN27] Similarly, these commenters asserted that shareholders seeking alternatives to funds with sales charges and 12b-1 fees have a variety of no-load funds from which to choose. The NASD believes and the Commission agrees that disclosure alone is insufficient to achieve market uniformity and investor protection in this context. While disclosure is the cornerstone of the securities laws, the Commission believes the NASD's proposal would further the objectives of market uniformity and investor protection.

Further, those opposing the rule change objected to the fee capping aspect of this proposal, arguing that the government does not require the same disclosure and fee caps for other products such as bank certificates of deposit and insurance products. Approval of the proposal, thus, would place the mutual fund community at a competitive disadvantage.[FN28] In response to this argument, the NASD has stated that it does not believe the proposed rule change imposes any burden on the ability of investment companies to compete for investor's dollars not necessary or

16

appropriate in the furtherance of the purposes of the Act. In addition, the Commission notes that the alternative investment products to which commenters have compared mutual fund shares are subject to an entirely different regulatory scheme, and some differences in the nature of regulation may be warranted.

In the same vein, commenters expressed opposition to the proposed rule change because they believed that the proposed rule would not give NASD members reasonable compensation for the skills and services provided to mutual fund shareholders. More specifically, three commenters opposed the imposition of the .25 percent service fee limitation entirely, arguing that this amount is inadequate compensation for brokers.[FN29] Having considered this argument, the NASD has informed the Commission that it believes a .25 percent annual service fee is adequate compensation for the service provided to investors as no aggregate cap is imposed on service fees and such fees may be assessed indefinitely.

## 57 Fed. Reg. 30,989

Two commenters generally opposing the proposal, and one who offered specific comments but no general opinion in favor or against the proposal contended that the rule change should not be retroactively applied to investments made under the then-existing rules where fees were adequately disclosed in the prospectus and/or fee table.[FN30] The NASD takes issue with this position and believes that it is advantageous for investment companies to apply the proposed rule change to investments made prior to the effective date of the proposed rule change. The proposed rule change would apply current charges to old debts, thereby allowing investment companies to recoup distribution costs which were previously paid and intended to be amortized. Without this provision, the NASD asserts that funds would have difficulty paying off their debts while remaining within the rule's limitations. In addition, the NASD has asserted that if this were not permitted funds would be forced to utilize three different net asset values: (1) Investments made before the new rule: (2) investments made under the new rule; and (3) investments made after the cap is reached.

Finally, in its notice of the proposed rule change, the Commission specifically requested comment on the no-load de minimis exception in section 26(d)(3) of the proposal. Commenters addressed what they believed to be the consequences of use of the "no-load" designation by funds that assess a charge on assets to finance sales activities. Four commenters who objected strongly to the de minimis exception argued that the no-load designation should be reserved for funds with no sales or

distribution charges so as not to undercut their distinctive marketing advantage or confuse investors.[FN31] Two argued that 0.25 percent was not "immaterial" in that it would be the equivalent of a 2.25 percent front-end sales load for an investor that held the shares for ten years.[FN32]

Six commenters supported the de minimis exception, saying that funds with small asset-based charges were functionally similar to traditional no-load funds because they both use low-cost distribution systems. [FN33] One of these commenters supplied statistical data to show that funds with de minimis charges had expense ratios generally comparable to those of most traditional no-load funds.[FN34] Commenters also pointed out that the prospectus fee table, which discloses actual fees and charges, would minimize investor confusion. The NASD agreed and expressed the opinion that the industry generally supports this exception.[FN35]

Moreover, two commenters favoring the proposal pointed out that without a de minimis exception the rule could have anomalous results, since a fund with a high advisory fee but no distribution fee could be described as no-load while a fund with a de minimis distribution fee and a low advisory fee could not use the no-load label, even if the two funds had the same overall expense level.[FN36] These commenters suggested that this would give the fund without an explicit distribution fee an unfair marketing advantage.

V. Discussion

The Commission has considered all comments received and has determined that the NASD's proposed rule change should be approved. The Commission is of the opinion that the proposed rule change carries out the NASD's congressional mandate to prevent excessive sales charges on mutual funds shares. The Commission believes that the proposed rule change appropriately balances the need to ensure that the NASD's rules allow broker-dealers, sales personnel and underwriters to receive reasonable compensation, against the need to ensure that investors are charged reasonable sales loads. While disclosure of the sales loads in the fund's prospectus is critical to an informed investor, disclosure alone in this instance is insufficient to comply with the congressional mandate that the NASD adopt rules to prevent excessive sales loads. Additionally, the Commission believes the amendments will promote fairness by assuring some degree of parity between the sales and sales-promotion expenses permitted of traditional load funds and those allowable to funds that assess finance charges against their assets.

The Commission has considered the jurisdictional issues raised with respect to

service fees in the comments received and finds that regulation of these fees is within the NASD's jurisdiction. The ability of the NASD, through its rules, to regulate comprehensively mutual fund fees received by members is fully consistent with the statutory mandate of section 22(b) of the 1940 Act that gives the NASD authority to prohibit excessive sales loads, and with protection of investors and the promotion of just and equitable principles of trade pursuant to section 15A(b)(6) of the Act.

Section 22(b) of the 1940 Act gives the NASD a specific grant of authority to prohibit excessive sales loads. In addition, section 15A(b)(6) of the Act requires, in pertinent part, that the Association adopt and amend its rules to promote just and equitable principles of trade, and in general to provide for the protection of investors and the public interest. The requirement that the Association's rules comport with just and equitable principles of trade encompasses the power to provide safeguards against unreasonable rates of commission or other charges.

The Association's proposal would revise its existing regulation of maximum sales charges that may be imposed by investment companies. The revision would extend the current maximum sales charge rule to include asset-based sales charges and tailor the rule's application to different sales charge compensation structures. The purpose of the revised maximum sales charge rule is to create "approximate economic equivalency" as to maximum sales charges for different types of mutual funds. Given the specific mandate of section 22(b) of the 1940 Act and the requirement of just and equitable principles of trade embodied in section 15A(b)(6) of the Act, the Commission is of the view that the NASD has authority to adopt rules that ensure overall reasonableness of sales fees received by members.

The Association's proposal would also directly limit members' underwriting and distribution of shares of investment companies that impose or pay service fees in excess of prescribed maximums. These limitations are intended to assure that service fees paid by investors are reasonable. If maximum sales loads are regulated, but service fees are not subject to any maximum limitation, it will be possible for members and investment companies to circumvent the intention of the sales fee rules by imposing or paying increased service fees.  Such a result would frustrate the NASD's power to regulate sales charges pursuant to section 22(b) of the 1940 Act.

**63 Fed. Reg. 40231-01**

AGENCY: Securities and Exchange Commission.

ACTION: Proposed rule.

SUMMARY: The Commission is proposing for public comment amendments to the rule under the Investment Company Act of 1940 that permits an investment adviser, in certain circumstances, to advise an investment company temporarily under a contract that the investment company's shareholders have not approved. The proposed amendments would expand the exemption provided by the rule to include new advisory contracts entered into as a result of a merger or similar business combination involving the fund's adviser or a controlling person of the adviser, and would lengthen the period during which the adviser may serve under a contract without shareholder approval. The proposed amendments are intended to enable more investment advisers to rely on the rule rather than seek individual exemptions from the Commission, subject to conditions designed to protect the interests of investors pending the shareholder vote.

DATES: Comments must be received on or before September 30, 1998.

…

SUPPLEMENTARY INFORMATION: The Securities and Exchange Commission (the "Commission") today is requesting public comment on amendments to rule 15a-4 (17 CFR 270.15a-4) under the Investment Company Act of 1940 (15 U.S.C. 80a) (the "Investment Company Act" or the "Act").

. . .

I. Executive Summary

The Commission is proposing for public comment amendments to rule 15a-4 under the Investment Company Act. Rule 15a-4 permits an investment adviser to an investment company ("fund") to serve temporarily under a contract that has not been approved by the fund's shareholders. The proposed amendments would extend the rule to new advisory contracts entered into as a result of a merger or similar business combination involving the fund's adviser or a controlling person of the adviser, in connection with which the adviser or a controlling person of the adviser receives a benefit (collectively, "adviser mergers"). The amendments also would increase the maximum number of days the investment adviser could serve under the rule and clarify the timing of board approval of the fund's advisory contract. The proposed amendments would enable more investment advisers to rely on the rule rather than seek an individual exemption from the Commission, subject to conditions designed to protect the interests of investors pending the shareholder vote.

II. Background

Section 15(a) of the Investment Company Act prohibits a person from serving as

an investment adviser to a fund except under a written advisory contract that the fund's shareholders have approved.[FN1] Section 15(a) also requires that an advisory contract must provide for its automatic termination upon its assignment.[FN2] An advisory contract that continues in effect for more than two years must be approved annually by either the fund's board of directors or its shareholders.[FN3]

Section 15(a) is designed to give shareholders a voice in a fund's investment advisory contract and to prevent trafficking in fund advisory contracts.[FN4] One of section 15(a)'s unintended effects, however, is to leave a fund without an investment adviser if the fund's contract with the adviser is terminated before the fund's shareholders can vote on a new contract.

### 63 Fed. Reg. 40235 n. 38

A provision related to annual shareholder meetings would, as a practical matter, principally affect closed-end funds. The Act does not require that shareholders annually elect directors. Investment Company Act section 16(a) (15 U.S.C. 80a-16(a)); John Nuveen & Co. Inc., SEC No-Action Letter (Nov. 18, 1986). Most open-end funds are organized in states that do not require annual shareholders' meetings. See, e.g., Del. Code Ann. tit. 12, § 3806(b)(5) (1995); Md. Code Ann., Corps. & Ass'ns §2-501(b) (1993). See generally Protecting Investors Report, supra note 9, at 275. Most closed-end funds, however, list their shares on stock exchanges and are required to hold annual meetings under stock exchange rules. See, e.g., New York Stock Exchange Listed Company Manual 302.00 (1995).

### 75 Fed. Reg. 47,064

SUMMARY: The Securities and Exchange Commission ("SEC" or "the Commission") is proposing a new rule and rule amendments that would replace rule 12b-1 under the Investment Company Act, the rule that has permitted registered open-end management investment companies ("mutual funds" or "funds") to use fund assets to pay for the cost of promoting sales of fund shares. The new rule and amendments would continue to allow funds to bear promotional costs within certain limits, and would also preserve the ability of funds to provide investors with alternatives for paying sales charges (e.g., at the time of purchase, at the time of redemption, or through a continuing fee charged to fund assets). Unlike the current rule 12b-1 framework, the proposed rules would limit the cumulative sales charges each investor pays, no matter how they are imposed. To help

investors make better-informed choices when selecting a fund that imposes sales charges, the Commission is also proposing to require clearer disclosure about all sales charges in fund prospectuses, annual and semi-annual reports to shareholders, and in investor confirmation statements.

As part of the new regulatory framework, the Commission is proposing to give funds and their underwriters the option of offering classes of shares that could be sold by dealers with sales charges set at competitively established rates—rates that could better reflect the services offered by the particular intermediary and the value investors place on those services. For funds electing this option, the proposal would provide relief from restrictions that currently limit retail price competition for distribution services.

The proposed rule and rule amendments are designed to protect individual investors from paying disproportionate amounts of sales charges in certain share classes, promote investor understanding of fees, eliminate outdated requirements, provide a more appropriate role for fund directors, and allow greater competition among funds and intermediaries in setting sales loads and distribution fees generally.

DATES: Comments must be received on or before November 5, 2010.

. . .

SUPPLEMENTARY INFORMATION: The Commission is proposing to rescind rule 12b-1 [17 CFR 270.12b-1] under the Investment Company Act of 1940 ("Investment Company Act" or "Act").[FN1] The Commission is also proposing for comment: New rule 12b-2 [17 CFR 270.12b-2] under the Investment Company Act; amendments to rules 6c-10 [17 CFR 270.6c-10] and 11a-3 [17 CFR 270.11a-3] under the Investment Company Act; amendments to Form N-1A[FN2] under the Investment Company Act and the Securities Act of 1933 ("Securities Act"); [FN3] amendments to rule 6-07 [17 CFR 210.6-07] of Regulation S-X under the Securities Act; amendments to rule 10b-10 [17 CFR 240.10b-10] and Schedule 14A[FN4] under the Securities Exchange Act of 1934 ("Exchange Act"); [FN5] technical changes to rule 10b-10; and technical and conforming changes to various rules and forms under the Investment Company Act.

## 75 Fed. Reg. 47,065

## I. Introduction

More than 87 million Americans, representing slightly less than half of all

households, own mutual funds.[FN6] Some investors buy fund shares directly from mutual fund sponsors without paying a sales charge.[FN7] However, most fund investors buy through intermediaries.[FN8] These intermediaries include broker-dealers, banks, insurance companies, financial planners, and retirement plans. When investors use intermediaries to buy fund shares, they typically will pay (either directly or indirectly) some form of sales charge or service fees to compensate the intermediaries for the services they provide.[FN9]

Investors use intermediaries for a variety of reasons. Some want help in selecting a particular fund or building a diversified portfolio of investments. Others like the convenience of holding a variety of financial assets together in the same account and receiving a single comprehensive account statement. A growing number of investors use mutual funds as a way to fund their retirement plans, college savings accounts, annuity or life insurance contracts, or other tax-advantaged investment vehicles, which are often offered by an intermediary.[FN10] In some cases, investors use an intermediary (and pay sales charges) not necessarily for the services they obtain from the intermediary, but simply to be able to invest in shares of a particular fund that they cannot buy directly (i.e., that are sold only through intermediaries).

There are over 9,000 funds available to investors, offering a variety of investment strategies to suit different investment needs.[FN11] Investors can select among many types of intermediaries from which they can purchase fund shares, and have choices as to how they pay for the services of those intermediaries. They may pay a "sales load" at the time they purchase shares, or a deferred sales load when they redeem shares, or they may invest in a fund that pays ongoing sales charges on behalf of investors from fund assets, otherwise known as 12b-1 fees.[FN12] As an alternative, they may choose to invest through an intermediary that deducts fees directly from the investor's account by a separate agreement (e.g., "wrap fee programs"). Whether an investor pays sales charges depends upon the fee structure of the fund in which the investor chooses to invest, and how those sales charges are paid depends upon the "class" of fund shares that the investor selects.[FN13]

These sales charge arrangements are disclosed in fund prospectuses, and are governed by a combination of statutory provisions and rules adopted by the Commission and the Financial Industry Regulatory Authority, Inc. ("FINRA"), a self-regulatory organization for broker-dealers.[FN14] These rules have been in place for many years and, as discussed in more detail below, we believe that they may no longer fully reflect the current economic realities of the mutual fund marketplace or best serve the interests of fund investors. In this Release, we first

review how these rules developed, our experience in administering them, changes we have observed in how funds distribute their shares, and the evolving needs of shareholders. We then propose a new framework that would continue to allow funds to give investors choices as to how and when to pay for sales charges, improve disclosure designed to enhance investor understanding of those charges, limit the cumulative sales charges each investor pays, and eliminate uncertainties associated with current requirements while providing a more appropriate role for fund directors. Finally, the proposal would offer funds and their underwriters the option of offering a class of shares that could be sold by intermediaries subject to competition in establishing sales charge rates.

II. Background

A. Mutual Fund Sales Charges

When the Investment Company Act was enacted in 1940, investors paid most of the costs of selling and promoting fund shares in the form of a sales charge or sales "load" deducted from the purchase price at the time of sale by the fund's principal underwriter (typically the fund's adviser or a close affiliate).[FN15] The sales load financed brokers' commissions, advertisements, and other sales and promotional activities. Only a limited number of funds, called "no-load" funds, marketed their shares directly to investors without the assistance of a retail broker, and did not charge sales loads.[FN16] The selling costs of no-load funds (primarily advertising) typically were subsidized by the funds' investment advisers out of their profits.

**75 Fed. Reg. 47,070**

Through our Web site, we have also provided investors with information and tools designed to enhance their understanding of the fees and distribution expenses they pay as a consequence of owning mutual funds.[FN80]

3. Multiple Classes
We also permitted funds to offer multiple "classes" of shares, each with its own arrangement for the payment of distribution costs and related shareholder services.[FN81] These multiple class arrangements were designed to give investors a choice of ways to pay for sales charges.[FN82] Investors in one class of shares have the same investment experience as investors in the other classes, except for expenses related to distribution and shareholder services. These multiple class

arrangements have been adopted by most fund groups that sell through intermediaries.[FN83]

Class designations are not standardized by law, although funds often use similar nomenclature.[FN84] Class "A" shares generally are sold with a front-end sales load, and also often have a 12b-1 fee of about 25 basis points.[FN85] Class "B" shares typically are sold without a front-end load but charge a spread load consisting of a 12b-1 fee of 100 basis points (the maximum rate under NASD Conduct Rule 2830, including a service fee) and a declining CDSL. Class B shares usually convert automatically to class A shares after a fixed period of time has elapsed (commonly six to eight years from the date of purchase).[FN86] Class "C" shares typically charge a "level load" consisting of a 100 basis point 12b-1 fee that is imposed for as long as the investor owns the shares, and also may charge a small CDSL of one percent if a shareholder redeems within the first year, but seldom convert to class A shares with lower 12b-1 fees.[FN87] Other classes may be available only to certain types of investors, such as those who invest in retirement plans, are institutional investors, or purchase through a particular intermediary or type of intermediary, such as a financial planner.[FN88]

D. The Current Role of 12b-1 Fees
Rule 12b-1 plans continue to play a significant role in paying for fund distribution costs. The majority of funds have adopted rule 12b-1 plans, which paid a total of $9.5 billion in 12b-1 fees in 2009 (down from a high of $13.3 billion in 12b-1 fees in 2007).[FN89]

There has been a trend in fund class share ownership away from those that impose the highest sales loads and 12b-1 fees. In recent years, no-load share classes have attracted more net new cash flow than load share classes.[FN90] According to Investment Company Institute ("ICI") figures, in 2009, $323 billion flowed into no-load share classes of long-term mutual funds, while in comparison, load share classes only received $39 billion in net new cash flow.[FN91] In 2009, class B shares experienced net outflow for a seventh consecutive year, with total net outflow of approximately $24 billion.[FN92] In contrast, net new investment in class A shares was approximately $19 billion, and net new investment in class C shares was approximately $37 billion.[FN93]

Although more investors appear to be investing in no-load funds and share classes, these statistics do not reflect a trend away from using intermediaries.[FN94] According to the ICI, 80 percent of investors who own funds outside of a retirement plan use an intermediary that provides professional financial assistance

25

("financial advisor"). [FN95] Of those investors, almost half own funds purchased solely through financial advisors, while the rest own funds purchased through financial advisors as well as directly from fund companies, mutual fund supermarkets, or discount brokers.[FN96]

**75 Fed. Reg. 47,071 & nn.94, 96-98, 100, 103**

The data suggest a growing predominance of no-load or load-waived classes in funds that traditionally were sold with a load.[FN97] In these circumstances, investors do not pay a sales load, but pay distribution expenses through a separate fee arranged between the intermediary and the investor, and/or through the payment of ongoing "service fees." [FN98]

A significant use of 12b-1 fees today is for what is typically characterized as "services" provided to investors after the sale by the broker-dealers and other intermediaries who sell the fund. According to the Investment Company Institute, more than half of all 12b-1 fees paid by funds are used for this purpose,[FN99] with broker-dealers and bank trust departments being the primary recipients. Under the NASD sales charge rule discussed above, up to 25 basis points of fund assets annually may be paid to members as a "service fee." [FN100]

Amounts deducted from assets in excess of a service fee are typically charged to support the fund's distribution efforts and operate as an alternative to a front-end sales load.[FN101] These 12b-1 fees, which are used to pay the selling costs of B and C share classes, are "asset-based sales charges" under the NASD sales charge caps and are limited to a maximum of 75 basis points of fund assets, annually, as discussed above.

A common use of 12b-1 fees is to pay for the fund to be included on third-party platforms for purchasing mutual funds, such as employer-sponsored retirement plans and fund supermarkets. Supermarkets and retirement plans have become major avenues by which investors purchase mutual funds. They have assumed many of the recordkeeping and ongoing servicing and support functions for shareholders that funds otherwise would perform, and these are often paid for, at least partially, through 12b-1 fees.[FN102] Under the NASD sales charge rule, no-load funds are able to compensate discount brokers and supermarkets for the costs of servicing shareholders in those channels through asset-based fees of up to 25 basis points annually of the value of fund shares that are held in the intermediary's client accounts.[FN103] Funds that are offered as investment options in defined

26

contribution retirement plans also may pay 12b-1 fees (often 50 basis points or more annually) to the plan administrator to offset some of the costs of servicing shareholders (and perhaps other participants) who invest through those plans.[FN104]

A minor use of 12b-1 fees is to pay expenses of the fund's principal underwriter and for advertising and promotions. Although this was one of the main purposes for which 12b-1 plans originally were intended, in recent years, only about two percent of 12b-1 fees have been used to pay these types of expenses.[FN105]

E. Additional Commission Consideration of Rule 12b-1
In 2004, the Commission amended rule 12b-1 to prohibit fund advisers from directing fund brokerage to compensate broker-dealers for selling fund shares.[FN106] When we proposed those amendments, we invited comment on whether the Commission should consider additional changes to the rule, including potentially rescinding it.[FN107] We made this request after observing that the current practice of using 12b-1 fees as a substitute for a sales load was a departure from the rule as envisioned in 1980.[FN108]

To further explore the available options for reforming the rule, we held a roundtable on rule 12b-1 on June 19, 2007, to solicit the views of investor advocates, fund industry representatives, independent directors, current and former regulators, representatives from broker-dealers and other intermediaries who sell fund shares, and interested observers.[FN109] The participants responded to Commissioners' questions regarding the costs and benefits of 12b-1 plans, the role of 12b-1 plans in current fund distribution practices, and options for reform.

n.94  Among households owning mutual funds, only 20 percent of these investors purchased directly from mutual funds in 2009. See Shareholder Profile Report, supra note 6, at 27. The prevalence of mutual fund "supermarkets" (described in note 96, infra), employer-sponsored retirement plans, and fee-based financial advisers (advisers who charge investors separately for their services rather than through a load or fee assessed at the fund level) has provided investors alternative means of purchasing no-load funds. See 2010 ICI Fact Book, supra note 6, at 65. Many investors now purchase no-load funds through these intermediaries.

n.96  Id. at 85. Mutual fund supermarkets, which are sponsored by brokerage firms, "permit investors to purchase and hold a broad range of funds from many different fund sponsors through a single brokerage account." Robert C. Pozen, The Mutual Fund Business (2d Ed., 2002), at 304. The primary benefit of this "one-stop

shopping venue" is simplicity: An investor can buy funds from different fund families and receive all of their statements in a single report. Discount brokers allow investors to trade securities at a lower commission rate but provide less individualized service.

n.97  See 2010 ICI Fact Book, supra note 6, at 76.

n.98  See generally Carol Gehl, et al., Mutual Fund Regulation § 18:6.1 (May 2008); Fee Trends Report, supra note 22, at 6 (noting that although in the 1980s and 1990s sales loads were a primary means of compensating brokers for services provided to investors, in recent years brokers have increasingly been compensated through "asset-based" fees).

n.100  NASD Conduct Rule 2830(d)(5). The NASD rule defines "service fees" as "payments by [a fund] for personal service and/or the maintenance of shareholder accounts." NASD Conduct Rule 2830(b)(9). These services could include responding to customer inquiries, providing information on investments, and reviewing customer holdings on a regular basis, but would not include sub-transfer agency services, sub-accounting services, or administrative services. See NASD Sales Charge Rule Q&A, supra note 73, at Question #17. The NASD rule does not address whether "service fees" are required to be included in 12b-1 plans. Id. at Question #25. However, we understand that funds continue to include "service fees" as distribution expenses under rule 12b-1, presumably because the stream of payments (often called "trail commissions") may act as an inducement to intermediaries' sales personnel to sell fund shares and, arguably, because fund intermediaries would provide these services in the ordinary course of business regardless of whether they receive compensation from the fund (which may be just one of many other investments held by the intermediary's clients).

n.103  See NASD Conduct Rule 2830(d)(4). Discount brokers and fund supermarkets typically hold one account with the fund in the name of the broker, and then provide sub-accounting for individual shareholder holdings of fund shares. See Mutual Fund Redemption Fees, Investment Company Act Release No. 26782 (Mar. 11, 2005) [70 FR 13328 (Mar. 18, 2005)] at text following n.10 ("Rule 22c-2 Adopting Release").


## 75 Fed. Reg. 47,072 & n.111

The roundtable discussions and the nearly 1,500 comment letters we received on

the topic greatly informed our understanding of the operation of rule 12b-1 and the role it plays in the distribution of mutual funds today.

Many of the panelists and commenters representing fund management companies and intermediaries contended that the rule had benefited both funds and investors in substantial ways, and that the central problem lay with the rule's outdated requirements.[FN110] Some of these commenters asserted that rule 12b-1 provides a cost-efficient way of paying for services that investors want and need (i.e., by "mutualizing" them), including ongoing services from financial professionals and access to funds through fund supermarkets and retirement platforms.[FN111] Several participants thought that investors preferred paying rule 12b-1 fees to paying front-end loads, and equated a decision to invest in a class of shares with a 12b-1 fee with a decision to pay a sales load over time.[FN112] They asserted that rule 12b-1 fees were, at least in part, responsible for bringing down the overall cost of investing in funds.[FN113]

Many of these panelists emphasized the importance of 12b-1 fees to pay for services that matter to investors.[FN114] They noted that platforms such as supermarkets and retirement plans use 12b-1 fees to support their service infrastructures, including interactive Web sites, investment allocation tools, and other educational materials that are currently made available to, and benefit, fund investors in those channels.[FN115] Several roundtable participants and commenters also noted that 12b-1 fees paid to platforms have enabled small funds and no-load funds to compete successfully for a broader segment of the investing population in many distribution channels, which is critical to their distribution strategies.[FN116] This development, they contended, has been beneficial because it increases competition and helps spur innovation.[FN117]

Other panelists were not as sanguine about rule 12b-1. They argued that even though 12b-1 fees may pay for worthwhile services to investors, the costs of those services are obscured in the fund's expense ratio in a way that makes the costs less transparent and the services less likely to be priced competitively.[FN118] They questioned the necessity of having these types of distribution charges embedded as a fund expense. In addition, they questioned whether investors are aware of and making informed choices about the services they pay for through the 12b-1 fee, which many panelists agreed lacks the prominence of a front-end load.[FN119] Most commenters believed that better disclosure and more effective communication of 12b-1 fees, and the manner in which they are used, would be useful to investors.[FN120]

One panelist argued that 12b-1 fees have the effect of increasing expense ratios and decreasing investment returns for investors.[FN121] Some suggested that the Commission encourage (or require) that fees to compensate distributors be paid by investors as an account charge (through "demutualization" or "externalization").[FN122] They argued that externalizing these "bundled costs" would make them more visible to shareholders and that unbundling costs and services promotes more efficient pricing of those services.[FN123] Representatives of fund management companies and others countered that such a fee structure already exists in the form of a mutual fund "wrap" account and other types of fee-based service arrangements that charge fees comparable to the maximum 100 basis point 12b-1 fee. They argued that it is more cost-effective and tax-efficient for funds to collect 12b-1 fees and credit the intermediaries, than it is for the intermediaries to charge their clients directly through wrap accounts.[FN124] As discussed above, although more investors today invest in no-load funds and share classes, this trend does not reflect the decreasing use of intermediaries, but rather the growing use of wrap accounts and other arrangements between intermediaries and investors that entail separate fees.[FN125]

Several participants suggested that the term "12b-1 fee" causes confusion because it encompasses so many different activities.[FN126] Most roundtable participants agreed that greater transparency and better communication of what 12b-1 fees are and how they are used are vital to enabling investors to make optimal choices among the alternatives offered to them.

n.111  See, e.g., Roundtable Transcript, supra note 109, at 111-113 (Paul Haaga, Capital Research Management).


**75 Fed. Reg. 47,074 & n.141**

We also heard concerns that significant changes could disrupt arrangements that are today deeply embedded in mutual fund sales and distribution networks, including those that finance the operation of fund supermarkets, retirement plan platforms, and financial planning. These arguments supported the preservation of business models that were developed around an existing regulatory framework, but tended to discount some of the more troubling aspects of distribution arrangements that affect millions of American investors. We have evaluated all of these views in developing this proposal, which is designed, as discussed further below, to enhance transparency and fairness to the benefit of investors.

We do not believe that it would benefit fund investors to return to the era in which they paid a substantial front-end sales load and did not have access to various alternative forms of distribution payment arrangements. Denying investors the ability to select alternate distribution methods or to pay for distribution services over time is not a goal of this rulemaking. Thus, we are not proposing in this rulemaking to prohibit the use of fund assets to pay sales costs. We remain concerned, however, about the conflicts of interest that arise when fund assets are used for distribution, and that fund directors monitor those conflicts. We also do not believe that merely modifying the "factors" for director consideration in order to accommodate existing industry practices would sufficiently address the issues we have identified with the use of fund assets to pay for distribution under rule 12b-1.

Therefore, we are proposing a new approach to asset-based distribution fees (i.e., 12b-1 fees) that is designed to benefit fund shareholders while minimizing disruption of current arrangements. Specifically, our proposal would explicitly recognize that a portion of asset-based distribution fees (i.e., asset-based sales charges) functions like a sales load that is paid over time, and thus should be subject to the requirements and limitations that apply to traditional sales loads.[FN141] Limits on asset-based sales charges would be applied to the amounts paid by each investor (rather than amounts paid by the fund) in order to assure that each shareholder would pay only his or her proportionate share of distribution related costs. In addition, we propose to require funds to identify for shareholders that portion of asset-based distribution fees (today's 12b-1 fees) that operates as a substitute for a sales load and thus facilitate comparison with the distribution related costs of other funds or classes of shares. The proposed new rule and rule amendments would replace current rule 12b-1.

We describe the details of our proposals in the next sections of this Release. In Section III.M of this Release, we describe the anticipated impact of these proposals on investors, fund managers and directors, broker-dealers, and other intermediaries.

A. Summary of Our Proposals

The new approach we propose would, like NASD Conduct Rule 2830, differentiate between the two constituent parts of current 12b-1 fees (asset-based sales charges and service fees). Under proposed new rule 12b-2, funds could continue to use a limited amount of fund assets to pay for distribution related expenses.[FN142] The maximum amount of this "marketing and service fee" would be tied to the service fee limit imposed by the NASD sales charge rule (currently 25 basis points per

year).[FN143] Unlike the service fee, however, funds could use this portion of fund assets for any distribution related expenses. This approach would serve the interests of investors and other members of the fund marketplace by providing a means of paying for participation in fund supermarkets and the maintenance of shareholder accounts, among other things, and allowing funds to support their own marketing and distribution strategies.

We also propose to permit funds to deduct from fund assets amounts in excess of the marketing and service fee, and we would treat these amounts as an alternative means to pay a front-end sales load. To accomplish this, we propose to amend rule 6c-10 (which permits funds to charge deferred loads) to permit this asset-based sales charge, which we would call an "ongoing sales charge." The proposed amendments in effect would treat ongoing sales charges as another form of sales load.

Our proposed amendment to rule 6c-10 would not require any special board findings (such as those required by rule 12b-1), a written plan, annual renewal, or automatic termination provisions, or impose fund governance requirements. Instead, we would apply limits on asset-based sales charges by referencing the front-end load imposed by the fund or, if none, by referencing the aggregate sales load cap imposed under the NASD sales charge rule for funds with an asset-based sales charge and service fee (currently 6.25 percent).[FN144]

These limits would be based on the cumulative amount of sales charges that an investor pays in any form (front-end, deferred, or asset-based). Under the proposed rule amendment, a fund imposing an ongoing sales charge would be required to automatically convert fund shares to a class of shares without an ongoing sales charge no later than when the investor has paid cumulative charges that approximate the amount the investor otherwise would have paid through a traditional front-end load (or, if none, the NASD rule 6.25 percent cap).[FN145] The proposed amendment would shift the focus of the limits from how much fund underwriters may collect in asset-based sales charges (a fund-level cap) to how much individual shareholders will pay either directly or indirectly (a shareholder account-level cap).

We are also proposing to amend rule 6c-10 to permit an alternative, elective distribution model. In this new model, intermediaries of funds could impose charges for sales of the fund's shares at negotiated rates, much like they charge commissions on sales of exchange-traded funds (ETFs) [FN146] and other equity securities. The proposed rule would permit fund intermediaries to charge sales

32

loads other than those established by the fund underwriter and disclosed in the fund prospectus.

n.141  We acknowledged this, at least implicitly, when we approved the NASD sales charge rule amendments in 1992. We observed that the "purpose of the revised maximum sales charge rule is to create 'approximate economic equivalency' as to the maximum sales charges for different types of mutual funds." See 1992 NASD Rule Release, supra note 66, at section V. The Commission believed the amendments would, among other things, promote fairness by assuring "some degree of parity" between the sales and sales-promotion expenses charged by traditional load classes and classes that assess 12b-1 fees. Id.

### 75 Fed. Reg. 47,076 & n.161

The marketing and service fee would be specifically identified and fully disclosed in the fund prospectus fee table as a type of operating expense.[FN158]

Funds may use the proceeds of the marketing and service fee to pay for, for example, the ongoing cost of participation on a distribution platform such as a fund supermarket, giving investors a convenient way of buying shares; for paying trail commissions to broker-dealers in recognition of the ongoing services they provide to fund investors; or for paying retirement plan administrators for the services they provide participants (and which relieve the fund from providing such services). In addition, funds (including no-load funds) may use the marketing and service fee to pay for shareholder call centers, compensation of underwriters, advertising, printing and mailing of prospectuses to other than current (i.e., prospective) shareholders, and other traditional distribution activities.[FN159]

Under the proposed rule, the marketing and service fee could not, on an annual basis, exceed the limits on service fees prescribed by the NASD sales charge rule (currently 0.25 percent of fund net assets annually). Any charge in excess of 0.25 percent per year would be considered an asset-based sales charge and subject to the overall sales load limitations established by the NASD sales charge rule and other requirements, as discussed in the next section of this Release. We chose to propose this limit because it would permit, without change, the continuation of many important uses of 12b-1 fees that may benefit investors. It also represents the line the NASD sales charge rule draws between a limited distribution fee and a sales charge—25 basis points currently is the limit that a fund may deduct and still call itself a "no-load" fund.[FN160] The NASD drew upon its knowledge and expertise as the self-regulatory organization of the brokerage industry to develop these

limits, which we approved as an appropriate exercise of the NASD's congressional mandate to prevent excessive sales charges on mutual fund shares.[FN161] Accordingly, we have used the NASD limit on service fees in formulating our proposal to distinguish a limited distribution fee from a sales charge.

We request comment on the proposal to limit the marketing and service fee to the maximum service fee permitted under the NASD sales charge rule.

• Would a different term, such as "sales/service fee," be more appropriate? If so, why? Would a different limit be more appropriate? Should the limit be higher (e.g., 30 or 50 basis points) or lower (e.g., 10 or 20 basis points)? If so, why? Should the limit be set with reference to the NASD rule, which would allow the NASD (now FINRA) to change the level, pending approval by the Commission?

We understand that many share classes either do not currently charge 12b-1 fees in an amount that exceeds 25 basis points, or charge none at all.[FN162] Many funds use these fees to compensate intermediaries for providing customers with follow-up information and account maintenance services pursuant to the NASD sales charge rule. In such cases, the shareholder service fees may in fact have a significant distribution component, which is why funds often pay them pursuant to a rule 12b-1 plan.[FN163] We do not propose, however, to limit the use of the marketing and service fee to these types of services (i.e., those described in the NASD sales charge rule), so that funds may continue to use fund assets to pay for promotional and advertising expenses.

• Should we limit the marketing and service fee to expenses incurred for "shareholder services" as defined in the NASD sales charge rule? More generally, do investors in omnibus accounts receive equivalent levels of service relative to investors who invest directly and pay similar 12b-1 fees? Is there a disparity in service, and if so, why? What implications does this have for our proposal?

Under the proposal, "distribution activity" would be defined as "any activity that is primarily intended to result in the sale of shares issued by the fund, including, but not necessarily limited to, advertising, compensation of underwriters, dealers, and sales personnel, the printing and mailing of prospectuses to other than current shareholders, and the printing and mailing of sales literature." [FN164] The proposed rule does not attempt to delineate permissible distribution expenses because our experience with rule 12b-1 has shown that new distribution methods continually evolve.

34

• Are the identified activities appropriately considered "distribution activities"? Should we provide more guidance regarding specific expenditures that are distribution expenses and others that are not, as some commenters have suggested? [FN165] Should we define "distribution activity" differently? If so, how should we define it? Should funds be permitted to classify only certain expenses as marketing and service fees? [FN166] If so, what types of expenses?

n.161  See 1992 NASD Rule Release, supra note 66, at section V; 15 U.S.C. 80a-22(b).


**75 Fed. Reg. 47,079**

If a fund offers a class of A shares, the maximum amount of sales charges it could collect from an investor in B or C share classes would be the amount the investor would have paid had the investor invested in A shares with the maximum front-end load.[FN186] By setting the maximum front-end load, the fund, its board, and the principal underwriter would also establish the maximum amount of the cumulative ongoing sales charge.[FN187]

As we noted above, sales loads rarely approach the maximum of 8.5 percent permitted under the NASD sales charge rule,[FN188] yet we understand that rule 12b-1 fees often are charged at the maximum rate permitted, currently 100 basis points annually.[FN189] One reason may be that 12b-1 fees are deducted in smaller amounts, over longer periods of time, and indirectly from fund assets, and thus, to investors, they may be less salient and not as well understood when compared to front-end sales loads, and the fees themselves appear to be subject to less market pressure.[FN190] Thus, some of our roundtable panelists and commenters urged that the Commission "externalize" asset-based sales charges (i.e., require that such charges be paid directly from a shareholder's account, rather than indirectly from fund assets) so that the amounts investors are paying would be more noticeable and transparent.[FN191] Our proposed approach in rule 6c-10(b) would, instead, tie the maximum amount of the ongoing sales charge to the front-end load. To the extent that competitive pressures result in funds imposing lower front-end loads, these pressures should transfer to ongoing sales charges and could result in lower charges or charges that more accurately reflect the value of the distribution services provided. In addition, this proposed approach is designed to reduce the potential that some long-term shareholders will pay a significantly disproportionate share of the distribution costs of a fund.

We request comment on the definition and function of the reference load.

• Should we establish a maximum limit on the amount of ongoing sales charge that may be deducted? Could this approach encourage funds to offer a share class with a high front-end sales load in order to charge a higher cumulative ongoing sales charge on other classes? Are the NASD rule's limits on sales charges a sufficient or appropriate guide for the reference load? The NASD sales charge limits apply at the fund level on an aggregate basis, whereas the ongoing sales charge limits of our rule proposal would apply at the level of individual accounts to limit the cumulative asset-based sales charge paid by any single investor. Should the proposed rule's reliance on the NASD sales charge limits be adjusted to take into account the difference in application? For example, would the proposal's cap have a more constraining effect on the amount of cumulative ongoing sales charges deducted by a fund? If so, should the proposal's cap be increased above the NASD cap to compensate for this? If not, what should the limits be?

• Alternatively, should we assign fund boards the responsibility of establishing the maximum amount of ongoing sales charges that a fund may deduct? If so, what standards or factors would be relevant to their determination?

b. Funds Without a Front-End Load Class

Some funds, of course, might not offer a class of shares with a front-end load, or might offer the front-end load class with asset-based distribution fees of more than 25 basis points (thus disqualifying the front-end load from acting as a reference load). We are proposing that, in these circumstances, the reference load would be the maximum sales charge permitted under NASD Conduct Rule 2830(d)(2) for funds with an asset-based sales charge and a service fee, which currently is 6.25 percent of the amount invested.[FN192]

We chose this rate because it is the current limit for funds with this type of sales charge structure under the NASD rule, which we approved in 1992 as not being excessive.[FN193] We believe linking the reference load to the NASD limits may minimize operational burdens of the amendment because funds, their underwriters, and broker-dealers are already familiar with the NASD sales charge rule limits and have structured their systems accordingly.[FN194] Under our proposal, funds could provide for lower sales loads (through shorter conversion periods) if they wish.[FN195]

• We request comment on whether the rule should permit the NASD maximum

sales charge of 6.25 percent to serve as a default reference load for funds that do not offer a class of shares without an ongoing sales charge. If the rule should not permit this load, what should be the limit? We are not proposing to use the limits in the NASD sales charge rule for investment companies without an asset-based sales charge (as much as 8.5 percent).[FN196] This is because, under our proposed rule, each fund charging an ongoing sales charge by definition charges an asset-based sales charge of more than 25 basis points.


**75 Fed. Reg. 47,082**

In evaluating the ''fairness and reasonableness'' of the contract, the directors should consider any factors that may be relevant, including whether the fund's distribution networks and overall structure are effective in promoting and selling fund shares given current economic and industry trends, any available breakpoints on advisory fees that may be attained from future growth in fund assets, and any economies or diseconomies of scale that may arise from continued growth of fund assets.[FN214]

• Is this proposed guidance appropriate? Does it provide assistance to fund directors in evaluating ongoing sales charges? Are there other factors that would be relevant to the guidance we propose to provide? Should the guidance link board approval of the principal underwriting contract to board oversight of the use of fund assets for an ongoing sales charge? If not, what standard or requirements should apply to board oversight of ongoing sales charges?

• We request comment on our proposed overall approach to refashioning the role of the board of directors in overseeing asset-based distribution fees.[FN215] Is there a better approach we could take? Should we retain a formal role for directors in any rule permitting funds to pay for distribution expenses from fund assets? If so, what should that role be? Should we retain the current rule 12b-1, but update the suggested factors for director consideration in order to provide directors with additional guidance? For example, should the factors specifically recognize that directors may consider that ongoing sales charges provide an alternative to a front-end sales load and, in that sense, benefit shareholders who choose to invest in a share class that has an ongoing sales charge? Should directors, in addition, consider whether these arrangements are structured so that individual shareholders do not bear a disproportionate share of distribution expenses? In this regard, we are particularly interested in the views of fund directors.[FN216]

E. Proposed Amendments to Rule 10b-10: Transaction Confirmations

Rule 10b-10 under the Securities Exchange Act requires broker-dealers to disclose specific information to their customers about securities transactions, including the price at which the transaction was effected, remuneration such as sales charges paid by the customer to the broker-dealer (if it is acting in an agency capacity), and in certain circumstances remuneration received by the broker-dealer from third parties such as a mutual fund or its affiliates.[FN217] The Commission and its staff have taken the position, with respect to mutual fund transactions, that a broker-dealer may satisfy its rule 10b-10 obligations without providing customers with a transaction-specific document that discloses information about sales charges or third-party remuneration, so long as the customer receives a fund prospectus that adequately discloses that information.[FN218] Today, in connection with the other amendments we are proposing to limit cumulative sales charges and help investors make better choices when selecting a fund that imposes sales charges, we are also proposing amendments to rule 10b-10 to require disclosure of additional information on transaction confirmations in connection with transactions involving securities issued by mutual funds.[FN219] In addition, we are proposing to amend rule 10b-10 to require disclosures related to callable debt securities, and to eliminate outdated transition provisions.[FN220]

**75 Fed. Reg. 47,095**

We request comment on our proposed treatment of ongoing sales charges in rule 11a-3.

• Are there reasons not to treat a sales load and an ongoing sales charge in the same way when determining the amount of sales load due upon an exchange? Should we require funds to also give credit for any marketing and service fee paid under rule 12b-2 when calculating the sales load due upon an exchange? Should we require funds to also give credit for any 12b-1 fees previously paid on the exchanged shares? If so, should we limit the credit to fees paid in excess of 25 basis points (i.e., the asset-based sales charge component of 12b-1 fees)? Would our proposed amendments to rule 11a-3 result in significant operational difficulties? Is there a simpler or less costly method of accomplishing the goal of ensuring that investors receive credit for ongoing sales charges during rule 11a-3 exchanges than the approach we are proposing?

2. Deferred Sales Loads Upon Exchange

Rule 11a-3 prohibits funds from imposing a deferred sales load at the time of an exchange.[FN332] The provision was designed to remove the incentive for fund underwriters to induce shareholders to make exchanges in order to accelerate its collection of a deferred sales load.[FN333] Under the rule, a fund may not treat an exchange as a redemption for purposes of assessing a deferred sales load, and thus may impose a deferred sales load only when the acquired shares are ultimately redeemed.[FN334] When the deferred load is imposed, the fund must determine the amount of the deferred load by "tacking" (i.e., adding) the time the shareholder held shares of the exchanged fund to the time the shareholder held shares of the acquired fund.[FN335] However, in determining the amount of the deferred load, a fund may toll (i.e., exclude) the time the acquired shares are held if a new sales load is not charged upon the exchange and credit is given to the investor for any 12b-1 fees paid with respect to the acquired shares.[FN336]

We propose to modify the "tolling" provision of rule 11a-3 to permit funds, in determining the amount of deferred sales load due upon ultimate redemption, to provide credit only for the sales charge component of any asset-based distribution fee, i.e., the ongoing sales charge. Because the marketing and service fee is not considered to be an alternative sales charge under our proposal, we would not require funds to give credit for such fees when determining the sales load payable upon an exchange. In addition, we propose to modify the rule to clarify that funds must provide credit for ongoing sales charges in terms of the cumulative rate of the ongoing sales charge previously paid rather than the amount of fees paid. As discussed previously, we understand that funds generally do not have the ability to track dollar amounts of 12b-1 fees that are attributable to individual shareholder accounts.[FN337] In addition, requiring that credit be given in terms of rates rather than dollar amounts would make rule 11a-3 consistent with the method of calculating maximum sales loads under rule 6c-10(b).[FN338]

• Should rule 11a-3 require funds to give shareholders credit for the payment of any marketing and service fee when relying on the tolling provisions? We request comment on any aspect of our proposed changes to rule 11a-3. Should rule 11a-3 operate in terms of dollar amounts instead of rates? Would it be difficult or costly for funds to comply with the new requirements? Is it difficult or costly for funds today to comply with the tolling provisions of rule 11a-3? Is our understanding correct that funds generally do not have the ability to track dollar amounts of 12b-1 fees? Would it be difficult or costly for funds to track these amounts?

L. Other Proposed Conforming Amendments

1. Rule 17a-8

Rule 17a-8 provides an exemption from section 17(a) of the Act to permit mergers of funds with certain of their affiliated persons, including other funds (affiliated funds), subject to certain conditions.[FN339] Among other requirements, the rule requires the board of the merging fund to have made certain determinations, the surviving fund to keep certain records, and the shareholders of the merging fund to approve of the merger.[FN340] The rule allows for affiliated funds to merge in the absence of a shareholder vote, if, among other conditions, the 12b-1 fees of the surviving company are no greater than the 12b-1 fees of the merging company.[FN341] This condition prevents 12b-1 fees from being instituted or increased as a result of a merger on which the acquired fund's shareholders have not had an opportunity to vote.[FN342] We propose to preserve this protection by amending rule 17a-8 to replace references to rule 12b-1 with references to rule 12b-2(b) or (d) and rule 6c-10(b).[FN343]

• We request comment on this proposed revision. Should we continue to permit affiliated funds to merge in reliance on this provision in light of our new approach to asset-based distribution fees and the different role that fund directors would have in overseeing these fees under our proposal? Is there another approach we should take in amending rule 17a-8 to conform with our proposal?

2. Rule 17d-3

When the Commission adopted rule 12b-1 in 1980, it also adopted rule 17d-3 because a fund's payments for distribution under a rule 12b-1 plan may involve it in a "joint enterprise" with an affiliated person that otherwise would be prohibited by section 17(d) of the Act and rule 17d-1 unless an application regarding the joint arrangement was filed with the Commission and granted by order.[FN344]

**75 Fed. Reg. 47,096 & n.345**

The rule grants an exemption for funds to enter into agreements with certain affiliated persons and the fund's principal underwriter in connection with the distribution of its shares, provided that such an agreement is in compliance with rule 12b-1, among other requirements.[FN345]

We believe that under our proposed new rules, funds should continue to be afforded the exemption provided by rule 17d-3 with respect to distribution

payments made to certain affiliated persons and the principal underwriter, so long as those payments are consistent with the conditions set forth in proposed rule 12b-2 and amended rule 6c-10.[FN346] We therefore propose to revise rule 17d-3(a) to replace the reference to 12b-1 with references to rule 12b-2(b), rule 12b-2(d) and rule 6c-10(b) in order to permit a fund to enter into an asset-based distribution fee arrangement with an affiliated underwriter.[FN347]

• We request comment on any aspect of this proposed revision. Would the revised role of directors in approving asset-based distribution fees under our proposal make this type of exemption less warranted? Is there another approach we should take in revising rule 17d-3 to conform with our proposal?

3. Rule 18f-3

Rule 18f-3 permits funds to offer multiple classes of fund shares. Section (f) of the rule permits funds to convert shares of one class to shares of another class after a specified period of time, provided that, among other things, the expenses (including 12b-1 fees) charged to the converted class are no higher than the expenses of the original share class. We believe that, under our proposed amendments, funds should continue to be able to convert shares under the same conditions. We believe that expenses attributable to proposed rule 12b-2 and proposed amendments to rule 6c-10 should be taken into account when making these conversions, much like rule 12b-1 expenses are today. We therefore propose that rule 18f-3(f)(ii) be amended to delete the reference to 12b-1 fees and replace it with references to fees under rule 12b-2(b), rule 12b-2(d) and rule 6c-10(b).[FN348]

• We request comment on any aspect of this revision. Is there another approach we should take in revising rule 18f-3 to conform with our proposal?

4. Forms N-3, N-4, and N-6

Form N-3 is the registration form used by insurance company separate accounts registered as management investment companies that offer variable annuity contracts. Instruction 2 to Item 7(a) requires separate accounts to disclose, among other things, the principal activities for which 12b-1 payments are made and the total amount spent under a 12b-1 plan in the most recent fiscal year, as a percentage of net assets. We believe that most of the information required to be disclosed by Instruction 2 to Item 7(a) would continue to be useful to investors and the Commission, and thus we propose to amend Instruction 2 to Item 7(a) to

replace references to rule 12b-1 and 12b-1 plans with references to asset-based distribution expenses incurred under rule 12b-2(b), rule 12b-2(d) and rule 6c-10(b). The proposal would eliminate the requirement that registrants disclose the total amount spent in the most recent fiscal year (although this information would continue to be available in funds' financial statements), and would instead require registrants to provide a description of asset-based distribution fees. As discussed above, disclosure of the aggregate total of asset-based distribution fees may not be helpful to investors because it primarily reflects the size of the fund and not the distribution activities that are paid for with these amounts.[FN349] The proposal would retain the requirement that registrants list the principal types of activities for which asset-based distribution fees are charged.

As discussed above, under our proposals funds would not be required to have written "plans" that are supervised and approved by the board of directors. We therefore propose to eliminate paragraphs (ii) and (iii) of Item 21(f) because these items relate to the specific operation of a 12b-1 plan that would no longer exist under our proposal.[FN350]

• We request comment whether we should retain any of these parts of Item 21(f).

We believe, however, that the information required to be disclosed in paragraph (i) of Item 21(f), which requires registrants to disclose the manner in which amounts paid by the registrant under a 12b-1 plan were spent, would continue to be useful to investors and the Commission. This information may be relevant to an investor making an investment decision because it discloses the types of services the fund (and its investors) may receive in exchange for these fees. We propose to amend Item 21(f) to eliminate references to the 12b-1 plan, and instead require disclosure of the principal activities paid for through asset-based distribution expenses incurred under rule 12b-2(b), rule 12b-2(d) and rule 6c-10(b). For the reasons discussed above, we also propose to amend Instruction 5 to Item 26(b)(ii) [FN351] to delete any references to 12b-1 plans.[FN352] However, registrants would be required to provide the same information with respect to expenses and reimbursements accrued pursuant to rule 12b-2(b), rule 12b-2(d) and rule 6c-10(b).

• We request comment on any aspect of these proposed revisions to Form N-3.

We are also proposing to amend the fee tables in Forms N-4 and N-6, the registration forms used by insurance company separate accounts registered as unit investment trusts that offer variable annuity contracts and variable life insurance contracts, respectively. We propose to replace existing references to "distribution

42

[and/or service] (12b-1) fees" with a new defined term, "asset-based distribution fees." We also propose to add new instructions that would define the term "asset-based distribution fee" as "all asset-based distribution fees paid under rule 12b-2(b), rule 12b-2(d), and rule 6c-10(b)."

• We request comment on these proposed revisions to Forms N-4 and N-6.

n.345  The Commission stated that prior review and approval as required by rule 17d-1 would not be necessary if the safeguards of rule 12b-1 have already been applied to the arrangement. 1979 Proposing Release, supra note 33. The exemption does not extend to arrangements for the joint sharing of distribution costs by funds that are affiliates (or affiliates of affiliates) of each other (e.g., mutual funds in the same fund complex). 1980 Adopting Release, supra note 23, at section titled "Proposed Rule 17d-3."


**75 Fed. Reg. 47,098**

Investors who do not want to pay 12b-1 fees have available to them a range of funds that do not charge these fees, although investors in these funds may pay distribution costs through other means. In recent years, expenses of funds as a group have begun to decline as more investors have sought funds with lower expenses, and as index funds and exchange-traded funds have become more popular with investors.[FN363] We believe that more transparent disclosure of fund expenses may help investors to better evaluate different fund options. This transparency also may lead to greater competition among funds and ultimately downward pressure on fund costs.

2. Fund Intermediaries and Distributors

We received comments from a large number of financial planners, broker-dealer representatives, and brokerage firm managers who expressed concern that the "trail commissions" or "service fees" they receive from the proceeds of 12b-1 fees might be cut off as a result of this rulemaking, and they could no longer provide ongoing services to their customers.[FN364] These proposals should address these concerns.[FN365] Approximately 80 percent of fund assets that are subject to 12b-1 fees are charged 12b-1 fees of 25 basis points or less. They therefore would not be subject to the portion of our rule proposals related to ongoing sales charges.[FN366]

Intermediaries that may be affected by our proposed rules are primarily broker-dealers that currently receive payments from the sale of classes of fund shares that pay 12b-1 fees that exceed 25 basis points (e.g., class C shares). Under our rule proposals, funds could continue to pay broker-dealers 12b-1 fees at previously approved levels for grandfathered shares.[FN367] For shares issued after the compliance date, fund underwriters would likely reduce the stream of payments when the shares convert to a class that pays no more than 25 basis points of asset-based distribution expenses (e.g., class A shares) or else find a different source of revenue to fund the payments. The amount of time before conversion would depend on the amount of sales load charged on the class A shares, i.e., the reference load, and the rate of the ongoing sales charge (the amount of asset-based distribution fees that exceeds 25 basis points). Thus, for example, if a fund offers class A shares with a 5.25 percent front-end load and class C shares with an ongoing sales charge of 75 basis points, then the class C shares would have to convert no later than seven years from the time of purchase.[FN368] This consequence flows from the premise (discussed above) that amounts paid by funds in excess of the marketing and service fee are charged as an alternative to sales loads, and thus are properly limited by the NASD sales load caps.

Some commenters and roundtable participants described "level load" classes of shares as providing for an alternative to front-end or spread-load arrangements, and thus acknowledged them as a form of sales load designed to support distribution of fund shares.[FN369] Others, however, have asserted that the 12b-1 fees associated with level load funds (often 100 basis points) pay for valuable ongoing investment advice provided by the intermediary, and are an alternative to mutual fund wrap fee programs, which often charge a 100 basis point (or greater) wrap fee.[FN370] The use of fund assets to finance personal advisory services (rather than support fund distribution), however, raises issues regarding whether those advisory services provided by an intermediary to a customer years after the sale ought to be payable from fund assets. Such expenditures arguably do not relate to the operation of the fund or to the distribution of its shares.

• We request comment on these matters. Are asset-based distribution fees associated with level load share classes an efficient means to pay for ongoing investment advice?

With respect to level load share class arrangements, roundtable panelists and commenters raised questions regarding the applicability of the Investment Advisers Act of 1940 ("Advisers Act") [FN371] to intermediaries that receive those ongoing fees.[FN372]

44

• We request comment on these matters, and whether the conversion provisions of our proposed rules would appropriately address them by requiring a nexus between the sale of a share of a mutual fund and the amount of ongoing sales charges an intermediary's customer pays through the fund.

Finally, we note that our proposed relaxation of restrictions on retail price competition could provide fund intermediaries with greater control over the pricing of fund shares sold to their customers by permitting intermediaries to establish their own sales loads specifically tailored for their customers.

**75 Fed. Reg. 47,111**

C. Marketing and Service Fee

Proposed rule 12b-2 would allow funds to deduct from fund assets a marketing and service fee of up to the maximum rate of the service fee permitted under NASD Conduct Rule 2830 (currently 0.25% or 25 basis points of net fund assets annually).[FN457] The proposed 25 basis point marketing and service fee could be used for any legitimate distribution related activity including, but not limited to, the continuing shareholder account services encompassed by the NASD service fee.

1. Benefits

We anticipate that proposed rule 12b-2 would benefit investors by permitting funds to continue to pay for: (i) Follow-up services provided to investors by brokers and other intermediaries after the sale has been made; and (ii) a fund's participation in distribution channels that offer investors a convenient way of buying shares, such as fund supermarkets [FN458] and retirement plans.[FN459]

We anticipate that our proposal would also benefit funds and their directors, and ultimately fund shareholders, by eliminating the procedural requirements of rule 12b-1. Under proposed rule 12b-2, boards of directors of funds that deduct a marketing and service fee would not be required to adopt a 12b-1 plan or annually approve it. As a result, funds and their advisers would no longer incur many of the costs of creating a 12b-1 plan, preparing quarterly and fiscal year reports of plan expenditures, or preparing materials that support the specific findings that fund boards are required to make annually in order to approve a 12b-1 plan, as discussed

in more detail in Section I of this analysis.

As discussed above, fund boards would have discretion to use fund assets to finance distribution activities within the limits of the rule and their fiduciary obligations to the fund and fund shareholders. Therefore, we anticipate that funds would still incur some costs stemming from director review of arrangements paid for through the marketing and service fee. Our understanding is that, in general, funds pay their directors on an annual or per meeting basis, and we do not expect that the directors will reduce the frequency of their meetings as a result of the proposed marketing and service fee. Based on this assumption, we estimate that funds that currently charge a 12b-1 fee of 25 basis points or less will likely not realize significant cost savings as a benefit deriving from our proposal.

## NASD Rule 2830(b)(8)(A)

(8) "Sales charge" and "sales charges," as used in paragraph (d), shall mean all charges or fees that are paid to finance sales or sales promotion expenses, including front-end, deferred and asset-based sales charges, excluding charges and fees for ministerial, recordkeeping or administrative activities and investment management fees. For purposes of this Rule, members may rely on the sales-related fees and charges disclosed in the prospectus of an investment company. (A) An "asset-based sales charge" is a sales charge that is deducted from the net assets of an investment company and does not include a service fee.

## NASD Rule 2830(b)(9)

(9) "Service fees," as used in paragraph (d), shall mean payments by an investment company for personal service and/or the maintenance of shareholder accounts.

## NASD Rule 2830(d)(2)(E)

(d) Sales Charge
No member shall offer or sell the shares of any open-end investment company, any closed-end investment company that makes periodic repurchase offers pursuant to Rule 23c-3(b) under the 1940 Act and offers its shares on a continuous basis pursuant to Rule 415(a)(1)(xi) under the Securities Act of 1933, or any "single payment" investment plan issued by a unit investment trust (collectively

46

"investment companies") registered under the 1940 Act if the sales charges described in the prospectus are excessive. Aggregate sales charges shall be deemed excessive if they do not conform to the following provisions:
(2) Investment Companies with an Asset-Based Sales Charge
(E) No member shall offer or sell the shares of an investment company with an asset-based sales charge if:
(i) The amount of the asset-based sales charge exceeds .75 of 1% per annum of the average annual net assets of the investment company; or
(ii) Any deferred sales charges deducted from the proceeds of a redemption after the maximum cap described in subparagraphs (A), (B), (C) and (D) hereof, has been attained are not credited to the investment company.


## Federal Rule of Civil Procedure 12(b)(6)

(b) How to Present Defenses. Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:
(6) failure to state a claim upon which relief can be granted; and
. . .
A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed. If a pleading sets out a claim for relief that does not require a responsive pleading, an opposing party may assert at trial any defense to that claim. No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion.


## Federal Rule of Civil Procedure 15

(a) Amendments Before Trial.
(1) Amending as a Matter of Course. A party may amend its pleading once as a matter of course within:
(A) 21 days after serving it, or
(B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.
(2) Other Amendments. In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.
(3) Time to Respond. Unless the court orders otherwise, any required response to

an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later.

(b) Amendments During and After Trial.
(1) Based on an Objection at Trial. If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.
(2) For Issues Tried by Consent. When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move--at any time, even after judgment--to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

(c) Relation Back of Amendments.
(1) When an Amendment Relates Back. An amendment to a pleading relates back to the date of the original pleading when:
(A) the law that provides the applicable statute of limitations allows relation back;
(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading; or
(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
(i) received such notice of the action that it will not be prejudiced in defending on the merits; and
(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.
(2) Notice to the United States. When the United States or a United States officer or agency is added as a defendant by amendment, the notice requirements of Rule 15(c)(1)(C)(i) and (ii) are satisfied if, during the stated period, process was delivered or mailed to the United States attorney or the United States attorney's designee, to the Attorney General of the United States, or to the officer or agency.

(d) Supplemental Pleadings. On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any

48

transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

## Federal Rule of Civil Procedure 59(e)

(e) Motion to Alter or Amend a Judgment. A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment.

## Federal Rule of Appellate Procedure 10(c)

(c) Statement of the Evidence When the Proceedings Were Not Recorded or When a Transcript Is Unavailable. If the transcript of a hearing or trial is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement must be served on the appellee, who may serve objections or proposed amendments within 14 days after being served. The statement and any objections or proposed amendments must then be submitted to the district court for settlement and approval. As settled and approved, the statement must be included by the district clerk in the record on appeal.

## District of Arizona Local Rule 15.1

A party who moves for leave to amend a pleading, or who seeks to amend a pleading by stipulation and order, must attach a copy of the proposed amended pleading as an exhibit to the motion or stipulation, which must indicate in what respect it differs from the pleading which it amends, by bracketing or striking through the text to be deleted and underlining the text to be added. The proposed amended pleading is not to incorporate by reference any part of the preceding pleading, including exhibits. If a motion or stipulation for leave to amend is granted, the party whose pleading was amended must file and serve the amended pleading on all parties under Rule 5 of the Federal Rules of Civil Procedure within fourteen (14) days of the filing of the order granting leave to amend, unless the Court orders otherwise.

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/    Kirstin E. Largent